1

2

3

4

5

6

7

8

**UNITED STATES FEDERAL DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

RUTHANNA SHIRLEY,
JOHNATHAN HONE, CARLY
PETERS, CHARLES FRADY,
MARCUS SANCHEZ, MORGAN
WINES, SAMUEL KOLB,
STEPHEN J. ANDERSON,
THOMAS MOATS, TRENTON DE
BOER, DONALD BRADLEY
ALLEN, JOSHUA BELTZ, ERIC
OSWALD, DREW DELOZIER,
LINDA LOPEZ, PAUL CHERRY,
ISAAC STUTES, JULI ANDERSON,

Plaintiffs,

vs.

WASHINGTON STATE
DEPARTMENT OF FISH AND
WILDLIFE, a Washington State
Governmental Agency; KELLY
SUSEWIND, an individual, AMY
WINDROPE, an individual, LONNIE
SPIKES, an individual, STEVE
BEAR, an individual, CRAIG
BURLEY, an individual,

Defendants.

**CASE NO. 3:23-cv-05077**

**FIRST AMENDED
COMPLAINT**

JURY DEMANDED

## I.    <u>INTRODUCTION</u>

1.    Plaintiffs are eighteen (18) former State employees who were
wrongfully denied accommodations and terminated for non-
compliance with a new State requirement for COVID-19 vaccination,
in violation of their Constitutional and statutory rights.  Plaintiffs come
to this Court to be made whole.

## II.    <u>PARTIES</u>

FIRST AMENDED COMPLAINT         2

2.    Defendant Washington State Department of Fish and Wildlife ("WDFW" or the "Department") is a governmental agency of the State of Washington.

3.    Defendant Kelly Susewind is Director of the Department, and is an employer, officer, vice principal and/or agent for purposed of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Susewind performed the acts and omissions complained of herein to advance his career and/or for his personal benefit and the benefit of his marital community.

4.    Defendant Amy Windrope is Deputy Director of the Department, and is an employer, officer, vice principal and/or agent for purposes of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Windrope performed the acts and omissions complained of herein to advance her career and/or for her personal benefit and the benefit of her marital community.

5.    Defendant Lonnie Spikes is Director Human Resources with WDFW, and is an employer, officer, vice principal, and/or agent for purposes of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Spikes performed the acts and omissions complained of herein to

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

advance his career and/or for his personal benefit and the benefit of his marital community.

6.  Defendant Steve Bear, Chief of WDFW Police, and is an employer, officer, vice principal, and/or agent for purposes of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Bear performed the acts and omissions complained of herein to advance his career and/or for his personal benefit and the benefit of his marital community.

7.  Defendant Craig Burley, Department Deputy Director for Fish Program, and is an employer, officer, vice principal, and/or agent for purposes of Wash. Rev. Code § 49.52.070; upon information and belief, Defendant Burley performed the acts and omissions complained of herein to advance his career and/or for his personal benefit and the benefit of his marital community.

8.  Plaintiff Ruthanna Shirley was a Fish and Wildlife Biologist 2, who during employment with the Department was a resident of Washington State, and who was granted a religious exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and was terminated by the Department.  Ms. Shirley had verifiable natural immunity through a positive antibody test and

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

performed her job primarily outdoors with supervisory responsibilities and data analysis responsibilities easily performed remotely.

9.    Plaintiff Johnathan Hone was a Fish and Wildlife Biologist 2, who during employment with the Department was a resident of Washington State, was granted a religious exemption from the Department's vaccination requirement, but was wrongfully denied an accommodation and was terminated by the Department. Mr. Hone's job was performed primarily outdoors with supervisory responsibilities and data analysis responsibilities easily performed remotely.

10.    Plaintiff Carly Peters was a Fish and Wildlife Police Officer, who during employment with the Department was a resident of Washington State, and who was granted both a religious and medical exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and was terminated by the Department. Ms. Peters had verifiable natural immunity and performed her job entirely outdoors alone in her patrol vehicle.

11.    Plaintiff Charles Frady was a Fish and Wildlife Biologist 3, who during employment with the Department was a resident of Washington State, and who was granted both a religious and medical exemption from the Department's vaccination requirement but was wrongfully denied an

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

accommodation and was terminated by the Department.  Mr. Frady's job was performed primarily outdoors with supervisory and data analysis responsibilities easily performed remotely, and he had both verifiable natural immunity as confirmed through a positive antibody test and a positive COVID-19 test.

12.     Plaintiff Marcus Sanchez was a Fish and Wildlife Police Officer, who during employment with the Department, was a resident of Washington State, and who was granted a religious exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and was terminated by the Department. Mr. Sanchez's work was performed primarily outdoors alone in his patrol vehicle.

13.     Plaintiff Morgan Wines was a Fish and Wildlife Police Officer, who during employment with the Department was a resident of Washington State, and who was granted a religious exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and terminated by the Department.  Ms. Wines performed her work primarily outdoors, alone, in her patrol vehicle, and has verifiable natural immunity as confirmed through a positive COVID-19 antibody test.

FIRST AMENDED COMPLAINT            6

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

14.    Plaintiff Samuel Kolb was a Fish and Wildlife Biologist 3, who during employment with the Department was a resident of Washington State, and who was granted a religious exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and terminated by the Department.  Mr. Kolb worked outdoors but was told he was denied an accommodation because he would have to meet with his supervisor indoors.

15.    Plaintiff Stephen J. Anderson was a Fish and Wildlife Technician 2, who during employment with the Department was a resident of Washington State, and who was granted a religious exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and terminated by the Department. Mr. Anderson worked almost exclusively outdoors.

16.    Plaintiff Trenton De Boer was a Fish and Wildlife Biologist 2, who during employment with the Department was a resident of Washington State, and who was granted a religious exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and terminated by the Department. Mr. De Boer worked primarily outdoors with supervisory and data analysis responsibilities which could easily be performed remotely.

FIRST AMENDED COMPLAINT            7            ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

17.  Plaintiff Thomas Moats was a Fish and Wildlife Police Officer, who during employment with the Department was a resident of Washington State, and who was granted a religious exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and terminated by the Department.  Mr. Moats worked primarily outdoors alone in his patrol vehicle and had demonstrable natural immunity confirmed through a positive COVID-19 test.

18.  Plaintiff Donald B. Allen was a Fish and Wildlife Scientific Technician 3, who during employment with the Department was a resident of Washington State, and who retired prematurely under duress after he was told by the Department that there were no accommodations available and that he would lose his pension if he did not resign.  Mr. Allen worked almost exclusively outdoors and alone.

19.  Plaintiff Joshua Beltz was a Fish and Wildlife Police Officer, who during employment with the Department was a resident of Washington State, and who was granted a religious exemption from the Department's vaccination requirement but was wrongfully denied an accommodation and terminated by the Department.  Mr. Beltz worked primarily outdoors and alone in his patrol vehicle.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

20.    Plaintiff Eric Oswald is Fish and Wildlife Police Sergeant, who during employment with the Department was a resident of Washington State, was granted a religious exemption but wrongfully denied an accommodation and terminated by the Department.   Mr. Oswald worked alone in his patrol vehicle and worked half his time outdoors and half his time performing administrative duties, which he could easily perform remotely in his patrol vehicle and, in fact, did perform those duties remotely, as he was expected to be in the field and only minimal office time only if needed.

21.    Drew DeLozier, an individual, was a Prescribed Fire Unit Manager who was granted a religious exemption but denied an accommodation and was terminated on November 2, 2021.  Prior to COVID-19, beginning with his hire in 2018, Mr. DeLozier was allowed to work from home part time because he did not have an office.  When he eventually was assigned an office, it was enclosed from the rest of the building, and he had his own bathroom.   Mr. DeLozier also drove his own vehicle. Approximately half of the essential functions of his job involved planning and implementing controlled burns to remove fuel from the ground, were performed outdoors, oftentimes not even in the company of others, and the remaining portion could easilyhave been performed

FIRST AMENDED COMPLAINT                9

through telework.  Defendants failed to provide an interactive and individualized dialogue with Mr. DeLozier, failed to identify an undue burden it would have suffered had he been accommodated, and failed to identify the risk he posed unvaccinated and balance that risk against potential accommodations.  Defendants relied on a job description in denying Mr. DeLozier a dialogue and an accommodation.   Mr. DeLozier performed the same job as Grievant Tyler Kave, who was likewise terminated by Defendants without accommodation but who was awarded full reinstatement and backpay through arbitration, PERC Case No. 134848-P-22.   Defendants claimed Mr. DeLozier, a supervisor, could not perform his supervisory duties remotely, a conclusion specifically rejected in arbitration.

22.  Plaintiff Linda Lopez, an individual, was an administrative Assisant 5 serving in Yakima who was granted a religious exemption but denied an accommodation and terminated on October 18, 2021.  Ms. Lopez performed her job entirely remotely during COVID-19 and had no essential job functions that required presence in the office.  In fact, Ms. Lopez's supervisor, Mike Livingston, fully supported her accommodation.  Ms. Lopez was granted an accommodation, which was later rescinded by Defendants without reason, discussion or

1
2
3
4
5
6
7

explanation.    Defendants failed to provide an interactive and individualized dialogue with Ms. Lopez, failed to identify an undue burden it would have suffered had she been accommodated, and failed to identify the risk she posed unvaccinated and balance that risk against potential accommodations.  Defendants relied on a job description in denying Ms. Lopez an individualized dialogue and an accommodation.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

23. Plaintiff Paul Cherry, an individual, was a Maintenance Mechanic 2 who was granted a religious exemption but denied an accommodation and terminated on November 18, 2021. Mr. Cherry performed approximately 70% of his work outdoors, with an additional 20-30% in the Fabrication Shop.  His in-office work encompassed less than 10% of his job and could have been performed remotely.  Mr. Cherry utilized PPE for 18 months and never contracted COVID-19 or transmitted it to others.  Defendants failed to provide an interactive and individualized dialogue with Mr.Cherry, failed to identify an undue burden it would have suffered had he been accommodated, and failed to identify the risk he posed unvaccinated and balance that risk against potential accommodations.  Defendants relied on a job description in denying Mr. Cherry a dialogue and an accommodation.

23
24

FIRST AMENDED COMPLAINT            11

24.    Plaintiff Isaac Stutes, an individual, was a police officer who was granted a religious exemption but denied an accommodation and terminated.  Defendants ignored Mr. Stutes for more than a month after he was terminated, and he never knew the date of his termination until two months after he was told to deliver his equipment to Port Orchard on his own time and expense.  Mr. Stutes performed his work almost exclusively outdoors, alone, in his patrol vehicle.  Any interaction with others was performed outdoors where social distancing and masking were easily achieved.  Physical arrests were infrequent, perhaps one to two a year.  Mr. Stutes also demonstrated natural immunity through a positive COVID-19 test. Defendants failed to provide an interactive and individualized dialogue with Mr. Stutes, failed to identify an undue burden it would have suffered had he been accommodated, and failed to identify the risk he posed unvaccinated and balance that risk against potential accommodations.  Defendants relied on a job description in denying Mr. Stutes a dialogue and an accommodation.

25.    Plaintiff Juli Anderson, an individual, was a Customer Service Specialist 3 who was granted a religious exemption but denied an accommodation.    Ms. Anderson also had a granted medical accommodation that allowed her to work until her termination date of

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

January 10, 2022.  This was based on a physician's documentation of Ms. Anderson's COVID-19 infection in August 2021, thus demonstrating natural immunity.  Defendants failed to provide an interactive and individualized dialogue with Ms. Anderson, failed to identify an undue burden it would have suffered had she been accommodated, and failed to identify the risk she posed unvaccinated and balance that risk against potential accommodations.  Defendants relied on a job description in denying Ms. Anderson a dialogue and an accommodation.

### III.     JURISDICTION AND VENUE

26.   The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

27.   Venue is proper in this Court under 28 U.S.C. § 1391 where the Department is headquartered within this District and, independently, where Defendant Windrope is a resident of this District.

28.   In compliance with Wash. Rev. Code § 4.92.100, Plaintiffs have submitted Tort Claims with the Washington State Office of Risk Management; sixty days have passed since that submission, during which all statutes of limitations were tolled pursuant to Wash. Rev. Code § 4.92.110.

### IV.     FACTS

FIRST AMENDED COMPLAINT          13

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

29.   Plaintiffs were employed by the Department until they were wrongfully terminated on or about October 18, 2021.[1]

30.   During 2020, several experimental vaccines were developed to limit the effects of COVID-19.

31.   These vaccines were developed quickly to protect those who were at highest risk of getting seriously ill from COVID-19, especially the elderly and those with multiple co-morbidities.

32.   Pfizer officials have admitted that its vaccine was not tested for efficacy at preventing transmission or infection.

33.   It is now universally admitted that the vaccinated can contract and transmit COVID-19.

34.   Recorded "breakthrough" cases (fully vaccinated individuals contracting COVID-19) in Washington State from July 17, 2021, to July 9, 2022, alone totaled 636,766.

35.   Nevertheless, on August 9, 2021, Governor Inslee issued Proclamation 21-14 (with amendments 21-14.1 on August 20, 2021, and 21-14.2 on September 27, 2021, the "Proclamation").

---

[1] Plaintiffs were required to turn in equipment, badges, computer, etc, on October 18, 2021, and were then put on leave without pay while Defendants allegedly conducted a termination process, with an "official" termination date sometime after the October 18, 2021 date.  Official termination dates vary, but effectively each was terminated on or about October 18, 2021.

FIRST AMENDED COMPLAINT                14

36. The Proclamation provided that "State agencies…***must*** provide any disability-related reasonable accommodations and sincerely held religious belief accommodations to the requirements of this Order that are required under the American with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973 (Rehabilitation Act), Title VII of the Civil Rights act of 1964 (Title VII), the Washington Law Against Discrimination (WLAD), and any other applicable law." (emphasis added).

37. Proclamation 21-14.2 likewise provided that state agencies "***must comply*** with the procedures required under the above-noted laws and any other applicable laws when considering and deciding whether to provide accommodations." (emphasis added).

38. Under both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Washington Law Against Discrimination, Wash. Rev. Code. 49.60 ("WLAD"), any employer's restrictions of employees' constitutional rights must be narrowly tailored to further a compelling government interest.

39. The Washington State vaccine mandate imposed by the Proclamation was continuously and zealously enforced, despite a plethora of admissions by government officials and scientists that the vaccines did

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

not stop transmission or infection of the virus, and thus the mandate could not further the goal of stopping the spread of COVID-19.

40. Pursuant to Proclamation 21-14, Defendants demanded their employees be vaccinated or be terminated.

41. Defendant Susewind stated in an "All Staff Teams Video Meeting" on August 12, 2021, that the Proclamation applied to WDFW, "that all our staff need to be fully vaccinated by October 18th," that "our bottom line for us is that this is a *nondiscretionary act we have to implement*…." and that "we don't have a lot of choice or latitude, but you have a commitment from me and [Defendant] Amy [Windrope] to support staff in any way we can and to do this in as compassionate of a way as we can."

42. Defendant Susewind likewise stated he would "do this in as empathetic and supportive way as we can, but I also get to be the one to dump the cold water, too.  We have to comply with the Proclamation and it says that you as a worker are prohibited from working after October 18th and we as employer, or state agencies, are prohibited from allowing you to work after the 18th…"

43. Defendant Susewind likewise stated in that same meeting that "as agency administrators we don't get to question the logic on this one.

FIRST AMENDED COMPLAINT             16

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

We've checked with our attorneys [at OFM], we're told it's legal, we have to follow it, and so…I am feeling sorry for [Defendant] Amy taking all the heat here…"

44. Defendant Susewind fundamentally misrepresented the terms of Proclamation 21-14, as it did not demand vaccination with no ability to work but required agencies to comply with all state and federal law, specifically citing ADA, the Rehabilitation Act, Title VII, WLAD, and any other applicable law." Proclamation 21-14, *supra.*

45. Defendant Susewind authorized the failure to perform an interactive process compliant with those federal and state laws but instead made the predetermined decision that nothing other than vaccination would assure compliance with the Proclamation.

46. Many employees of Defendants, including numerous Plaintiffs, questioned Defendants regarding the known fact that the vaccine did not stop transmission or infection.

47. Defendants refused to acknowledge any such information presented to them by Plaintiffs.

48. In August–September 2021, each Plaintiff completed and submitted a request for religious exemption, and in some cases also for medical

FIRST AMENDED COMPLAINT                17

exemption, from the Department's new employee vaccination requirement.

49. The Department correctly found that each Plaintiff had a sincerely held religious belief that prevented them from receiving the COVID-19 vaccination, and/or had a medical exemption that prevented vaccination, and the Department therefore granted each Plaintiff a nominal exemption from the vaccination requirement.

50. Even though each Plaintiff worked primarily outdoors, which significantly reduces any risk of viral transmission, the Department refused to consider outdoor work as an accommodation to the vaccination requirement.

51. Neither the Department nor any of the individual Defendants can articulate any undue hardship in accommodating any of the Plaintiffs.

52. Independently, the Department could not, and cannot, articulate a relative undue hardship in accommodating the Plaintiffs, as balanced against the negative impact on the Department of incurring staffing shortages. The Department's actions in refusing to accommodate Plaintiffs has resulted in undue hardships to the citizens of Washington, the environment, and the mission of the Agency.

53.   Defendants, after the termination of religious and/or medical exempted employees without accommodation, adopted a policy authorizing the use of unvaccinated volunteers to help fill the extraordinary loss of experience and manpower caused by the mass termination.  This policy demonstrates an arbitrary and capricious policy that terminates religious and medical objectors for no vaccination, ostensibly to prevent the spread of COVID-19, then authorizes the use of unvaccinated volunteers to enter the workplace carrying that same alleged risk.

54.   In fact, Plaintiff Allen was specifically requested to become a volunteer and return to his old job unpaid, even in his unvaccinated status.

55.    Plaintiff Shirley has been ridiculed, harassed, ostracized, and degraded by Defendants upon her return to her job after reinstatement.

56.   In fact, on Ms. Shirley's first day back at work after her successful Arbitration Order reinstating her with backpay, Defendant Spikes facilitated and furthered a hostile work environment when he ordered Ms. Shirley to remove two balloons and flowers that had been placed on her desk anonymously from co-workers welcoming her return. Defendant Spikes alleged to other employees that there was a complaint

FIRST AMENDED COMPLAINT                    19

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

from someone but did not reveal the nature of the complaint or the reason flowers and balloons were offensive.

57. Defendant Spikes ordered Plaintiff Shirley to immediately carry the balloons and flowers to her vehicle, in front of her colleagues, with the specific intent to embarrass and humiliate Ms. Shirley.

58. Other employees acting under authority from Defendants furthered that hostile work environment by chastising employees who acknowledged in a positive way Ms. Shirley's imminent reinstatement and return to the office.

59. Plaintiff Shirley's vaccination status has likewise been revealed to those who would have no way of knowing that information unless Defendants violated Ms. Shirley's privacy and disclosed that private medical information without her consent, which is a violation of federal law.

60. Defendants also held discussions of Plaintiffs' private vaccination status at numerous in-person Regional Management Team meetings with eight or more individuals in attendance, which had no relevance to the issues being discussed.

61. Defendant Burley also created a hostile work environment. Defendant Burley had been the individual who gave approval for many of the

FIRST AMENDED COMPLAINT         20         ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

separation letters, including, but not limited to Plaintiff Shirley's separation letter dated November 29, 2021, which resulted in her termination on December 10, 2021. Defendant Burley gave approval for the denial of accommodations in letters sent to the Department's HR.

62. Defendant Burley called Plaintiff Shirley's supervisor, Eric Winther, on December 6, 2022, shortly after Ms. Shirley's reinstatement was publicly announced, telling Mr. Winther that other people in the Department were allegedly not excited about Ms. Shirley's reinstatement and pending return to her job.

63. Defendant Burley told Mr. Winther that he had been made aware that Ms. Shirley's program colleagues were organizing an alleged return party for her return, and Mr. Winther was ordered to prohibit or cancel such an event.

64. Defendant Burley also manipulated facts regarding Plaintiff Shirley and Hone's timesheets to initiate an investigation against Mr. Winther. The investigation concluded that Mr. Winther had done nothing improper.

65. Such action was taken for discriminatory and harassment purposes against Plaintiffs Shirley and Hone.

FIRST AMENDED COMPLAINT          21

66. Defendants have continued to discriminate against Ms. Shirley with no compelling reason by mandating that she wear a mask and social distance, despite no other individuals having to wear a mask or social distance, in contradiction to CDC policy to treat the vaccinated and unvaccinated alike.

67. Plaintiff Shirley has been told that any violation of her accommodation to social distance and wear a mask could result in her immediate termination. This threat of noncompliance has required Ms. Shirley to proclaim to coworkers who wanted to hug her upon her return to the office that she was not allowed any contact closer than six feet. No one else in the office is wearing a mask or social distancing.

68. Plaintiffs fear this same retaliatory and hostile work environment awaits them upon their potential return to their jobs.

69. Defendant WDFW has a culture of harassment, bullying, and unprofessional conduct that was the subject of a special Performance Audit by the Office of Washington State Auditor, Pat McCarthy, published September 13, 2021. The Audit concluded that there were "real concerns about different forms of unprofessional behavior, communication breakdowns across the agency, and a general lack of confidence in management's ability to address issues."

FIRST AMENDED COMPLAINT                22

70.    Moreover, the Audit concluded that "[e]mployees described widespread unprofessional behavior that has not been successfully addressed, lessening trust in agency leadership."

71.    Some of the Plaintiffs endured humiliating comments and opinions from Defendants who voluntarily injected their opinions and attitudes into what should have been a private medical and faith decision between Plaintiffs, their God, their health care provider, and their families.

72.    Several Plaintiffs were denied medical exemptions from doctors and were routinely told by health care providers that they could not sign medical exemptions for fear of retaliation by the State.

73.    Plaintiff Peters was nursing a newborn baby and requested a medical exemption based on the unknown effects of the vaccine on her child, which was granted by Defendants.  Defendant Bear stated during "coffee chat" TEAMS meetings that Officers were dying from COVID because they were not vaccinated, and that vaccination was like "wearing a seat belt," but he told Ms. Peters that he would not recommend his wife getting the shot if she were nursing.

74.    Defendant Bear also told Ms. Peters that his "AG rep," presumably his Human Resources point of contact within the Attorney General's

FIRST AMENDED COMPLAINT                23

Office, and Defendant Bear both agreed with each other that if their wives were nursing, they would not recommend taking this vaccine. Defendant Bear signed Ms. Peter's letter notifying her of her termination.  Ms. Peters was still nursing her child at that time.

75. Defendant Bear likewise directly pressured Morgan Wines specifically, as well as others, through guilt and shame to take the vaccine, stating that his daughter was a nurse and knew that COVID was killing people. Defendant Bear also sent lengthy numerous emails to Plaintiff WDFW police officers about how the virus was killing officers and that the vaccine would solve the issue.

76. This unrelenting pressure to change their choices was a wrongful intrusion into Plaintiffs' private decisions.

77. At least thirteen individuals working for WDFW, including Plaintiffs Shirley, Kolb, and Hone, were officially granted an accommodation, approved by their supervisors, to continue to work outdoors with specific personal protective equipment, ("PPE"), but then Defendant Windrope rescinded 13 accommodations without reason, justification, or explanation, and demanded the exempt employees receive vaccination.

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

78. Several Plaintiffs, including Mr. Allen, were told by Defendants that there would be no accommodation and that applying for an exemption was a pointless and futile process.

79. Plaintiff Allen was told by the Department that if he did not retire or voluntarily quit, he would lose retirement benefits.

80. Plaintiff Allen was forced to retire, but within two weeks he was asked by an employee of WDFW to check some traps that were part of his regular duties even though he was no longer employed.

81. Plaintiff Allen was also specifically solicited in writing to "volunteer" with WDFW, with WDFW knowing full well his unvaccinated status and his forced retirement.

82. Defendants continued to reach out to Plaintiff Allen for months after his forced retirement to answer questions related to the job Mr. Allen performed.

83. Plaintiffs did not receive an individualized assessment or interactive dialogue to discuss accommodation options prior to the Department's decision to terminate them.

84. This is shown by, at least, the Department's granting of exemption and denial of accommodation only a few days after certain Plaintiffs applied, without any discussion with those Plaintiffs.

FIRST AMENDED COMPLAINT                25

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

85. The Department's failure to provide an individualized assessment through an interactive dialogue was in violation of the Proclamation itself, and of Plaintiffs' constitutional rights and rights under Title VII and WLAD.

86. As stated, by early to mid- 2021, it had become clear that the COVID-19 vaccines developed by Pfizer, Moderna and Johnson & Johnson did not prevent recipients from being infected with, or spreading, COVID-19.

87. Thus, unlike polio or smallpox vaccines, the COVID-19 vaccines did not eliminate infection and could not end transmission of the virus.

88. Many studies confirmed this fact, including studies from the Centers for Disease Control ("CDC"), upon whom Defendants allegedly relied.

89. The single benefit of the COVID-19 vaccine, as even the government admits, is to protect an infected, vaccinated person from severe illness or death, but even that benefit is disputed, and wanes over time to the extent it exists at all.

90. Defendants denied accommodations to Plaintiffs based entirely on Plaintiffs' general job descriptions and did not have any individualized and interactive discussion with the Plaintiffs prior to the decision to terminate.

FIRST AMENDED COMPLAINT            26

91. In some instances, job descriptions which were relied upon by Defendants had not been updated in years. For instance, Mr. Hone's job description was nearly 20 years outdated and had not been updated since 2003, and Ms. Shirley's job description had not been updated since 2017.

92. Even Plaintiffs who had supervisory responsibilities which they had always performed remotely were told they could no longer perform those duties remotely and would have to supervise co-workers in person. Therefore, Defendants claimed no accommodation could be made for supervisors, as a blanket rule.

93. Likewise, Plaintiffs who had often met with their own supervisors remotely before COVID-19 were told they could no longer do so and had to conduct any interaction with their supervisor in person, and thus, could not be accommodated.

94. Defendants purposefully fashioned this new requirement with the end goal of denying exempt employees reasonable accommodations which posed no undue burden and had, in fact, been normal operating procedure prior to the onset of the COVID-19 pandemic.

95. Plaintiffs were denied *Loudermill* hearings.

FIRST AMENDED COMPLAINT          27

96.    Defendants identified no undue hardship that prevented the accommodation of Plaintiffs.

97.    Plaintiffs were told by Defendants that that they posed a "significant risk of harm" in their unvaccinated state such that "no accommodation could be identified to eliminate or reduce the risk of infection" to vaccinated co-workers or the public with which they might come into contact.

98.    Defendants did not identify what that significant risk of harm was.

99.    Defendants refused to accommodate Plaintiffs based on purely speculative harm regarding Plaintiffs' *potential* public interaction, regardless of whether there had been any such public interaction in the past, and regardless of whether any minimal *potential* exposure which might become necessary could be accommodated through the use of personal protective equipment ("PPE").

100.    Defendants denied accommodations knowing that all the Plaintiffs worked outdoors and alone all or nearly all the time.

101.    Defendants were aware at the time of termination of Plaintiff that the COVID-19 vaccines did not protect against infection and were therapeutic, at best.

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

102. Defendants were told directly by some Plaintiffs that numerous published studies concluded that the vaccines did not prevent infection, which Defendants chose to ignore.

103. There were many published studies, even by the CDC, documenting the catastrophic failure of the vaccine that were released prior to the October 18, 2021, termination date.

104. Defendants refused to answer Plaintiffs' inquiries regarding how Plaintiffs posed any greater "risk of harm" vaccinated than unvaccinated, given the abject failure of the vaccines to prevent infection and transmission, and given these studies.

105. As noted *supra*, many Plaintiffs presented a positive COVID-19 antibody test and/or a positive COVID-19 test, but Defendants refused to consider this evidence of natural immunity as a point in favor of accommodating exempt employees. These positive tests were historical and were presented after full recovery.

106. Defendants also refused to consider accommodating Plaintiffs by letting them use PPE on the job, even though all Plaintiffs had already worked nearly 18 months successfully utilizing PPE and social distancing to avoid infection.

FIRST AMENDED COMPLAINT          29

107. Defendant provided no evidence of any COVID-19 transmissions at any time which could be traced to any Plaintiff.

108. The particular egregious nature of the terminations of Plaintiffs is evidenced by the stellar performance record of each in the performance of their jobs. For example, as a supervisor, Plaintiff Shirley was awarded the Leadership Through COVID award in Region 5 in September 2020, the first award of its kind, for her ability to lead her team through COVID teleworking, but then was terminated a year later and denied the ability to telework.

109. Plaintiff Hone and Plaintiff Shirley both received the Public Engagement Award for the Pikeminnow program they supervised for their exemplary performance navigating the pandemic.

110. The Department operated under a 2014 "declaration" by Governor Inslee[2] that encouraged telework and sought to increase the remote public service workforce to 40% by 2017.

**Arbitration Decisions and Awards**

_____

[2] _See_ Executive Order 14-02.

FIRST AMENDED COMPLAINT          30          ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

111.  Most of the Plaintiffs have filed grievances for Union arbitration and have either received favorable decisions awarding backpay and reinstatement or are waiting arbitration of their individual grievances.[3]

112.  Plaintiffs Shirley and Hone each received an Arbitrators' Decision and Award of reinstatement and backpay due to their wrongful termination. A copy of those decisions by two different arbitrators, are attached as Exhibits A (Shirley) and B (Hone) to this Complaint and incorporated as if fully set forth herein.

113.  Nonparty Tyler Kave was also successful at arbitration, with the Arbitration Opinion attached as Exhibit C to this Complaint and incorporated as if fully set forth herein.

114.  Specifically, those Arbitration decisions found that the Department (1) did not make a good faith effort, under established case law, to find a reasonable accommodation before asserting an undue hardship, (2) did not establish an undue hardship because it's [sic] conclusions were unsupported by the evidence, and (3) violated the Proclamations and

---

[3] One Plaintiff has an arbitration through WAFWP scheduled for March 14, 2023; five (5) Plaintiffs have arbitrations through FWOG scheduled for February or March 2023; one (1) Teamsters arbitration is tentatively scheduled for end of March-beginning of April 2023; and four (4) Plaintiffs did not file a grievance of any sort. Two Plaintiffs, Shirley and Hone, have won arbitrations and Defendants were ordered to reinstate them with backpay and loss of benefits.

FIRST AMENDED COMPLAINT                31

Title VII." Exhibit A, Arbitration Decision and Award for Ruthanna Shirley ("Shirley Decision").

115. The Shirley Decision found that the Department did not consider masks and social distancing as accommodations and that "[f]ailing **to consider** available accommodations is extremely concerning. It is difficult for the Agency to establish good faith when EEOC and/or CDC guidance is ignored and not considered." Exhibit A at 36 (emphasis in original).

116. The Shirley Decision further held that, "[t]here is nothing in the evidence to indicate that the Agency considered testing or any alternative accommodation to vaccination." *Id.* at 37.

117. The Shirley Decision specifically addressed Defendant Windrope's having "rescind[ed] 13 reasonable accommodations that were approved," because they allegedly "did not comport with the guidance that we developed to ensure a safe workplace." *Id.* at 39. Ms. Windrope "did not take this opportunity to explain with specificity," why masks and social distancing were no longer a reasonable accommodation.

118. The Shirley Decision disparaged Defendant Windrope for sending letters with subject line "Guidelines for Review of Reasonable Accommodations relative to the Governor's Proclamation 20-05, as

FIRST AMENDED COMPLAINT          32

well as an email regarding "Vaccine Mandate Update," neither of which discuss masks and social distancing as a reasonable accommodation, and do not disclose any guidance from OFM. *Id.* at 39.

119. "The position taken by the Agency constituted a hypothetical hardship in violation of Title VII because it was conclusory and unsupported by data and other statistical evidence." *Id.* at p. 40.

120. "There is **nothing in the exhibits and testimony** to indicate what type of guidance the Agency received not just from the Office of Financial Management, but also the Center for Disease Control and the Department of Health.  Again, without specifics as to what guidance was provided, it is difficult to determine" whether an accommodation is an undue hardship." *Id.* at p. 41 (emphasis in original)

121. The Hone Arbitration Decision and Award ("Hone Decision"), Exhibit B, likewise ordered reinstatement and backpay.

122. The Hone Decision found that prior to Defendant Windrope's decision to rescind 13 accommodations she had already granted, the Plaintiffs had received a satisfactory accommodation process and "individualized consideration."  Exhibit B at 9.

123. The Hone Decision found it was Defendant Windrope who made the decision to "rescind" the reasonable accommodations provided to

FIRST AMENDED COMPLAINT              33

Plaintiffs, resolving the question of whether the accommodations had been initially approved or not. *Id.* at 9.

124. The Hone Decision specifically found that Defendants failed to follow the interactive process and that such failure could not be excused. *Id.* at 10.

125. The Hone Decision also rejected Defendants' assertion that "in effect, no inquiry into an individuals' work situation – beyond evaluating a job description – was necessary." *Id.* at 10-11.

126. The Hone Decision likewise rejected that supervisors had to meet with employees under their supervisory umbrella and that the work could not be done remotely. *Id.* at 13-14.

127. The Hone Decision found that "the Department failed to afford [Mr. Hone] the individualized consideration of his religious accommodation request that is required by law and by the parties' MOU. In addition, at least as applied to Mr. Hone, The Department's *per se* rule against masking and distancing as part of an appropriate religious accommodation violated the law and the MOU." *Id.* at 16.

128. Non-party Tyler Kave was similarly successful at arbitration against the Department. Exhibit C.

FIRST AMENDED COMPLAINT          34          ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

129. The Kave Arbitration decision likewise found Defendants did not provide a legal accommodation process before terminating Mr. Kave. Exhibit C at 25.

130. Despite its universal failure to defend its conduct at arbitration, the Department refuses still to reinstate and pay wages withheld.

131. The arbitration awards, among other issues, are conclusive evidence that the Department's withholding of wages has been <u>knowingly wrongful for purposes of Wash. Rev. Code § 49.52.070.</u>

132. The arbitration awards are *res judicata* in favor of Plaintiffs Shirley and Hone, and also collaterally estop Defendants as to all other Plaintiffs, where the Department treated all Plaintiffs in the same manner as Shirley, Hone, and Kave.

133. Despite these three consistent and binding arbitration decisions, the Department has refused to reinstate others similarly situated, including the other Plaintiffs.[4]

134. The Department initially refused to adhere to, and take action regarding, at least one of these three binding arbitration decisions, for

---

[4] Defendants have yet to follow the arbitration order with respect to Plaintiff John Hone, who still has not been reinstated, nor received backpay. Mr. Hone is likewise fearful of reentering the same hostile work environment currently faced by Plaintiff Shirley.

FIRST AMENDED COMPLAINT                    35

1  which it made no cognizable excuse, stating merely that it "did not want

2  to" reinstate the individual.

135.  The vaccines were known by the State of Washington to not prevent

the transmission of COVID-19 *prior* to October 18. 2021. Attached as

Exhibit D is a true and correct copy of an email between state and

county health officials discussing breakthrough cases traced to a staff

party from July 2021. Attached as Exhibit E is a true and correct copy

of an email chain between state and county officials discussing the

"concerning" trend of escalating rates of reinfection of vaccinated

individuals in July 2021. Attached as Exhibit F is a true and correct

copy of an email from Jeff Duchin, Professor of Medicine at the

University of Washington and Chief, Communicable Disease

Epidemiology and Immunization Section, Public Health, Seattle and

King County, regarding ability of vaccinated to both reinfect and spread

to others.

### V.    CAUSES OF ACTION AGAINST THE DEPARTMENT

### FIRST CAUSE OF ACTION
### Violation of Washington Law Against Discrimination Perceived Physical Disability

136.  Plaintiffs here reallege the allegations set forth above in this Complaint

as if fully set forth herein.

FIRST AMENDED COMPLAINT                      36

137. The Washington Law Against Discrimination ("WLAD") prohibits discrimination in the workplace for actual or perceived disability. Wash. Rev. Code § 49.60.180. *Taylor v. Burlington Northern Railroad Holdings,* 193 Wash.2d 611 (2019) (en banc*).*

138. WLAD's definition of disability is broader than the definition in the ADA. *Pulcino v. Fed. Express Corp.,* 141 Wash.2d 629, 641 n.3 (2000).

139. A disability is defined as "a sensory, mental, or physical impairment that …(i) [i]s medically cognizable or diagnosable; or (ii) [e]xists as a record or history; or (iii) [i]s *perceived* to exist whether or not it exists in fact." Wash. Rev. Code § 49.60.040(7).

140. Disability is also an impairment that "affects one or more of the … body systems." Wash. Rev. Code§ 49.60.040(7)(c)(i).

141. The legislature intended to adopt a broad and expansive definition of "disability" to protect against discrimination. *Taylor,* 193 Wash.2d at 618.

142. The EEOC has interpreted these rules to include protection for an actual or perceived immunological condition.

143. WLAD's definition of disability is broader than the definition in the ADA. *Pulcino v. Fed. Express Corp.,* 141 Wash.2d 629, 641 n.3 (2000).

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

144. Defendants perceived Plaintiffs as having an impairment and/or disability that identified them as presenting a "significant risk of harm."

145. Defendants acted believing Plaintiffs have a perceived physical disability of not having the best protection against COVID-19 in their bodies that conflicted with a stated job requirement defined by Defendants' vaccine mandate.

146. Defendants were aware of this conflict but did not explore any available reasonable alternatives for accommodating Plaintiffs to resolve the conflict. *Suarez v. State,* 2022 WL 4351109 (September 20, 2022).

147. Defendants refused to consider or explore accommodations and refused to balance the undue hardships to the citizens of Washington State, the environment, and the mission of the agency.

148. Defendants terminated Plaintiffs due to their perceived physical disability.

149. Defendants' actions caused Plaintiffs to suffer damages to be proven at trial, such actions being the actual and proximate cause of those damages.

**SECOND CAUSE OF ACTION**
**Deprivation of Privacy, WA Const. Art. I, Sec. 7**

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

150. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

151. No person shall be disturbed in his private affairs, or his home invaded, without authority of law.  Wash. Const. Art. I, § 7.

152. This constitutional right to privacy includes the right to autonomous decision-making and autonomy over one's medical care and includes the right to refuse treatment. *See, e.g., In re Welfare of Colyer,* 99 Wash.2d 114, 119-22, 660 P.2d 738 (1983); *see also* Wash. Rev. Code § 7.70.050.

153. Bodily autonomy is a critical component of the constitutional right of privacy.

154. The decision to suffer the battery of a vaccination is also a private affair which further impacts a citizen's bodily integrity.

155. The Washington State privacy protections under Art. I, § 7, are broader than the privacy rights under the U.S. Constitution's Fourth Amendment, as Section 7 guarantees, "an individual's right to privacy *with no express limitations." Robinson v. City of Seattle,* 102 Wash. App. 795 (2000) (emphasis added).

156. Plaintiffs have the right to make the decision whether to receive a COVID-19 vaccine and have the right to decide not to disclose their

FIRST AMENDED COMPLAINT              39

personal medical history – including whether they have been "fully vaccinated" for COVID-19.

157.  Despite these rights, Defendants will continue to violate the privacy rights of every individual seeking employment with WDFW.

158.  Despite these rights, Defendants will continue to refuse reemployment to Plaintiffs.

159.  Plaintiffs have been deprived of their rights to privacy by the actions of Defendants in forcing Plaintiffs to violate their religious and/or medical freedoms or suffer loss of employment and loss of pension.

160.  The right to privacy is protected under Wash. Const. Art. I, § 7, as a fundamental right which can only be infringed upon by a law which satisfies a strict scrutiny analysis, that is, which furthers a compelling state interest and is narrowly tailored thereto, using the least restrictive means.

161.  Defendants demanded termination of religious and medical objectors who did not vaccinate, alleged in the interest of stopping the spread of COVID-19.

162.  However, the vaccines did not stop infection or transmission, and both the vaccinated and unvaccinated spread COVID-19.

FIRST AMENDED COMPLAINT                40

163. The termination of religious and/or medical objectors did not further the alleged state interest because the efficacy of the vaccines failed. Defendants knew at the time of the termination that the vaccine was failing, but Defendants purposefully chose to continue with the wrongful termination of religious and medical objectors.

164. Even if the vaccines had worked as promoted, the Defendants failed to utilize a narrowly tailored method to control the spread of virus, leaping directly to termination without considering lesser available means of achieving the alleged objective.

165. Defendants failed to utilize PPE, testing, telework, or natural immunity in stopping the spread of COVID-19, and the method they relied upon – vaccination only – did nothing to stop the spread of the virus, as evidenced by a "cleansed" workforce with high breakthrough numbers of fully vaccinated contracting the virus.

166. Defendants' actions fail strict scrutiny.

167. Defendants' actions would fail even rational-basis review.

168. Additionally, Plaintiffs have been deprived of their right to privacy through the invasive nature of the religious exemption questionnaire which Defendants required them to answer.

FIRST AMENDED COMPLAINT        41        ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

169. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

### THIRD CAUSE OF ACTION
### Deprivation of Life, Liberty, or Property, U.S. Const. Am. V., Am. XIV, WA Const. Art. I, Sec. 3.

170. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

171. No person shall be deprived of life, liberty, or property, without due process of law. U.S. Const. Ams. V, XIV; Wash. Constitution, Art. I, § 3.

172. Plaintiffs suffered loss of pension rights and benefits as a direct result of the actions of Defendants.

173. Plaintiffs lost title to their real property due to Defendants' actions, had to relocate at considerable loss in the sale of that property, which are losses which they cannot recover.

174. Public employees have a property interest in their pensions, which cannot be unilaterally altered to the material disadvantage of the employee. *Eagan v. Spellman,* 90 Wash.2d 248 (1978).

175. Public employees have a property interest in their employment, cannot be terminated without "just cause," and cannot be terminated without due process, which includes a fair hearing. *Board of Regents v. Roth*,

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

408 U.S. at 564 (1972); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 (1985).

176. Plaintiffs were terminated from public employment without a hearing or other due process.

177. The law regarding due process in employment is well established.

178. Defendants knew the Fourteenth Amendment prohibits government from denying an employee due process.

179. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**FOURTH CAUSE OF ACTION**
**Violation of the Equal Protection Clause of the WA Const. Art. I, Sec. 3**

180. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

181. Wash. Const. Art. I, § 3, states that "[n]o person shall be deprived of life, liberty, or property, without due process of law."

182. If a law neither burdens a fundamental right nor targets a suspect class, it will be upheld so long as it bears a rational relation to some legitimate end. *Romer v. Evans,* 517 U.S. 620, 631 (1996).

183. There was no rational relation to some legitimate government end because the action taken – termination of the unvaccinated – did not

FIRST AMENDED COMPLAINT            43

further the interest of reducing the spread of COVID-19 given that the vaccinated and the unvaccinated both contract and transmit COVID-19.

184. In fact, people who are vaccinated for COVID-19 are more likely to become infected with and spread COVID-19 than are people who have recovered from COVID-19 and have natural immunity.

185. Defendants have treated different classes of people unequally, with the protected class of religious objectors not coincidentally were adversely impacted by the actions of Defendants.

186. The actions of Defendants, on its face and as applied, was not rationally related to a legitimate end.

187. The actions of Defendant have caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to Plaintiffs.

188. Defendants' actions caused Plaintiffs to suffer damages to be proven at trial, such actions being the actual and proximate cause of those damages.

### FIFTH CAUSE OF ACTION
### Deprivation of Religious Freedom, WA Const. Art. I, Sec. 11.

189. Plaintiffs here reallege the allegations set forth above in this Complaint as if fully set forth herein.

FIRST AMENDED COMPLAINT            44            ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

190. Defendants' vaccination mandate and religious exemption questionnaire are contrary to and transgress Wash. Const. Art I, § 11, which states, "Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion…No religious qualification shall be required for any public office or employment."

191. Plaintiffs' absolute right to religious freedom has been infringed.

192. Defendants, by their conduct and words, discriminated against the Plaintiffs for acting according to their conscience, guided by their religious faith, in refusing to be vaccinated.

193. Defendants' vaccination mandate, in conjunction with their religious exemption questionnaire, by design and intent, impose a religious qualification for public employment, and deny Plaintiffs' absolute freedom of conscience in all matters of religious sentiment, belief and worship, and result in an unauthorized molestation or disturbance of the Plaintiffs' persons and property rights on account of religion.

194. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Wage Theft**

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

195. Plaintiffs here reallege the allegations set forth above in this Complaint

196. Defendants have, willfully and with the intent to deprive, failed to pay wages to the Plaintiffs since the date of their respective terminations.

197. Defendants had a pre-existing duty under contract to pay Plaintiffs the specific compensation as set forth in their employment contracts.

198. Defendants were aware at the time of termination that Plaintiffs were being treated differently than secular and non-medical objectors by requiring religious and medical objectors to receive a vaccine to prevent infection, knowing that both the vaccinated and the unvaccinated both contracted and spread the COVID-19 virus equally, and affirmatively elected to ignore the established science.

199. Defendants have authority and control over the employment status and payment of wages to Plaintiffs.

200. Plaintiffs did not knowingly submit to the deprivation of wages.

201. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial, including at least lost wages and lost benefits, including pensions.

202. Defendants' actions are the actual and proximate cause of Plaintiffs' damages.

FIRST AMENDED COMPLAINT                46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

203. Plaintiffs not yet reinstated are entitled to back wages, and for all Plaintiffs to double damages, costs of suit and reasonable attorney's, Wash. Rev. Code § 49.52.070.

**SEVENTH CAUSE OF ACTION**
**Breach of Contract**

204. Plaintiffs here reallege the allegations set forth above in this Complaint.

205. There existed a binding contract between each Plaintiff and the Department that permitted termination only for "just cause."

206. Each Plaintiffs substantially performed their obligations under this contract.

207. The Department breached its contracts with Plaintiffs by terminating them without just cause.

208. Defendants' wrongful termination of Plaintiffs was based on a new condition of employment that was not part of Plaintiffs' contract when hired.

209. Defendants' actions violated Plaintiffs' right to continued employment by terminating them without "just cause" and by adding a new condition to employment – vaccination –without consideration.

210. Defendants' action also violated Plaintiffs' pension rights, likewise established by contract.

ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

211.    Defendants' actions caused a substantial change to the pension rights of Plaintiffs established by Wash. Rev. Code Title 41 *et. seq.*

212.    Plaintiffs have suffered extraordinary financial loss because of the substantial change in their pension rights without cause.

213.    Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial, including at least lost wages and lost pensions.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF THE WASHINGTON LAW AGAINST DISCRIMINATION
### Failure to Accommodate

214.    Plaintiffs here reallege the allegations set forth above in this Complaint.

215.    Each Plaintiff was found by the Department to have a sincerely held religious belief preventing vaccination and was granted an exemption, and/or was granted a medical exemption preventing vaccination due to a medical condition.

216.    Defendants were aware of these exemptions.

217.    Plaintiffs made repeated requests for accommodations but were shut down without discussion.

218.    Defendants failed to consider any of the accommodations proposed by Plaintiffs.

FIRST AMENDED COMPLAINT            48

219. Defendant stated that reassignment was the only possible accommodation, but then universally denied reassignment to terminated employees.

220. Plaintiffs were forced to either (a) disregard their sincerely held religious beliefs, and/or put their health at risk, or (b) lose their positions, seniority, pensions, professions, and livelihoods.

221. Plaintiffs were forced to either be terminated or take a vaccine in direct violation of their sincerely held religious beliefs in order to feed their families.

222. Strict scrutiny applies where fundamental rights are concerned.

223. Where the mandated vaccine does not prevent infection or transmission, Defendants' actions, *and the continuance thereof,* are arbitrary and capricious and fail even a rational basis review.

224. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**NINTH CAUSE OF ACTION**
**VIOLATION OF THE WASHINGTON LAW AGAINST DISCRIMINATION**
**Disparate Impact**

225. Plaintiffs here reallege the allegations set forth above in this Complaint.

226. To the extent that Defendants' policy is facially neutral, it falls more harshly upon those within a protected class.

FIRST AMENDED COMPLAINT                49

227. The Plaintiffs have been damaged by the disparate impact of the Defendants' policy.

228. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

## TENTH CAUSE OF ACTION
## VIOLATION OF THE FIRST AMENDEMENT OF THE UNITED STATES CONSTITUTION –
### Free Exercise

229. Plaintiffs here reallege the allegations set forth above in this Complaint.

230. All the acts of Defendants were conducted by them under color and pretense of the statutes, regulations, customs, policies, and/or usages of the State of Washington and the Washington Department of Fish and Wildlife.

231. The law regarding the free exercise of religion and employment is well established.

232. The law regarding due process in employment is well established.

233. Defendants Susewind and Windrope knew that the First Amendment prohibits governmental officials from demonstrating hostility to religion or prohibiting the free exercise thereof.

234. Defendants Susewind and Windrope acted with willful malice, and/or intentionally and in gross disregard of Plaintiffs' constitutional rights, and/or in reckless disregard of Plaintiffs' constitutional rights.

FIRST AMENDED COMPLAINT                50                ARNOLD JACOBOWITZ & ALVARADO PLLC
8201 164TH AVE. NE, STE. 200
REDMOND, WA 98052
(206) 799-4221

235. As a direct and proximate result of Defendants' Susewind and Windrope's actions, Plaintiffs have been deprived of their constitutional rights to the free exercise of religion and to be free from governmental hostility directed at their religion and have been denied their rights to due process and equal protection under the law.

236. Defendant's actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**RELIGIOUS DISCRIMINATION –**
**42 U.S.C. §2000e–2(a)(1)**

237. Plaintiffs here reallege the allegations set forth above in this Complaint.

238. Title VII of the Civil Rights Act of 1964 prohibits Defendants from discriminating against employees based on their sincerely held religious beliefs. *See* 42 U.S.C. § 2000e-2(a).

239. Plaintiffs each hold sincere religious beliefs that precluded them from receiving any of the COVID-19 vaccines available.

240. Plaintiffs each notified defendants of those beliefs by requesting a religious exemption and reasonable accommodation from the vaccine mandate.

241. Defendants determined that each Plaintiff had a sincerely held religious beliefs that precluded them from taking the vaccine and notified each Plaintiff of that decision granting them religious exemptions.

FIRST AMENDED COMPLAINT                    51

242. The Department determined that at least 3 of the Plaintiffs, utilizing PPE, could be accommodated for their sincerely held religious beliefs utilizing PPE.

243. The Department, and Defendants Windrope and Susewind, thereafter withdrew that determination and refused to provide accommodation to their sincerely held religious beliefs.

244. The Department, Susewind and Windrope specifically withdrew accommodations to 13 exempt employees, some of whom are not currently Plaintiffs.

245. The Defendants then failed to engage with the Plaintiffs in an interactive process as set forth in the EEOC's Compliance Manual on Religious Discrimination before concluding that it would not accommodate any of the Plaintiffs for their sincerely held religious beliefs.

246. Accommodating the Plaintiffs' religious beliefs would not have resulted in any undue hardship to the Department.

247. Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII**.**

248. Defendants' actions proximately caused Plaintiffs to suffer damages in amounts to be proven at trial.

**INJUNCTION AGAINST FUTURE RETALIATION**

FIRST AMENDED COMPLAINT                    52

249.  Plaintiffs here reallege the allegations set forth above in this Complaint.

250.  Plaintiffs have the right to be free from discriminatory retaliation for activity statutorily protected activity under Title VII and WLAD, Wash. Rev. Code Ann. § 49.060.010 *et. seq.*

251.  Plaintiffs have a fundamental right to be free from a hostile work environment because of their religious beliefs and/or their actions taken in response to an adverse employment action or other statutorily protected activity.

252.  Plaintiffs have a right to be free from "disparate treatment" compared to those who do not share their religious beliefs.

253.  Plaintiff Shirley has experienced numerous acts of harassment, retaliation, and disparate treatment because of her adverse employment action that required Defendants to reinstate her to her former position with backpay.

254.  The Court should ENJOIN Defendants from harassment, retaliation, and disparate treatments against Ms. Shirley, specifically, and other Plaintiffs not yet to be reinstated generally.

### VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, and each of them, pray for the following relief against the Defendants:

1.  Judgment against all Defendants on all claims.

FIRST AMENDED COMPLAINT                53

2. Money judgment for back pay and front pay, loss of benefits, and loss of pension rights, for those Plaintiffs who were terminated or forced to quit.

3. Money judgment for back pay, loss of benefits, and loss of pension rights, for those two reinstated Plaintiffs, to the extent they are reinstated.

4. Double damages for lost wages pursuant to Wash. Rev. Code § 49.52.070.

5. Money judgment for all Plaintiffs pursuant to the infringement upon their constitutional and statutory rights.

6. Attorney fees as authorized by State and Federal statute.

7. Such other and further relief that is just and equitable.

Dated: May 28, 2024.

**ARNOLD JACOBOWITZ & ALVARADO PLLC**

*/s/ Nathan J. Arnold*
Nathan J. Arnold, WSBA No. 45356
8201 164th Ave. NE, Suite 200
Redmond, WA 98052
Nathan@ajalawyers.com
(206)799-4221
*Counsel for Plaintiffs*

FIRST AMENDED COMPLAINT          54

# EXHIBIT A

hMICHAEL ANTHONY MARR #2580
ATTORNEY, ARBITRATOR & MEDIATOR
111 NORTH KING STREET
SUITE #314
HONOLULU, HAWAII 96817
TELEPHONE: (808) 599-5258
E-MAIL: hhtp://www.MmarrADR@aol.com

### BEFORE ARBITRATOR MICHAEL ANTHONY MARR

### OLYMPIA, WASHINGTON

| | |
|---|---|
| In the Matter of the Arbitration | ) PERC NO. 134851-P-22 |
| | ) |
| between the | ) DECISION AND AWARD |
| | ) |
| STATE OF WASHINGTON | ) HEARING DATE: OCTOBER 19, 2022 |
| ASSOCIATION OF FISH AND | ) |
| WILDLIFE PROFESSIONALS, | ) GRIEVANCE OF RUTHANNA SHIRLEY |
| | ) |
| Union, | ) |
| | ) |
| and the | ) |
| | ) |
| STATE OF WASHINGTON, | ) |
| DEPARMENT OF FISH AND WILDLIFE, | ) |
| | ) |
| Employer. | ) |
| _____ | ) |

### DECISION AND AWARD

The Arbitrator was mutually selected by the parties to render a final and binding decision

concerning the above-referenced grievance. Both parties were represented by professional and

competent counsel at the arbitration hearing. The State of Washington, Association of Fish and

Wildlife Professionals, hereinafter referred to as "Union" and the Grievant, Ruthanna Shirley,

hereinafter referred to as "Grievant," were represented by Rhonda Fenrich, Esq. The Grievant's

grievance shall be referred to as the "Shirley Grievance." The State of Washington, Department of

Fish and Wildlife, hereinafter referred to as "Agency," "State" or "Employer" was represented by

Assistant Attorney General Carl J. Gaul, IV and Assistant Attorney General Elizabeth Delay Brown.

The Shirley Grievance was heard before the Arbitrator on October 19, 2022 using the Zoom.com platform. While the Arbitrator presided in Honolulu, Hawaii, counsels, the parties, and all witnesses appeared from various locations on the mainland United States.

The Agency called two (2) witnesses and the Union called two (2) witnesses. One of the witnesses called by the Union was the Grievant. Full opportunity was given to the parties to offer evidence, examine and cross-examine witnesses, and present oral argument. The parties agreed to oral argument after the presentation of evidence at the arbitration hearing in lieu of closing briefs.

The Arbitrator has reviewed the transcripts and evidence presented during the arbitration hearing. The Arbitrator, as a general rule, will not comment on matters that the Arbitrator believes are irrelevant, superfluous, redundant, or rendered moot by this decision and award. Nor does the Arbitrator feel compelled to address all of the numerous arguments and issues raised and asserted by these professional advocates. Rather, the Arbitrator has elected to address only those elements that have had a significant impact on his decision-making process. [1]

## I.    BACKGROUND.

---

[1]    The proceeding was transcribed by court reporter Nicole Bulldis of Buell Real Time Reporting. References to a statement made in the transcript of the proceedings shall sometimes be referred to as "Tr." or by a witness's last name or an attorney's last name (for context), may be followed by the transcript page number and line number(s) and shall be in italics. During the arbitration hearing, twenty-eight (28) exhibits were received into evidence from the Agency and twenty-five (25) exhibits were received into evidence from the Union. In addition, six (6) joint exhibits were received into evidence. Union exhibits shall be prefaced with the letter "*U*," State exhibits shall be prefaced with the letter "*E*," joint exhibits with the letter "*J*" and shall be in italics. Citations to Union, Agency, and joint exhibits shall sometimes include the exhibit number, bates or page number, and shall be in italics. *J-1* consists of the Collective Bargaining Agreement which governs the relationship between the parties, and shall hereinafter sometimes be referred to as "*CBA*" and shall be in italics. The parties executed a Memorandum of Understanding regarding the COVID-19 pandemic on September 7, 2021, hereinafter referred to as the "MOU" and shall be in italics.

The Arbitrator advised the parties that it was the Arbitrator's practice to receive all exhibits into evidence without the necessity of laying a foundation. The parties had no objections. *Fenrich at 5:23, Gaul at 5:24.*

The COVID-19 virus was first reported in China in 2019. COVID-19 quickly spread to other countries. The pandemic first appeared in the United States in February of 2020 in the State of Washington. COVID-19 quickly spread throughout the United States causing thousands of infections and deaths. The healthcare systems in many states and countries were overwhelmed. In response, Governor Inslee issued Proclamation 20-25. *J-5.* This Proclamation provides in relevant part as follows:

## PROCLAMATION BY THE GOVERNOR
## AMENDING PROCLAMATION 20-05

### 20-25

### STAY HOME – STAY HEALTHY

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout the state of Washington as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations, I have subsequently issued amendatory Proclamations 20-06, 20-07, 20-08, 20-09, 20-10, 20-11, 20-12, 20-13, 20-14, 20-15, 20-16, 20-17, 20-18, 20-19, 20-20, 20-21, 20-22, 20-23, and 20-24, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations; and

**WHEREAS,** the COVID-19 disease, caused by a virus that spreads easily from person to person which may result in serious illness or death and has been classified by the World Health Organization as a worldwide pandemic, has broadly spread throughout Washington State, significantly increasing the threat of serious associated health risks statewide; and

**WHEREAS,** there are currently at least 2,221 cases of COVID-19 in Washington State and, tragically, 110 deaths of Washingtonians associated with COVID-19; and

**WHEREAS,** models predict that many hospitals in Washington State will reach capacity or become overwhelmed with COVID-19 patients within the next several weeks unless we substantially slow down the spread of COVID-19 throughout the state; and

**WHEREAS,** hospitalizations for COVID-19 like illnesses are significantly elevated in all adults, and a sharply increasing trend in COVID-19 like illness hospitalizations has been observed for the past three (3) weeks; and

3

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State  continues to threaten the life and health of our people as well as the economy of Washington  State, and remains a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and  other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division,  through the State Emergency Operations Center, continues coordinating resources across state  government to support the Department of Health and local health officials in alleviating the  impacts to people, property, and infrastructure, and continues coordinating with the Department of  Health in assessing the impacts and long-term effects of the incident on Washington State and its  people.

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the  above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim: that  a State of Emergency continues to exist in all counties of Washington State; that Proclamation 20-05 and all amendments thereto remain in effect as otherwise amended; and that Proclamations  20-05, 20-07, 20-11, 20-13, and 20-14 are amended and superseded by this Proclamation to  impose a Stay Home – Stay Healthy Order throughout Washington State by prohibiting all people  in Washington State from leaving their homes or participating in social, spiritual and recreational  gatherings of any kind regardless of the number of participants, and all non-essential businesses in  Washington State from conducting business, within the limitations provided herein.

I again direct that the plans and procedures of the Washington State Comprehensive Emergency  Management Plan be implemented throughout state government. State agencies and departments  are directed to continue utilizing state resources and doing everything reasonably possible to  support implementation of the Washington State Comprehensive Emergency Management Plan  and to assist affected political subdivisions in an effort to respond to and recover from the  COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include  the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of  The Adjutant General to address the circumstances described above, to perform such duties as  directed by competent authority of the Washington State Military Department in addressing the  outbreak. Additionally, I continue to direct the Department of Health, the Washington State  Military Department Emergency Management Division, and other agencies to identify and
provide appropriate personnel for conducting necessary and ongoing incident related assessments.

**FURTHERMORE,** based on the above situation and under the provisions of RCW  43.06.220(1)(h), to help preserve and maintain life, health, property or the public peace, and to  implement the Stay Home—Stay Healthy Order described above, I hereby impose the following  necessary restrictions on participation by all people in Washington State by prohibiting each of  the following activities by all people and businesses throughout Washington State, which prohibitions shall remain in effect until midnight on April 6, 2020,  unless extended beyond that date:

    1. **All people in Washington State shall immediately cease leaving their home or place of residence except: (1) to conduct or participate in essential activities, and/or (2) for employment in essential business services.** This prohibition shall remain in effect until  midnight on

April 6, 2020, unless extended beyond that date.

**To implement this mandate, I hereby order** that all people in Washington State are  immediately prohibited from leaving their home or place of residence except to conduct or  participate in (1) essential activities, and/or (2) employment in providing essential
business services:

    a. **Essential activities** permitted under this Proclamation are limited to the following:
- **Obtaining necessary supplies and services** for family or household members  and pets, such as groceries, food and supplies for household consumption and use, supplies and equipment needed to work from home, and products  necessary to maintain safety, sanitation and essential maintenance of the home  or residence.
- **Engaging in activities essential for the health and safety** of family, household members and pets, including things such as seeking medical or behavioral health or emergency services and obtaining medical supplies or medication.
- **Caring for** a family  member, friend, or pet in another household or residence, and to transport a family member, friend or their pet for essential health and safety activities, and to obtain necessary supplies and services.
- **Engaging in outdoor exercise activities**, such as walking, hiking, running or biking, but only if appropriate social distancing practices are used.

    b.     **Employment in essential business services** means an essential employee performing work for an essential business as identified in the "Essential Critical Infrastructure Workers" list, or carrying out minimum basic operations (as defined  in Section 3(d) of this Order) for a non-essential business.

    c. **This prohibition shall not apply to** individuals whose homes or residences are unsafe or become unsafe, such as victims of domestic violence. These individuals  are permitted and urged to leave their homes or residences and stay at a safe  alternate location.

    d.     **This prohibition also shall not apply to** individuals experiencing homelessness,  but they are urged to obtain shelter, and governmental and other entities are  strongly encouraged to make such shelter available as soon as possible and to the  maximum extent practicable.

    e. For purposes of this Proclamation, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **All people in Washington State shall immediately cease participating in all public  and private gatherings and multi-person activities for social, spiritual and  recreational purposes, regardless of the number of people involved, except as  specifically identified herein.** Such activity includes, but is not limited to, community,  civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals;  conventions; fundraisers; and similar activities. This prohibition also applies to planned  wedding and funeral events.  This

prohibition shall remain in effect until midnight on  April 6, 2020, unless extended beyond that date.

**To implement this mandate, I hereby order** that all people in Washington State are  immediately prohibited from participating in public and private gatherings of any number  of people for social, spiritual and recreational purposes. **This prohibition shall not apply  to** activities and gatherings solely including those people who are part of a single  household or residential living unit.

3. **Effective midnight on March 25, 2020, all non-essential businesses in Washington  State shall cease operations except for performing basic minimum operations. All  essential businesses are encouraged to remain open and maintain operations, but  must establish and implement social distancing and sanitation measures established  by the United States Department of Labor or the Washington State Department of  Health Guidelines.** This prohibition shall remain in effect until midnight on April 8,  2020, unless extended beyond that date.

**To implement this mandate, I hereby order** that, effective midnight on March 25, 2020,  all non-essential businesses in Washington State are prohibited from conducting all  activities and operations except minimum basic operations.

   a. **Non-essential businesses** are strongly encouraged to immediately cease operations other than performance of basic minimum operations, but must do so  no later than midnight on March 25, 2020.

   b. **Essential businesses** are prohibited from operating under this Proclamation unless  they establish and implement social distancing and sanitation measures established  by the United States Department of Labor's Guidance on Preparing Workplaces  for COVID-19 at https://www.osha.gov/Publications/OSHA3990.pdf and the  Washington State Department of Health Workplace and Employer Resources &  Recommendations at https://www.doh.wa.gov/Coronavirus/workplace.

   c. **This prohibition does not apply to** businesses consisting exclusively of employees or contractors performing business activities at their home or residence, and who do not engage in in-person contact with clients.

   d. For purposes of this Proclamation, minimum basic operations are the minimum  activities necessary to maintain the value of the business' inventory, preserve the  condition of the business' physical plant and equipment, ensure security, process  payroll and employee benefits, facilitate employees of the business being able to  continue to work remotely from their residences, and related functions.

This Proclamation shall not be construed to prohibit working from home, operating a single owner business with no in-person, on-site public interaction, or restaurants and food services providing delivery or take-away services, so long as proper social distancing and sanitation measures are established and implemented.

No business pass or credentialing program applies to any activities or operations under this

Proclamation.

Violators of this of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Signed and sealed with the official seal of the state of Washington on this 23rd day of March, A.D., Two Thousand and Twenty at Olympia, Washington.

By:

/S/ _____

Jay Inslee, Governor

The United States worked feverishly with numerous drug manufactures to develop a COVID-19 vaccine. Vaccines became available for use in the United States during December of 2020.

Washingtonians were encouraged to be vaccinated. Governor Inslee issued two proclamations which mandated that the vaccines be administered to all State workers with few exceptions. The first was Proclamation 21-14.1, dated August 20, 2021. *J-1*. This Proclamation did not apply to the Agency. The second Proclamation, 21-14-22, dated September 27, 2021 applied to employees of the Agency. *J-2*. Governor Inslee recognized the importance of disability and religious accommodations to COVID-19 and provided these workers with an exemption and accommodation process. The significant parts of this Proclamation are as follows:

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above-noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim that a State of Emergency exists in all counties in the state of Washington, that Proclamation 20-05, as amended, remains in effect, and that, to help preserve and maintain life, health, property or public peace pursuant to RCW 43.06.220(1)(h), and (3), I hereby amend and supersede the prohibitions in 20-14 as set out below, subject to conditions, exceptions, and circumstances also set forth below, and for the following activities: [2]

---

[2]  RCW 38.08 and 43.06 concerns the governor's powers and duties. RCW 38.52 relates to emergency management. RCW 43.06.220(1)(h) and (3) address the governor's powers pursuant to proclamation in a state of emergency. The State of Washington Supreme Court has agreed to hear a challenge to Governor Inslee's emergency powers in the context of Washington's eviction moratorium. Oral argument is scheduled on February 23, 2023. See *Gonzales v. Inslee and the State of Washington*, 21 WashApp.2nd 110, 504 P.3d 890 (2022).

4. <u>Exemptions from Vaccine Requirement</u>.

   a. Disability and Religious Accommodations
- Workers for State Agencies, Workers for operators of Educational Settings, and Health Care Providers are not required to get vaccinated against COVID-19 under this Order if they are unable to do so because of a disability or if the requirement to do so conflicts with their sincerely held religious beliefs, practice, or observance. Workers for State Agencies, workers for operators of Educational Settings, and Health Care Providers are prohibited from claiming an exemption or accommodation on false, misleading, or dishonest grounds, including by providing false, misleading, or dishonest information to a State Agency, operator of an Educational Setting, or operator of a Health Care Setting when seeking an accommodation.
- In implementing the requirements of this Order, State Agencies, operators of Educational Settings, and operators of Health Care Settings:
  - Must provide any disability-related reasonable accommodations and sincerely held religious belief accommodations to the requirements of this Order that are required under the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973 (Rehabilitation Act), Title VII of the Civil Rights Act of 1964 (Title VII), the Washington Law Against Discrimination (WLAD), and any other applicable law. As provided in the above- noted laws, State Agencies, operators of Educational Settings, and operators of Health Care Settings are not required to provide accommodations if they would cause undue hardship.
  - Must comply with the procedures required under the above-noted laws and any other applicable law when considering and deciding whether to provide accommodations;
  - Must, to the extent permitted by law, before providing a disability-related reasonable accommodation to the requirements of this order, obtain from the individual requesting the accommodation documentation from an appropriate health care or rehabilitation professional stating that the individual has a disability that necessitates an accommodation and the probable duration of the need for the accommodation;
  - Must, to the extent permitted by law, before providing a sincerely held religious belief accommodation to the requirements of this Order, document that the request for an accommodation has been made and include a statement in the document explaining the way in which the requirements of this order conflict with the sincerely held religious belief, practice, or observance of the individual;
  - Must, to the extent permitted by law, require an individual who receives an accommodation to take COVID-19 safety measures that are consistent with the recommendations of the state Department of Health for the setting in which the individual works; and
  - Are prohibited from providing accommodations:
    - That they know are based on false, misleading, or dishonest grounds or information;
    - That they know are based on the personal preference of the individual

and not on an inability to get vaccinated because of a disability or a conflict with a sincerely held religious belief, practice, or observance; or

- Without conducting an individualized assessment and determination of each individual's need and justification for an accommodation; i.e., "rubberstamping" accommodation requests.

Governor Inslee's Stay at Home Stay Safe Proclamation 20-25, dated March 23, 2021, *J-5*, and his Vaccine Proclamation 21-14-22, dated September 27, 2022, *J-2*, shall hereinafter be collectively referred to as the "Proclamations." He called upon Washingtonians called to commit to a JFK inaugural moment. As JFK expressed, "Ask not what your country can do for you. Ask what you and can do for your country." So many social, business, and economic sacrifices were, and still are, being made for the greater good of all Washingtonians, Americans, and people throughout the world.

### I.A  <u>THE GRIEVANT AND THE AGENCY</u>.

The Grievant testified she was employed as a Supervising Biologist 2. *Shirley at 143:17*. The Grievant noted that her total tenure with the Agency was approximately nine years and three months. *Id. at 143:24-144:1*. For approximately eight years prior to her separation, she was assigned to the Northern Pikeminnow Sport-Reward Fishery Program, hereinafter, referred to as "Program". *Id. at 143:19-21*.

The Grievant testified she was responsible for supervising field staff five months out of the year, from May 1st to September 30th. *Shirley at 151:9-14*. She explained that this was the on-season period of the Program. She explained that for the other seven months of the year, the off-season period for the Program, she supervised the PIT tag information that was collected throughout the entire State. She noted that her position during this time was data related. *Id. at 151:15-24*. There was no in-person supervision for this period of time. *U-10*.

9

The Grievant testified that from "day one" in her position, she supervised, hired, recruited and interviewed via the telephone because it was easier, more unbiased, and more efficient given the wide span of the river. *Shirley at 153:8-15*. She explained that she contacted and resolved technical issues by telephone and email. *Id. at 153:16-23*. She noted that if she had to meet a technician, it would be in the field where the technician was assigned and face to face contact was very limited. *Id. at 153:24-154:7*.

The Grievant explained that when COVID-19 arrived, not much changed with how she supervised. *Id. at 154:8-10, 12-22, 155:20*. She noted that during the off-season she could perform 100% of her work teleworking. *Id. at 155:24*. She acknowledged that for the on-season of five months, she could have completed her duties teleworking with a little accommodation. *Id. at 156:4-8*. The Grievant's testimony was uncontroverted.

The Grievant applied for a religious exemption from the vaccine. The Grievant's request was supported by her supervisor, Mr. Eric Winther. *Winther at 142:10-12*. [3]

The Grievant was interviewed by Joceile Moore, Human Resource Consultant 4 on September 3, 2021. *E-10, U-3*. Ms. Moore, who was also the Agency's Reasonable Accommodation Specialist, used a "Religious Exemption Accommodation Request Worksheet" while she interviewed the Grievant.

**Religious Exemption Accommodation Request Worksheet**

| NAME: Ruthanna Shirley |
|---|
| Review Accommodation Process:  Interactive process; supervisor input; accommodation agreement. |

---

[3]  Prior to the availability of vaccines, the Grievant was awarded a "Leadership Through COVID" award for Region 5. *U-26*. There were no COVID-19 outbreaks in her work unit. *Shirley at 165:16, 19*.

| 1.  What is your religion? |
| --- |
| Christianity |
| 2. Briefly, how does taking the vaccine violate your sincerely held religious belief? |
| My body is a Holy Temple |
| 3. Briefly, what is your religious source for this belief? |
| Bible |
| 4. How long have you held this belief: |
| 15 years old |
| 5. Have you ever received a vaccine or medicine from a health care provider as an adult: |
| ☐  YES  ☒ NO |
| POSITION TITLE: |
| F&W Biologist 2 |
| 1. I have your job description in front of me.  What duties do you perform involving any other people? |
| My job is to recruit and hire technicians, I have a crew, I sometimes communicate with the public.  For the last 18 months, either remotely or outside.  We were in the front lines from the beginning of COVID. |
| 2. Can you do the essential functions while teleworking? |
| While doing office work. |
| 3. Can you do the essential functions while wearing a mask at all times during your work hours? |
| Yes. |
| 4. Can you do the essential functions while maintaining social distancing of six feet at all times during your work hours? |
| Yes. |
| 5. If you are unable to be accommodated, what other positions do you believe you are qualified for at or below your current position that would you allow you to be accommodated? |
| Click or tap here to enter text. |
| NEXT STEPS:  Review with employee |

**Religious Exemption Accommodation Request Worksheet**

11

| NAME: Ruthanna Shirley |
| --- |
| We will contact your supervisor to verify that an accommodation will work in the performance of your duties and meet your unit's business needs. |
| If your supervisor approves an accommodation, you will be notified of the accommodation in a memo outlining the agreement. |
| Your compliance with the agreement will be monitored by your supervisor |
| If you fail to comply with your accommodation, you may be subject to disciplinary action up to and including discharge OR otherwise discharged. |
| If you are unable to be accommodated in your current position, we will identify alternate vacant positions for which you are qualified at or below your current position and in which you can be accommodated. |
| If no appropriate vacancies are identified, you will be subject to discharge. |
| Do you have any questions? |
| No.  I think you covered everything. |

Interview by: Joceile Moore
Human Resource Consultant: 4
Date: 9/3/2021

The Grievant testified that HR Assistant Joceile Moore informed her that she qualified for an exemption because her position was "easily accommodatable." *Shirley at 156:4-8.* The Grievant maintained that Ms. Moore advised her that she would receive an exemption if approved by her supervisor. *Id. at 156:13.* The Grievant explained that Ms. Moore advised her she would telework and mask and social distance if she "had to be around anyone." *Id.* The Grievant's testimony was uncontroverted.

The Grievant explained that received a letter agreeing to her accommodation request from Kelly Cunningham, Program Director, dated September 22, 2021. *U-5. U-5* was unsigned and provides in relevant part as follows:

TO:        Ruthanna Shirley

FROM:        Kelly Cunningham, Program

Director DATE:        9/22/2021

SUBJECT:        Accommodation/Expectations

I, as your Program Director, am agreeing to the following accommodations based on your vaccine exemption request:

1.  You will perform your duties while teleworking, **or**
2.  You will wear a mask at all times during your workday around other people, **and**
3.  You will maintain social distancing of six feet at all times during your work hours around other people.

Your compliance with this accommodation will be monitored by your supervisor. Non-compliance may subject you to disciplinary action up to and including discharge or otherwise discharged. This memo will remain in your supervisor file while in effect. Note that this accommodation agreement will be reassessed in 60 days and can be reviewed or changed at any time based on business needs as part of the ongoing interactive accommodation process.

If your exemption status changes, you must notify me or Joceile Moore, Reasonable Accommodation Specialist, at 360-463-1097 or by e-mail at <u>Joceile.Moore@dfw.wa.gov</u>. If you have questions, contact your supervisor or Joceile.

I have received a copy of this memo:

_____          _____
  Employee's Name (Electronic Signature)                    Date

cc:    Craig Burley, Deputy Program Director
       Charlene Hurst, Columbia River Management Unit
       Lead Eric Winther, Supervisor/File
       Reasonable Accommodation Confidential File

Mr. Cunningham denied initialing *U-5*. *Cunningham at 99:3-4*. However, it was undisputed that *U-5* was provided to employees who were granted an exemption, but later had their exemption rescinded. The Agency did not controvert the Grievant's assertion that she received *U-5*.

On September 30, 2021, the Grievant received a letter from Kelly Cunningham, Fish Program Director. *E-12, U-6*. The letter rescinded the Grievant's religious exemption. The letter acknowledged that the Grievant's religious exemption was approved, but concluded that since the

13

Agency was unable to identity a reasonable accommodation for her position, she was given one of two choices. The first choice was reassignment, although reassignment was only a possibility because opportunities were limited. The second choice was to be vaccinated no later than October 18, 2021, or be separated from employment. The letter provides in relevant part as follows:

> September 30, 2021
>
> Dear Ruthanna Shirley,
>
> You filed a religious exemption request stating you were **prevented from being vaccinated against COVID-19** pursuant to the Governor's Proclamation 21-14.1 based upon a sincere and personally held religious belief. Upon further review and consideration while your religious exemption has been approved, we are unable to identify a reasonable accommodation that would allow you to continue to perform all of the essential functions of your job.
>
> In considering your request for accommodation, the department has evaluated the essential functions of your position as well as business requirements for workplace safety. Performing the essential functions of your position unvaccinated poses a threat to the health and safety of others in the workplace.
>
> After carefully reviewing your essential functions in your job description, working environment, and your management's feedback, it has been determined that no reasonable accommodation can be made in your current position. This determination was made because your position must at times be done in the physical presence of others. There are no other accommodations for your position available which sufficiently mitigate or eliminate the risk of being associated with having an unvaccinated employee performing the essential functions of your position.
>
> Reassignment remains a possibility, although opportunities may be limited. If you would like to explore available reassignment options, please contact Joceile Moore, Reasonable Accommodation Specialist at Jocile.Moore@wa.gov as soon as possible.
>
> If you have additional information that supports your ability to be accommodated in your current position, please send that information to Joceile.Moore@dfw.wa.gov as soon as possible. A follow up meeting may be scheduled.
>
> Pursuant to Governor's Proclamation 21-14.1, verification of being fully vaccinated against COVID-19 is required to be shown no later than October 18, 2021 or you may be separated from employment. If you chose to proceed with vaccination, please show proof of vaccination to your supervisor. Please see HR Consultant for alternative schedules should you choose to be vaccinated.

We understand this may be a difficult time. We will do our best to support you during this time. The Employee Assistance Program (EAP) recognizes the ongoing need to provide support through counseling and referral services, management consultations and resources. We encourage you to review EAP's Well-Being Resource Guide.

In addition, we encourage you to review the Employee Benefits and Assistance Program Contact List to help you address questions pertaining (but not limited) to unemployment, retirement, medical insurance and the Social Security Administration.

Sincerely,

Kelly Cunningham
Fish Program Director

The Grievant, by email dated October 6, 2021, wrote to Fish Program Director Kelly

Cunningham and Reasonable Accommodation Specialist Joceile Moore and asked why the Agency

changed positions. *U-10.* It provides in relevant part:

Good morning everyone,

Joceile, I understand your position has changed and that what was said during the interview is not what is taking place currently.

Kelly (or Craig) my reasonable accommodation request needs to be reviewed again. As the director of Fish Program I am sure you already know that Pikeminnow Sport Reward Season runs from May 1st-September 30th (with a rare one or two-week season extension). That being said from October thru the end of April I do not supervise staff! From October thru April my position will be focused on season conclusion, data analysis, report writing, season preparations for the up and coming season, etc. which will be fully done by teleworking without contact with staff.

Sincerely,
Ruthanna Shirley

On October 8, 2021, Amy Windrope, the Deputy Director for the Agency, wrote to the

Grievant. *E-16, UE-9*. The relevant portions of this letter are as follows:

October 08, 2021

Dear Ruthanna Shirley:

15

On 09/30/2021, you received notice that your religious exemption request was unable to be reasonably accommodated. Additionally, you were advised that you could explore reassignment possibilities by contacting Joceile Moore, Reasonable Accommodation Specialist at Joceile.Moore@dfw.wa.gov as soon as possible.

This is a reminder that reassignment remains a possibility, although opportunities may be limited. However as of today, you have **not** notified Joceile that you are interested in exploring these possibilities. Consequently, you are being notified that you have until **October 13, 2021** to contact Joceile to initiate this process. If Joceile does not hear from you by October 13, 2021, your accommodation exemption request will be considered closed.

If after contacting Joceile, you wish to assist in this process you can go to State of Washington Job Opportunities | Departments: Dept. of Fish and Wildlife | Sorted by Posting Date descending | Work that Matters (governmentjobs.com) and look for positions that you are qualified for at or below your current position salary **and** where the duties and working conditions are identified as done via 100% telework and/or require no in-person contact. Note, these conditions are based on non-pandemic normal business circumstances. Supervisory positions do not fit this criteria, as it is a business expectation to meet with those supervised. If you identify a position that meets this criteria and you are interested in pursuing it, please contact Joceile to discuss next steps.

Additionally, if you have emergent information that was not included in your original request for accommodation which may impact the accommodation decision to grant you an accommodation, you must contact Joceile by **October 13, 2021**. If Joceile does not hear from you by October 13, 2021, your accommodation exemption request will be considered closed.

Failure to pursue either option, failure to notify your supervisor of initiating full vaccination, and remaining unvaccinated without an approved alternate will start your separation effective **October 18, 2021**. You will lose all access to your state resources such as email, phone access, and any agency equipment on close of business on October 18, 2021. For more information on vaccination options and timelines, please refer to your union memorandum of agreement.

**Additional Support**

We understand this may be a difficult time. We will do our best to support you during this time. The Employee Assistance Program (EAP) recognizes the ongoing need to provide support through counseling and referral services, management consultations and resources. We encourage you to review EAP's Well-Being Resource Guide.

In addition, we encourage you to review the Employee Benefits and Assistance Program Contact List to help you address questions pertaining (but not limited) to

16

unemployment, retirement,  medical insurance and the Social Security Administration.

Sincerely,

**Amy Windrope**
Deputy Director

The Grievant applied for a reassignment. Thereafter, Kelly Cunningham, Fish Program Director, by letter to the Grievant, dated November 30, 2021, informed the Grievant she could not be reassigned. *U-17*. The letter provides in relevant part as follows:

November 30, 2021

Dear Ruthanna:

You have been engaging in the interactive accommodation process with Joceile Moore, WDFW's Reasonable  Accommodation Specialist.  As part of the accommodation process, you requested consideration for  reassignment to other positions within WDFW.

Reassignment to vacant funded positions within the agency for which you meet the qualifications has been  reviewed as an accommodation for your approved exemption from the vaccine mandate contained in the  Governor's Proclamation 21.14. There are no qualifying positions within the agency that can be used for an accommodation for being exempted from the mandate mentioned above. Unfortunately, there are also no  expectations for qualifying vacancies becoming available in the foreseeable future to be used as a reasonable accommodation.

Failure to provide proof of beginning the process of becoming fully vaccinated within ten (10) calendar days of  this notice will result in non-disciplinary separation effective December 10, 2021.  If you have accrued annual  leave, you can notify your supervisor to request to use eight (8) hours of this leave for the month of December  2021.  This will ensure your healthcare benefits continue to the end of the month in which you are separated.  Contact information is attached for follow-up with potential benefit organizations.

For additional questions on this letter, you can contact Joceile Moore, WDFW Reasonable  Accommodation Specialist at Joceile.Moore@dfw.wa.gov and 360-463-1097.

Sincerely,

Kelly Cunningham

17

Fish Program Director

On October 13, 2021, the Union filed a grievance on behalf of the Grievant. *U18*. It

provides in relevant part as follows:

Facts:

The State of Washington and WAFWP entered into negotiations concerning the impacts of Governor Inslee's Proclamation 21-14.1 which required all State employees to become fully vaccinated by October 18, 2021 or be terminated. The Proclamation provided for employees to seek religious and/or medical exemptions and to seek reasonable accommodation based upon their exemption.

On September 30, 2021 the Washington Department of Fish and Wildlife, through a letter from Deputy Director Amy Windrope, notified its employees who had received approval for exemption, and in many cases had been approved for an accommodation, that regardless of the exemption, unless the employee could telework 100% of the time the employee would be terminated on October 18, 2021.

Ruthanna Shirley applied for a religious exemption and was granted the exemption by the Agency. The Agency violated the parties' MOU on this matter and ignored the Governor's commitment to accommodate where possible. By making a blanket declaration that the only employees who would be accommodated are those who can work from home evidences bad faith bargaining by the State as well as a lack of individualized accommodation as required. Ms. Shirley can perform her essential duties through teleworking, yet her accommodation was denied. The Agency has not shown any undue hardship in attempting to accommodate Ms. Shirley.

Remedy:

Rescind the termination notice. Reinstate Ms. Shirley to her prior positon with the State and repay her for lost wages and benefits. Engage in a true individualized accommodation process. Any additional remedy deemed reasonable.

The Shirley Grievance proceeded through the step process. The parties were unable

to settle the Shirley Grievance. It was eventually set for hearing before the Arbitrator.

## II.     CONCISE STATEMENT OF FACTS
## AND POSITIONS ARGUED BY THE AGENCY.

The Agency asserted several facts and positions to uphold the separation of the Grievant

from employment with the Agency. The primary facts and positions are set forth below.

18

1.  The Grievant has alleged that the Agency violated the MOU by failing to provide her with a reasonable accommodation for a religious exemption to a vaccine mandate. *Gaul at 13-20*. Executive orders and emergency powers are normally irrelevant to labor and employment law matters, but these are not normal times. *Id. at 13:21-24*. The State of Washington has been ravaged by COVID-19 since the pandemic began in March 2020. *Id. at 13:24-14:1*. The first COVID-19 case was detected in Washington followed by deaths shortly thereafter. *Id. at 14:1-4*. Governor Inslee declared a state of emergency and did his best to keep Washingtonians safe until a vaccine was developed. *Id. at 14:4-6*. In the months that followed, the sick and dying were overwhelming Washington's healthcare system. *Id. at 14:7-8*. The pandemic caused a massive disruption of government services, including those provided by the Agency. *Id. at 14:10-12*.

2.  Vaccines became available in December of 2020. *Gaul at 14:13-14*. Data indicated that vaccines were safe and effective at reducing infections and serious disease. *Id. at 14:14-16*. Data also indicated that widespread vaccination was the best way to protect the healthcare system, avoid lockdowns, and put the pandemic behind us. *Id. at 14:14-20*. In addition, death rates and serious disease was disproportionately higher among the unvaccinated population. *Id. at 14:20-22*.

3.  Governor Inslee, considering data from the Center for Disease Control and the Washington State Department of Health guidelines issued Proclamation 21-14 which prohibited workers from working for the State after October 18, 2021 if they were not vaccinated or accommodated. *Id. at 14:23-15:7*.

4.  Proclamation 21-14 also provided an exemption and accommodation based upon a disability and/or religion. *Gaul at 15:16-19*. Workers who have sincerely-held religious beliefs, practices, or observances consistent with the Civil Rights Act of 1964 and Washington law against discrimination were not required to get vaccinated. *Id. at 15:11-15*.

5.  Proclamation 21-14 further required agencies to provide workers with a reasonable accommodation if doing so was not an undue hardship. *Gaul at 15:16-19*. Accommodations must comply with COVID-19 safety measures that are consistent with the State Department of Health. *Id. at 15:15-22*. The assessment of any accommodation must be individualized. *Id at 15:22-24*.

6.  Implementation of the vaccine mandate began with a memorandum of understanding between the Agency and the Union. *Gaul at 15:1-16:4*. The MOU recognizes that vaccines are effective in reducing infections and serious disease. *Id. at 16:5-8*. The Union further recognized that vaccines are the primary way to avoid future lockdowns. *Id. at 16:8-10*.

7.  The MOU, like the proclamation, requires workers to be vaccinated or be covered by an exemption and accommodation. *Gaul at 16:10-13*.

8. The Agency's first witness, Mr. Spikes, will testify about the implementation of the vaccine mandate, pre-existing policies that were followed, the accommodation process, the risk associated with unvaccinated workers, identifying which essential functions unvaccinated workers could perform without exposing themselves to others and risking death or serious illness from COVID-19, and the importance of remote work for workers who do not have vaccine protection. *Gaul at 16:14-17:1.* Mr. Spikes will also testify regarding his knowledge of the Grievant's request for an accommodation for the essential functions of her position which could not be performed remotely. *Id. at 17:2-5.* He shall also testify that the Agency attempted to accommodate the Grievant with a 100% telework position. *Id. at 17:6-8.*

9. The Agency's second witness, Kelly Cunningham will testify about his role in reviewing accommodation requests, the process for approving or denying requests, and the "forward-facing" essential functions of the Grievant's former position. *Gaul at 17:9-14.*

10. The Agency's third witness, Charlene Hurst, will testify about Grievant's job specific duties, frequency of in-person contact, including field work, indoor work, work in vehicles, and places where COVID-19 might spread. *Gaul at 17:15-19.*

11. The evidence will show that the Agency complied with all state and federal laws and internal policies when it approved her religious accommodation request. *Gaul at 17:21-23.* After considering her request for an accommodation the Agency discovered that it could not accommodate the Grievant or reassign her without an undue hardship. *Id. at 17:23-18;1.* Any attempt to keep the Grievant in her position would have ignored the essential functions of her position or constitute a violation of the law for failure to comply with the vaccine mandate. *Id. at 18:3-5.*

12. The Agency provided an individualized accommodation process for the Grievant and reasonably concluded that no accommodation was available for her in the positon that she held. *Gaul at 189:20-24.* Key to this determination were the facts available to the agency, agency personnel, and the public at the time the decision was made. *Id. at 189:24-190:2.*

13. The Agency's actions and decisions were made around August and October 25 of 2021. *Gaul at 190:24:3-4.* At this time, the Delta variant of COVID-19 was spreading throughout the country. *Id. at 190:4-5.* It was twice as transmissible as the Alpha wave and caused widespread mortality. *Id. at 190:5-7.* It disrupted government operations on a massive scale. *Id. at 190:7-8.*

14. Agency guidance from the Department of Health, the Office of Financial Management, and federal guidance from the Center for Disease Control acknowledged that vaccines were the best way to prevent transmissions and death. *Gaul at 190:9-13.* In the *MOU, J-4*, the parties acknowledged that vaccines were effective in reducing transmissions, although the Union apparently denies this now. *Id. at 190:13-18.* The Union presented no evidence that vaccines do not reduce transmission of COVID-19. *Id. at 190:18-20.*

20

15.  The position held by the Grievant was a supervisory positon with essential functions divided into two categories, on-season and off-season. *Gaul at 190:21-23,* During off-season, the essential functions of her position involved less in-person contact. *Id. at 190:24-25.* During on-season, the position fills in for employees who cannot make it to their job site, provides training, interviews, and most importantly, supervises several employees. *Id. at 190:25-191:4.*

16.  Before the pandemic, it was obvious that supervisors supervise. *Gaul at 191:5-6.* They were not merely a resource for subordinates to call for advice or questions. *Id. at 191:6-6.* As testified by Mr. Spikes and Mr. Cunningham, supervising is an in-person activity. *Id. at 191:8-10.* There is nothing in the law, CBA, or MOU, that requires the Agency to change its expectation that supervisors supervise in-person to supervisors supervising remotely.  *Id. at 191:6-10.*

17. The Union would have essential job functions of the Grievant's position description modified so that it is no longer a supervisory position. *Gaul at 191:18-20.* If the Grievant's position was a 100% telework position, it would not be a supervisory position. *Id. at 191:20-21.* Rather, it would be a data entry or resource position. *Id. at 191:20-23.* The Agency is not required to modify, redistribute, or remove essential job functions such as supervision and training for this positon. *Id. at 191:23-192:1.*

18. Mr. Winther testified that the Agency could have kept the Grievant on accommodation status by modifying the essential functions of her position. *Gaul at 192:2-5.* Such a modification is not required by law and the Agency has no obligation to do so. *Id. at 184:2-3.* Essential functions were temporarily modified during the Delta wave to keep employees safe. *Id. at 192:5-10.*

19. Mr. Winther also protested the denial of the Grievant's accommodation in Agency's Exhibit 14. *Gaul at 192:11-12.* He stated that the Grievant could have been accommodated, but stated this in regard to her off-season duties, not her on-season duties. *Id. at 192:14-16.* The Grievant could not be safely accommodated in her position with removing her essential functions during the on-season. *Id. at 192:16-19.*

20. Although Mr. Winther explained that some employees were allowed full-time telework before the pandemic began, the Union did not list a single supervisor who was allowed to telework full-time. *Gaul at 192:25-193:1.* This is because there is no such example. *Id. at 193:1-2.*

21. The Agency had no obligation to provide a telework accommodation during the off-season because it knew it could not provide a telework accommodation during the on-season. *Gaul. at 193:3-11.* The Agency is not obligated to engage in an inefficient distribution and redistribution of essential resources.  *Id. at 193:9-11.*

22. The Grievant's position requires her to go into the field and she was expected to interact in-person. *Gaul at 193:12-13.* Unexpected in-person interaction adds to the reasons she

21

could not be safely accommodated without a vaccine. *Id. at 193:14-16*. Nothing in the record indicates that it was unreasonable for Mr. Cunningham, the appointing authority, to conclude the Grievant could safely interact with her subordinates and perform her essential functions. *Id. at 193:16-20*.

23.  The Agency concluded that it could not provide an accommodation to the Grievant entirely out of concern for the safety of staff and the public in September and October of 2021, during which time the Delta wave was spreading across the State. *Gaul at 193:21-194:1*. This variant was twice as transmittable than the Alpha variant and disrupted government operations on numerous occasions. *Id. at 194:1-4*.

24. Given all the reasons expressed, the Arbitrator should conclude that the Agency provided an individualized accommodation process to the Grievant and complied with all applicable rules, regulations, and laws. *Gaul at 194:5-9*.

25. It is unclear if the Grievant was ever granted a temporary accommodation, and if so, it is unclear if it ever went into effect. *Gaul at 215:11-15*. *U-5* is not signed by Mr. Winther. *Id. at 215:19-21*. Mr. Cunningham testified he never approved one for the Grievant. *Id. at 217:2-3*.

26. There has been argument that vaccines are not effective. *Gaul at 219:11-13*. The MOU provides that the parties agreed vaccines were effective in reducing infection and serious disease and widespread vaccination is the primary means of protection from COVID-19. *Id. at 219:13-18*.

27. The Union's argument that the Agency wishes to get back to an ideal world is incorrect. *Gaul at 219:21-24*. Governor Inslee declared a State of Emergency ends on October 31, 2022 and everyone is going back to normal. *Id. at 219:24-220:1*.

28. In regard to Hardship, removing essential functions is expensive and more than de minimis. *Gaul at 220:9-11*. Changing a supervisory position to something akin to a data entry position or a receptionist position would be costly and an undue hardship. *Id. at 220:12-17*.

29. Historically, supervisors interact in-person. *Gaul at 220:18-19*. It has in-person essential functions. *Id.at 220:19-20*. Supervisors interact in-person with employees and the public. *Id. at 220:20-22*. Removing the supervision function is a hardship on the Agency. *Id. at 221:2-4*.

### III.      CONCISE STATEMENT OF FACTS <br> AND POSITIONS ARGUED BY THE UNION.

1.  The arbitration is not about whether vaccines are appropriate or efficacious for COVID-19. *Fenrich at 18:18-20*. Nor is it about masking or other matters appropriate given COVID-19. *Id. at 18:20-22*.

2.  It is important to remember the timeframe of the Shirley Grievance. *Fenrich at 18:23-24*. COVID hit Washington State in March 2020. *Id. at 18:25-19:1*. Eighteen months later the Agency decided to start terminating some of its employees who could not receive the vaccine, like the Grievant, for religious purposes. *Id. at 19:2-4*. The Agency chose to terminate the Grievant despite the fact that she was exceeding expectations for her duties in a safe and efficacious manner during this 18-month period. *Id. at 19:5-8*. The Grievant received the Director's award for safe and effective COVID-19 practices about one year prior to her termination. *Id. at 19:8-12*.

3.  This arbitration is about the Agency's failure to properly implement the Governor vaccine mandate and the subsequent MOU that the State reached with all unions. *Fenrich at 19:13-17*.

4.  On August 20, 2021, Governor Inslee issued a proclamation requiring all employees of cabinet agencies, healthcare workers, and certain contractors to be fully vaccinated against COVID-19 or receive an exemption from the vaccine because of religious or medical reasons. *Fenrich at 19:18-21*. An exemption would allow the employee to work through the reasonable accommodation process to determine if they could be accommodated due to the vaccine mandate. *Id. at 19:21-20:1*. The Proclamation did not apply to the Agency because it was not a cabinet agency. *Id. at 20:1-3*. Almost one month later the Governor revised the mandate to make it applicable to the Agency. (9/29/21) *Id. at 20:1-3*. The proclamation, *J-2*, provided the Grievant with an exemption process for a reasonable accommodation and the Grievant applied through this process. *Id. at 20:8-13*.

5.  The Union is in arbitration because the Agency did not engage in an appropriate accommodation process that meets the statute, proclamation, and the MOU. *Fenrich at 20:14-19*. The Union represents over 900 bargaining unit members. *Id. at 20:20-23*. The Grievant was a member prior to her termination in 2021. *Id. at 20:23-25*. The Agency is attempting to frame the issue as if it were a nondisciplinary to follow reasonable accommodation guidelines, deciding instead to provide an exclusive accommodation for employees who could work 100% telework and if so, the employee would be accommodated. *Id. at 20:25-21:6*.

6.  The Agency did not consider looking at individual jobs. *Fenrich at 21:7*. It did not consider if an accommodation would be an undue hardship to the Agency. *Id. at 21:7-9*. Rather than taking an individualized approach of accommodation to an employee, it initiated a global process, which in and of itself, is a prima facie violation of the accommodation process. *Id. at 21:9-13*. It was not an individualized review as noted by Mr. Gaul. *Id. at 21:21-22*.

7.  The Agency viewed the situation in terms of how it viewed an ideal work environment and not the work environment at the time of the Grievant's separation. *Fenrich at 21:16-20*. A reasonable accommodation process requires a review of work at the time of the request, not at a time it is hoped an event would happen. *Id. at 21:20-22*.

8.  In October of 2021, there were no requirements for employees to show up for work in-person. *Fenrich at 21:23-25*. Work was done via a virtual platform, meetings were held outdoors, and indoors, with social distancing, masks, and an attestation. *Id. at 21:25-22:4*. This was the work environment prior to its recent decisions regarding what the work environment will be. *Id. at 22:5-6*.

9.  The Agency refused to modify position descriptions to reflect the work environment of the last 18 months. [4] *Fenrich at 22:7-9*. The State and the Agency have not gone back to 100% in-person although the mandate went into effect in October of 2021. *Id. at 22:14-17*. At present, employees need only come to work once a week, in-person or in the field. *Id. at 22:17-20*. The environment in which they viewed the Grievant's future work environment is fiction and not reality. *Id. at 22:20-22*.

10. Testimony will show that the Grievant's position required no in-person interaction for approximately one-half of the calendar year and during the other half, it was minimal. *Fenrich at 22:23-23:1*. Yet the Agency knew that from October of 2021 through April of 2022, the Grievant had no in-person obligations, but it still terminated her because she might have to go into the field or might have to be around someone. *Id. at 23:1-9*. The Grievant had safely performed her job for the 18 months prior to the vaccination mandate. *Id. at 23:9-10*.

11. The Grievant received a reasonable accommodation from the Agency on September 22, 2021. *Fenrich at 23:11-13*. The accommodation was for exactly the same type of work environment that she had for the prior 18 months after the pandemic began. *Id. at 23:13-15*. When she had to meet people in-person, she masked, maintained a safe distance of at least six feet, met outside when appropriate, and attested whether or not she had COVID-19 symptoms. *Id. at 23:15-19*.

12. On September 22, 2021, the Grievant was granted an accommodation. *Fenrich at 23:1-2*. Eight days later her accommodation was rescinded because her position was not one that would allow her to telework 100%. *Id. at 23:21-24*. Nothing changed between these dates, i.e., her work duties, COVID-19 status, or CDC recommendations. *Id. at 24:24-24:1*. Nothing changed except the Agency decided to move from an individualized accommodation to a global view that she had to be able to telework 100% or be unable to work for the Agency. *Id. at 24:1-6*.

13. It is the Union's hope that after the arbitration hearing is completed, the Arbitrator understands that the Agency did not fulfill its obligation to provide an individualized review of her work in regard to an accommodation, that the Agency elected to use a one-size-fits-all approach, which on its face violates reasonable accommodation

---

[4]  The parties sometimes framed a question, statement, or response in terms of an "18-month" period. This period of time is meant to include the time Governor Inslee issued his Proclamation in March of 2020 and the time the Grievant was separated from employment with the Agency in October of 2021. *Fenrich* at 195:6-9.

requirements of both state and federal law, the proclamation, and the MOU. *Fenrich at 24:7-15*.

14. The Agency is claiming that it separated the Grievant due to an inability to accommodate her exemption to the COVID-19 vaccine mandate. *Fenrich at 194:18-21*. It is undisputed that the Agency reviewed ant granted her an exemption from the vaccine mandate. *Id. at 194:21-22*. The Agency granted the Grievant a religious exemption because she had a valid religious exemption and demonstrated by *U-3,* which shows that she hasn't had a vaccine as an adult for 15-years prior the development of the COVID-19 vaccine. *Id. at 194:21-195:3*. Hence, the law and the MOU required the Agency to engage in a reasonable accommodation review and accommodate the Grievant unless the accommodation would result in an undue hardship. *Id. at 195:8*. The Agency continues to forget that the fact that they spoke to each individual does not does not constitute an individual review as to whether an accommodation can be made for their job. *Id. at 195:8-12*.

15. The Employer changed positions after granting a reasonable accommodation to the Grievant as per Amy Windrope's email response to Eric Winther. *U-16*. Eight day later she stated that she felt bad about having to rescind 13 accommodations, including the one to the Grievant, because the Agency revisited the accommodations and decided supervisors would get one because they might have to interact with other people. *Id. at 195:9-22*.

16. The Agency did not share how Joceile Moore, their accommodation expert, created an accommodation approving masks and social distancing and how it later became an undue hardship. *Fenrich at 195:3-196:7*.

17. The Agency cannot just speak to someone, check a box, and conclude an individual assessment was done when the only conclusion is that supervisors are not entitled to an accommodation. *Fenrich* at 196:8-13. The Grievant could have continued to do what she had been doing when she met people in-person, by wearing a mask and being social distanced, while also teleworking. *Id. at 196:13-20*.

18. Mr. Spikes testified that it was his assumption that all supervisors met with their employees. *Fenrich at 196:21-22*. To say that teleworking is allowed only for workers who don't supervise is disingenuous, when today, one-year after the Grievant's termination, supervisors are still teleworking, shows no undue hardship. *Id. at 196:23-197:5*.

19. The Agency keeps talking about an ideal world that it wants to achieve. *Fenrich at 197:6-7*. The Agency hasn't had an ideal world for 3 years. *Id. at 197:4-5*. The Agency has to realize that it dealing with a different world and it has to adapt to it. *Id. at 197:7-9*. Workers are being penalized while the Agency tries to get to the ideal world. *Id. at 197:10-13*.

20. The Agency has violated Title VII. *Fenrich at 197:14-198:1*. The Grievant and her workgroup have been working with each other, wearing a mask, for 18 months until the vaccine mandate. *Id. at 197:2-5*. A reasonable accommodation is not a singular accommodation. *Id. at 198:8-9*. The ethereal is not an undue hardship. *Id. at 198:10-12*.

21. On September 22, 2021, the Grievant met with the Agency's reasonable accommodation expert and was informed that she would be accommodated. *Fenrich at 198:13-20*. However, it was rescinded without a single statutorily significant basis. *Id. at 198:20-21*.

22. Undue hardship is defined as causing more than a de minimis cost and according to EEOC guidelines, U-19 through 21, undue hardship means difficulty or expense. *Fenrich at 198:22-199:1*. In the case of the Grievant, she did not have to change her duties for 7 months of the year and only minimally for the remaining 5 months. *Id. at 199:1-5*. Her supervisor testified that he was okay with her meeting virtually, by phone, or text. *Id. at 199:4-6*.

23. The Grievant met with staff only twice a year. *Fenrich at 199:7-8*. There have been no complaints about the Grievant, including her ability to perform her work, communicate, or her willingness to support subordinates. *Id. at 199:10-17*. In addition, the Grievant received an award for leadership during COVID. *Id. at 10-11, U-25*. This same management decided she could no longer do so and summarily terminated her. *Id. at 199:13-17*.

24. The Grievant's supervisor testified he did not require in-person meetings during the pandemic. *Fenrich at 199:18-21*. People just looked at words on paper without talking to the Grievant. *Id. at 199:20-21*. Nobody went over her position description with her. *Id. at 199:23-24*. The Grievant was never asked how she managed to do her work because Mr. Winther testified she could do it. *Id. at 200:3-4*.

25. The Agency was unable to realize all the good work the Grievant did because it made the decision that there is only one accommodation for the Grievant. *Fenrich at 200:6-9*.

26. The Agency did not conduct an individualized, fact specific accommodation review and weigh the requested accommodation against any undue hardship it would create for coworkers or the Agency. *Fenrich at 200:8-19*.

27. The fact that the Agency met with the Grievant does not indicate that the meeting was based upon fact specific information, especially when a position description is not discussed. *Fenrich at 200:20-22*. This is not a fact specific situation. *Id. at 200:22-24*. It could not be fact specific because the Agency never asked the Grievant what she did. *Id. at 200:22-24*.

28. The Agency created a fictional moment in time to set forth a work standard it has not followed. *Fenrich at 201:1-2*. Workers did not begin to meet in-person until last summer and it was only once a week. *Id. at 201:2-4*.

26

29. The Grievant's positon description does not require her to supervise in-person. *Fenrich at 201:6-7*. The Agency could not identify any resource that supports its proposition that supervision must be in-person and the Agency is terminating workers in a punitive manner. *Id. at 201:6-10*.

30. The Agency did not consider the 18 months in determining if an accommodation was reasonable. *Fenrich at 194:7-10*. It did not consider if the Grievant was performing her work in an efficient and professional manner, to determine if an accommodation could be made in terms of either a "sustainable" or "optimal" environment. *Id. at 205:3-12*.

31. A reasonable accommodation does not require the employee to fit into an optimal situation. *Fenrich at 205:13-15*. It requires the Agency to determine "can we still do our main duties?" It does not require the optimal. *Id. at 205:15-17*. However, the Agency's witnesses persisted on asserting that "what we want is to get back to," even after knowing a year into the Grievant's termination that it is not close to being there and might never be in an optimal environment. *Id. at 205:18-22*.

32. Mr. Winther, the Grievant's supervisor was not asked for the specifics of the Grievant's work in the reasonable accommodation process. *Fenrich at 205:23-25*. He was only asked if the Grievant "could telework for some of her duties*?" Id. at 205:25-1*. He was asked if she could wear a mask and social distance? *Id. at 206:1-7*. Those were the only questions he was asked about the Grievant's accommodation. *Id. at 206:6-7*. Joceile Moore asked Mr. Winther these questions supported by *U-4 and U-14. Id. at 206:1-7*.

33. The Agency did not go back to the accommodation process after it rescinded the Grievant's exemption, because it was not going to consider accommodations. *Fenrich at 206:17-200*. Although the Agency was not going to allow an exemption, it did not consider if there was a way for the Grievant to do her work teleworking or staying away from subordinates while she performed the essential functions of her duties. *Id. at 206:12-16*.

34. The Agency changed positions midstream on the Grievant's accommodation exemption and did not return to the individualized review process which is what it should have done. *Fenrich at 206:17-20*.

35. Fear of COVID-19 and the unvaccinated is the result of the Agency's decisions. *Fenrich at 206:20-21*. *E-7* provides that the Agency will only accommodate supervisors if 100% of their work is done teleworking without contact with others. *Id. at 207:1-3*. The Agency also concluded that if supervisors have to have contact with others, the supervisors will have to be masked. *Id. at 207:3-5*. Approximately a week later, the Agency determines it is not going to allow masking. *Id. at 207:7-9*. The Agency went back to the position that that an accommodation is reasonable only if the employee is kept 100% away from other people. *Id. at 200:3-5*. The Agency never justified the change in positions. *Id. at 207:9-10*. That week, there was no change in the pandemic, no change in the Governor's proclamation which the Agency had for one month, and no

27

change in the Grievant's duties. *Id. at 207:11-16.* Both the CDC and the EEOC have stated that it is a reasonable accommodation to require masking for the unvaccinated. *Id. at 207:19-21.* The Agency did not follow the CDC and EEOC guidelines it said it was following. *Id. at 207:21-22.* The Agency created its own guidelines without any support. *Id. at 207:23-24.*

36. The Agency's positon contradicts OFM guidance. *Fenrich at 207:25-208:1-2.* The OFM SHR Vaccine Mandate, Proclamation 21-14 COVID-19 Vaccination Requirement," page 10, provides for an individualized accommodation in the determination of whether or not a person's position can be modified so they can work. *Id. at 208:2-5.* However, the Agency said no modifications. *Id. at 208:6.* The Agency decided to use the antithesis of looking at an individualized review and make a decision for an entire class of employees, specifically, supervisors. *Id. at 208:6-11.*

37. The EEOC and Title VII require an accommodation if it can be provided without undue hardship. *Fenrich at 208:12-14.* There is no undue hardship if an accommodation is not beyond de minimus cost. *Id. at 208:14-15.* The Agency never claimed a cost. *Id. at 208:15.* The Grievant asked the Agency to explain the undue hardship and the Agency responded by saying see your termination letter rather than "here's why it is an undue hardship*." Id. at 208:16-20.* The Agency never said there was an undue hardship from between 9/22 when it said she could work with an accommodation until 9/30 when it determined she could not. *Id. at 208:17-22.* Neither the State or the Agency has proven that somebody who is exempt from the vaccine requirement would increase the spread of COVID-19 and this position is a fallacy. *Id. at 209:1-6.*

38. The Agency keeps referring to the MOU which is a boiler plate agreement. *Fenrich at 209:7-8.* While the agreement refers to people contracting COVID-19 and spread of COVID-19, the agreement does not say that the unvaccinated caused either one. *Id. at 209:9-13.* The Grievant received a leadership award for the first 18 months of the pandemic, nobody in her work group contracted the virus, she did not contract the virus, and the accommodation that the Agency chose to ignore was clearly working. *Id. at 209:14-22.*

39. The Agency cannot show that the Grievant's chosen accommodation impaired workplace safety. *Fenrich at 209:23-24.* The Agency asserts that it could have but mere assertion is not sufficient to override the Grievant's right to an accommodation. *Id. at 208:24-200:1-5.* The spread of COVID-19 is still in the workplace although vaccination is a requirement. *Id. at 210:2-5.* Vaccination did not stop the spread. *Id. at 210:4-5.*

40. There was no undue burden for the Agency to terminate the Grievant before the beginning of the seven-month season. *Fenrich at 210:25-211:2.* The Grievant's job still has not been filled with a permanent employee. *Id. at 211:3-4.*

41. The EEOC guidelines of October of 2021 states that a reasonable accommodation for a person with a religious exemption is masking and social distancing. *Fenrich at 211:21.*

42. The Agency must show a direct threat of the unvaccinated to others in the workplace and no such proof was offered. *Fenrich at 211:22-24*.

43. The EEOC Guidelines in October 2021 clearly state that masking and social distancing was a reasonable accommodation for employees who have been granted a religious exemption and who must be around other employees. *Fenrich at 211:12-21*. See 29 CFR §1630.

44. When the Grievant was terminated, the Agency was still requiring employees to wear masks and social distance so guidelines were in place. *Fenrich at 212:8-23*. With these guidelines in place, the Grievant could have easily been accommodated. *Id. at 212:23-213:6*. The Grievant was not a threat to the workforce. *Id. at 213:10-11*. The Grievant had practically zero in-person interaction with coworkers. *Id. at 213:13-15*. There is no undue hardship. *Id. at 213:17-18*.

45. The Agency failed to meet its obligation to provide the Grievant with a reasonable accommodation. *Fenrich at 213:20-21*. The Union requests reinstatement and back pay with all benefits. *Id. at 213:21-24*.

46. In regard to *U-5*, the Grievants testimony is supported by the fact that Joceile Moore told her that her reasonable accommodation request would be granted and *U-16*, where Deputy Amy Windrope said she had to rescind the accommodations of several employees. *Fenrich at 218:1-6*.

47. There is no evidence that the Grievant supervised in-person. *Fenrich at 221:15-17*.

*48.* While the MOU states that vaccines are important, it also says that exemptions and reasonable accommodations will be provided. *Fenrich at 222:2-9*.

49. The question is, was there a reasonable accommodation to vaccination? *Fenrich at 222:10-11*. Joceile Moore, the reasonable accommodation expert for the Agency found that the Agency could accommodate the Grievant but the Agency decided not to follow her advice and therein is the unreasonableness of the Agency's decision. *Id. at 222:23-223:2*

## IV.   <u>STIPULATED ISSUES.</u>

1. The parties agreed that the Arbitrator has jurisdiction over the

Shirley Grievance. *Fenrich at 11:10, Gaul at 11:11-12*.

2. The parties agreed that all steps in the grievance process were met or waived.

*Fenrich at 11:10, Gaul at 11:11-12*.

3. The parties agreed that the Shirley Grievance was procedurally

29

and substantively arbitrable. *Fenrich at 11:25, Gaul at 11-24*.

        4.   The parties agreed that the issue would be framed as follows:

        Was the State of Washington's termination of the grievant appropriate under Governor Inslee's proclamation regarding COVID-19, and if not, what is the appropriate remedy? In addition, the burden of proof shall shift to the Union on the issue of reasonable accommodation. *Fenrich at 12:12-13, Gaul at 12-22*.

## V.      <u>DID THE AGENCY APPROPRIATELY TERMINATE THE GRIEVANT?</u>

The Agency, to appropriately (properly) terminate (separate) the Grievant from employment, must have done so in a manner that is consistent with the Proclamations and Title VII. Otherwise, the separation is unlawful and must be set aside. [5]

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his/her compensation, terms, conditions, or privileges of employment" on the basis of the individual's religion. Hence, an employee who claims they cannot be vaccinated against COVID-19 because of a religious belief, practice, or observance may be exempt from the vaccination requirement.

An employee seeking relief under a failure to accommodate theory must establish a prima facie case of religious discrimination. The employee must prove that (1) he/she had a bona fide religious belief that conflicts with a condition of employment rule, policy, or requirement, (2) he/she informed his/her employer of this belief, and (3) he/she was discharged for failing to comply with the conflicting condition of employment. *See Complainant, v. Mayorkas,  Sec'y, DHS (Citizenship and Immigration Serv.)*, 2020001712, 2021 EEOPUB LEXIS 2529, at *41–42 (EEOC

---

[5]  The parties used the words "terminate" and "separate" interchangeably. Both of these words were used to describe the non-disciplinary discharge of the Grievant in relation to the Proclamations and Title VII.

2021). If an employee establishes a *prima facie* case, the employer must show that it made a good faith effort to reasonably accommodate the religious beliefs with a reasonable accommodation, and if such proof fails, the employer must show that the alternative means of accommodation proffered by the employee could not be granted without imposing an undue hardship on the employer's operations.

## V.A. <u>PRIMA FACIE CASE.</u>

The record of the Shirley Grievance indicates that the Grievant has a religious belief that conflicts with being vaccinated with the COVID-19 vaccine, that she informed the Agency, and that she received a non-disciplinary separation for refusing to take the COVID-19 vaccine. The Grievant established a prima facie case. The Agency did not contest the Union's assertion that the Grievant had proven a prime facie case.

## V.B.      <u>REASONABLE ACCOMMODATION.</u>

Title VII requires employers to use good faith efforts to negotiate an employee's reasonable religious accommodation without incurring undue hardship. *Yott v. American Rockwell Corp*., 602 F.2nd 904, 908 (9th Cir. 1979). The reasonableness of the accommodation is fact-sensitive and is determined on a case-by-case basis. *Id.*

The Grievant and the Agency worked together to determine if a reasonable accommodation for the Grievant existed. The Grievant and the Agency agreed to a reasonable accommodation as set forth in *U5*. The Agency decided to rescind the reasonable accommodation set forth in *U-5* because it revisited the exemption and accommodation process and determined that supervisors did not qualify for a religious exemption and accommodation. This was because unvaccinated supervisors could spread COVID-19 while meeting with coworkers and the public.

The Union maintained that the Agency improperly rescinded *U-5*. The Agency maintained it was an undue hardship. An employer is under an obligation to use good faith efforts to accommodate an employee's religious beliefs. *Heller v. EEB Auto Co.*, 8 F.3d 1433 (9th Cir. 1993).

If an attempt to accommodate is unsuccessful, the employer must show that it was not reasonably possible to accommodate the employee without an undue hardship. *EEOC v. Townly Engineering Mfg. Co.* 859 F.2d 610, 615 (9th Cir. 1998). If negotiations do not produce a proposal by the employer that would eliminate the religious conflict, the employer must either accept the employee's proposal or demonstrate that it would cause undue hardship. *Id.* Courts have allowed employers who do not attempt to provide a reasonable accommodation to move directly to proving that an accommodation would create an undue hardship. *Tooley v. Martin-Marietta Corp.*, 648 F.3d 1239 (9th Cir.) *cert denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2nd 639 (1981). Absent an agreement by the parties, your Arbitrator must determine if *U-5* imposes an undue burden on the Agency.

## V.C.   UNDUE HARDSHIP

Title VII does not require an employer to provide a religious accommodation if it would pose an "undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). The employer need offer only a reasonable accommodation. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70  (1986). Whether a proposed accommodation constitutes an undue hardship is determined by the "factual context of the case." *American Postal Workers Union v. Postmaster General*, 781 F.2d 772, 775 (9th Cir. 1986).

The Supreme Court defined "undue hardship" for religious discrimination cases as imposing "more than a de minimis cost." *Id. at 84.* An accommodation that imposes anything more than a *de minimis* cost on the employer causes  an undue hardship.  *Id. at 84.* However, underline{only if the

employer can show that **no accommodation would be possible without undue hardship** is it

excused from taking the necessary steps to accommodate the employee's religious beliefs. *Opuku-*

*Boateng v. State of California*, 95 F.3d 1461, 1467 (9th Cir. 1996).

      Both economic and non-economic costs matter. *Id.* at 83; *Webb v. City of Phila.*, 562

F.3d 256, 259-60 (3d Cir. 2009). Courts have recognized the following economic costs: lost

efficiency; and payment of overtime. [6] *TWA*, 432 U.S. at 84. Courts have recognized the

following non-economic costs:

- Violation of a collective bargaining agreement. *Fouche v. N.J. Transit*, 470 F. App'x 96, 96-97 (3d Cir. 2012).

- Increasing the difficulty or danger of work for other employees. *Smith v. Bethlehem Steel Corp.*, No.87-5340, 1989 U.S. Dist. LEXIS 1432, at *13-25 (E.D. Pa Feb. 13, 1989).

- Compelling other employees to work additional undesirable weekend shifts. *Aron v. Quest Diagnostics, Inc.*, 2005 U.S. Dist. LEXIS 49245, at *1 (D.N.J. June 30, 2005) *aff'd* 174 Fed. App'x 82, 83 (3d Cir. 2006).  This is especially true where the employer  has pre-existing staffing problems and the employee seeking the exclusion from weekend work as a part-time employee whose very job function is to provide relief.  *Smith*, 1989 U.S. Dist.  LEXIS 1432, at *13-15.

- Requiring more senior employees to work. *Smith v. United Ref. Co.*, No. 77-71 Erie, 1980 U.S. Dist. LEXIS 9038, at *25-26 (W.D.  Pa. Jan. 30, 1980).

- Violates an employer's diversity and nondiscrimination policy. *Peterson v. Hewlett-Packard*, 358 F.3d 559 (9th Cir 2004). [7]

      Hypothetical hardships do not constitute an undue hardship. Case law in the Ninth Circuit is

---

[6]  The record of the Shirley Grievance indicates the accommodation set forth in *U-5* is not an economic issue. In addition, the traditional non-economic issues with coworkers do not exist. For example, coworkers did not complain about the Greivant's accommodation set forth in *U-5* nor does the accommodation violate the CBA.  In fact, as noted above, the Grievant's supervisor, Mr. Eric Winther, testified that he supported the Grievant's reasonable accommodation set forth in *U-.5, Winther at 142:5.*

[7]  It is significant to note that the United States Third Circuit Court of Appeals ruling in *Groff v. Dejoy*, No. 21-1900, filed on May 25, 2022. This case is before the United States Supreme Court. Extensions of time have been granted for the submission of briefs. Oral argument has yet to be set. Issues on appeal include (1) Whether the court should disapprove the more-than-de-minimis-cost test for refusing religious accommodations under Title VII of the Civil Rights Act of 1964 as set forth in *Trans World Airlines, Inc. v. Hardison*; and (2) whether an employer may demonstrate "undue hardship on the conduct of the employer's business" under Title VII merely by showing that the requested accommodation burdens the employee's coworkers rather than the business itself.

clear that:

> "hypothetical moral problems are clearly insufficient to establish undue hardship.
> 'Even proof that employees would grumble about a particular accommodation is not
> enough to establish undue hardship.'" *Opuku-Boateng*, 95 F.3d 1461, 1474 (9th Cir.
> 1996), citing *Anderson v. General Dynamics Convair Aerospace Div.*, 589 F.2d 397,
> 402 (1978), *cert denied in International Ass'n of Machinists and Aerospace Workers
> AFL-CIO v. Anderson*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Burns
> v. Southern Pac. Trans. Co.,* 589 F.2d 403, 407 (9th Cir. 1978) cert. denied, 439 U.S.
> 1072, 99 S.Ct. 843, 59 L.Ed.2d 28 (1979).

 "A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships; instead, it must be supported by proof of actual imposition of co-workers or disruption of the work routine." *EEOC v. Townly Engineering Mfg. Co.* 859 F.2d 610, 615 (9th Cir. 1998).

### V.C.1    APPLICATION OF THE PROCLAMATIONS
### AND TITLE VII TO THE SHIRLEY GRIEVANCE.

The Agency's blanket prohibition against supervisors receiving a religious accommodation is not per se a violation of Title VII. If the Agency's conclusion is based upon a good faith attempt to accommodate employees without incurring undue hardship and it is supported by data and other evidence, rather than hypothetical hardships and conclusions unsupported by the evidence, the employer's action is justified and does not violate the Proclamations and Title VII.

The Agency argued that it's actions were justified under the management rights provision of the CBA (Article 12). The Union appeared to allude that the Grievant was terminated (separated) without just cause per the CBA (Article 26) and in violation of the MOU.

Proclamations have the full force and effect of law and supersede the CBA and MOU. [8] The parties may not agree to matters inconsistent with the Proclamations or other laws. The contract

---

[8]   RCW 38.08 and 43.06 concern the governor's powers and duties. RCW 38.52 relates to emergency management. RCW 43.06.220)(h)(1) and (3) address the governor's powers pursuant to proclamation in a state of emergency. The State of Washington Supreme Court has agreed to hear a challenge to Governor Inslee's emergency powers in the context of Washington's eviction moratorium. One of the primary issues concerns contract rights in the context of a rent moratorium. Oral argument is scheduled on February 23, 2023. See *Gonzales v. Inslee and the State of Washington*, 21 WashApp.2nd 110, 504 P.3d 890 (2022).

rights of the parties have been limited by the Proclamations. The contract rights are valid to the extent they do not violate the Proclamations and Title VII. The Proclamations and Title VII control the CBA and MOU in the analysis of whether the Shirley Grievance should be granted or denied.

The Arbitrator has considered Title VII and the case law construing and interpreting how it should be applied, given the context of Shirley Grievance. The Arbitrator, after reviewing the exhibits and the testimony of the witnesses, is mandated to find that the Agency (1) did not make a good faith effort, under established case law, to find a reasonable accommodation before asserting an undue hardship, (2) did not establish undue hardship because it's conclusions were unsupported by the evidence, and (3) violated the Proclamations and Title VII. These three conclusions are interrelated. Each of the sixteen (16) items below, standing alone, or collectively, support each of the Arbitrator's three (3) conclusions. The Arbitrator's conclusions are based upon the following totality of facts and circumstances: [9]

1. The Agency's position is contrary to the position taken by the EEOC experts who are responsible for enforcing Title VII accommodations. This is clear from a U.S. Equal Employment Opportunity Commission publication. *U-21*. As published: "**I Need a Modification of My Employer's <u>COVID-19 Safety Requirements.</u>** If you need a modification to your employer's safety requirements or equipment because of a medical condition or a **religious belief**, or observance, you might be able to get a reasonable accommodation. For example, you might be able to get a different mask as a reasonable accommodation. Or, if **you did not take a COVID-19 vaccination** because of your disability or religious belief, practice, or observance, you **might be able to get an exception to your employer's vaccination requirement, and instead, ask to use masks, social distancing**, schedule changes, or reassignment to stay safe at work." (Emphasis added).

   (a) On July 20, 2021 the CDC published guidance regarding masks and social distancing. *U-19*. It provides in relevant part as follows:

      On July 27th, the CDC updated its guidance for fully vaccinated people, recommending that everyone wear a mask in public settings or in areas of

---

[9] Some facts and finding may be mentioned more than once

substantial and high transmission, regardless of vaccination status. This decision was made **with the data and science available to the CDC** at the time, including a valuable public health partnership resulting in a rapid receipt and review of unpublished **data**. (Emphasis added).

(b) The OFM provided the Agency with frequently asked questions and answers titled "OFM SHR Vaccine Mandate Guidance, Proclamation 21-14 COVID Vaccination Requirement." *U-24*. Number 27 provides: Q. What are the requirements for receiving an accommodation for medical or religious reasons? A. An employee who has a sincerely held religious belief that prevents them from being vaccinated against COVID-19 may request an accommodation by notifying a supervisor in their chain of command or their human resource office. The employee must participate in the interactive accommodation process and provide all information reasonably needed to evaluate the request.

Please keep in mind that once an employer is put on notice of a request, it cannot require the employee to put the request in writing. The proclamation requires the employer to document the request for accommodation and the document must include a statement regarding the way in which the requirements of the order conflict with religious observance, practice or belief of the individual.

(c) It is significant to note that the OFM did not determine if masks and social distancing would or would not constitute a reasonable accommodation. *U-24* is the only evidence the Arbitrator has in regard to the specific guidance the OFM provided to the Agency.

2. Despite item 1 above, the Agency evidently did not give consideration to masks and social distancing although both were recommended as possible accommodations to the vaccine requirement. Failing **to consider** available accommodations is extremely concerning. It is difficult for the Agency to establish good faith when EEOC and/or CDC guidance is ignored and not considered.

(a) Consider the following exchange between Ms. Fenrich and Mr. Spikes.

(1)  Q. In fact, the CDC said be vaccinated or be masked, correct? A. If that's what the CDC states, I will trust them. *Tr. at 90:17-20.*

(2) Q. Okay. And did it also say be masked or at least be socially distant of six feet or more? A. That's very well true. *Tr. at 90:21-23.*

(3) Q. The fact that she met with her subordinates outside, masked and socially distanced, would that have met the CDC recommendation for October of 2021 for unvaccinated individuals? A. Without having to look at it, I trust it probably did. *Tr. at 91:11-16.*

(b)  Consider the following exchange between Ms. Fenrich and Mr. Cunningham.

(1) Q. The CDC guidelines at the time were: Be masked and socially distanced, correct? A. I'll take your word for that. *Tr. 109:15-17.*

3. The Union introduced an article published by McGuire Woods titled "No Magic Words: EEOC Clarifies Guidance on Religious Accommodations to Vaccine Mandates." *U-20.* It provides in relevant part: "Overall, despite this more COVID-19 specific guidance, some important questions remain unanswered. For example, while referencing "direct monetary costs" as a potential basis for hardship, the guidance does not indicate whether the cost of <u>testing as an alternative accommodation</u> may be considered or passed on to the employee." (Emphasis added). There is nothing in the evidence to indicate the Agency considered <u>testing or any alternative accommodation to vaccination.</u>

4. On September 3, 2021, the Agency's reasonable accommodations specialist, Joceile Moore, meet with the Grievant, interviewed her, and informed her that she could be easily accommodated. *U-3* indicates the accommodation would be based upon wearing a mask and social distancing while interacting with coworkers and teleworking. *Shirley at 156:7.* The Grievant subsequently received an accommodation. *Id. at 156:11.* This is evident from the Grievant's testimony and *U-5.*

5. Mr. Kelly Cunningham, by letter to the Grievant, dated September 30, 2021, <u>rescinded</u> *U-5*, stating: "after carefully reviewing your essential functions in your job description, working environment, and your management's feedback, it has been determined that no reasonable accommodation can be made in your current position. This determination was made because your position must at times be done in the physical presence of others. There are no other accommodatons for your position available which sufficiently **mitigate or eliminate the risk associated with having an unvaccinated** employee performing the essential functions of your position." (Emphasis added). *E-12, U.-6.*

6. On October 8, 2021, the Grievant emailed Mr. Cunningham and Ms. Moore. The Grievant requested specific information to support the Agency's position. *U-7.* As stated in relevant part:

> From this latest version of a "review" and denial letter, I am requesting further information for you all as my employer. Within the "review and denial" letter Kelly states that "it has been determined that no reasonable accommodation can be made in your position." This is my formal request for you to provide the following information: -**What accommodations were considered and what were the related costs and undue hardships identified? What measures were used to determine excess risk from me being unvaccinated and what are the numbers/statistics backing this up?**
>
> As stated and approved of during my interview with Joceile on September 3rd, reasonable accommodations for myself could easily be met following our WDFW agency and OFM safety guidelines. As the interview notes should outline and as my direct supervisor agreed to, teleworking would be able to be performed and in the rare cases where in-person interactions could potentially

37

need to happen wearing a mask and social distancing would take place. (Emphasis added).

(a) The Grievant never received a response for information that would support Mr. Cunningham's conclusion. *Shirley at 144:6-7; Winther at 144:6-7.* The Agency never responded to the Grievant request for information. This of course included the opportunity to explain with specificity why masks and social distancing were no longer an acceptable as a religious accommodation. Consider *Heller v. EEB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993), where the court stated: "At the very least, Title VII requires that once an employer gives an employee leave to attend a religious ceremony, the employer should provide a **good faith reason for rescinding that permission**. The employee whose employer gives and then takes it away is no better off, and is perhaps worse off, than one whose employer never gave permission at all. **Because it never gave any reason for Bowman's countermand order, EEB did not meet its Title VII burden**." (Emphasis added).

7. Mr. Winther, the Grievant's supervisor, testified he disagreed with the Agency's decision not to accommodate the Grievant. *Winther at 142:10-12, U-14.* He informed the Agency that the Grievant could perform her essential functions teleworking, wear a mask during working hours while in proximity to other people, and social distance. *Winther at 138:9-12, 17, 24-25.* He sent Mr. Cunningham a letter, dated October 11, 2021. *U-16.* In the letter, he requested that the Agency reconsider its position.

8. Deputy Director Amy Windrope responded to Mr. Winther by email dated November 1, 2021. *U-16.* It provides in relevant part as follow:

Dear Eric,

Thank you so much for your heartfelt letter and the toll the vaccine mandate has taken on staff you supervise. It has been an incredibly challenging time and supervisors like you, who care so deeply about the people they work with, are bearing a heavy load.

I understand that you wish WDFW had implemented the mandate differently, or perhaps not at all. As I have mentioned throughout the process, our collective job was to act with integrity and accountability in implementation of the mandate. To me, that means sharing information as soon as I can, explaining my decisions and acting with empathy in recognition of the challenge each person is facing. I find your characterization of management bullying staff to be offensive. We have consistently stated respect for every staff and their value. It is up to each staff to decide if they wish to be vaccinated and we have consistently said this in writing, at all staff meetings, at Fish Program meetings. The challenge is that there is a mandate that we are implementing and it requires us to act, that is fundamentally different than bullying.

> **One of the hardest decisions I made was to rescind 13 reasonable accommodations that were approved. I rescinded these accommodations because they did not comport with the guidance that we developed to ensure a safe workplace.** As you know, we did the best we could to make decisions in as timely a fashion as possible, but sadly, we were too slow for those early approvals. I feel very badly for those few staff that had to suffer that whiplash and wish that I made those decisions more quickly. (Emphasis added).

> (a)  The Agency did not take this opportunity to explain, with specificity, why *U-5* was no longer not a reasonable religious accommodation. It did not explain why masks and social distancing was no longer a reasonable accommodation.

9. Prior to Step 2, on September 24, 2021, Deputy Director Amy Windrope sent a letter to WDFW Appointing authorities. The subject line was "Guidelines for Review of Reasonable Accommodations relative to the Governor's Proclamation 20-05." *E-7A*. She also sent an email regarding "Vaccine Mandate Update" on September 29, 2021. *E-8*. Both do not discuss masks and social distancing as a reasonable religious accommodation. Specific guidance from the OFM was not disclosed.

10. The Agency's Step 2 response, dated November 3, 2021, from Deputy Director Amy Windrope, indicates that Ms. Fenrich raised the fact that the Grievant could wear a mask and social distance. *E-28*. However, Deputy Director Amy Windrope did not explain (1) with specifics why masks and social distancing was not an acceptable religious accommodation; (2) the specific guidance, if any, that she received from OFM regarding masks and social distancing; (3) why the Agency decided to ignore recommendations for the EEOC and CDC; (4) what the "Agency/cross program" was and the nature, objective, and definitiveness of what the response to RA requests was going to be; and (5) what constituted "limited exceptions" and why the Grievant did not fall into this group of protected employees. She appeared to echo the same position regarding masks and social distancing as Mr. Spikes and Mr. Cunningham. If the Agency is going to reject a suggested EEOC and CDC recommendation by way of rescission, it must be done with specificity. As Deputy Director Amy Windrope concluded at Step 2:

> As I shared during the hearing, WDFW could have been clearer with the RA process, and that I recognize how very disappointed it was to staff that management rescinded the previously granted RAs. After issuing several RAs, we redefined our previous approach based on our continued understanding, OFM guidance, and determining a consistent Agency/cross program to all RA requests. We approached it as a publicly facing organization where most of our people work with people, driving together, working in teams, working with the public or with colleagues in other organizations. It is time for WDFW to move forward to return to normal business operations and restart the important partnership work you have done throughout your career. The standard for moving forward is not the same it has been for the last 20 months. However, on constant is that we are

39

maintaining a strong focus on workplace safety.

We did not have vaccinations available when COVID first started, and the safety protocols required of employees were different. By requiring vaccination, we are putting staff safety first so we can move back onto a more normal path to provide the kinds of services and work products that meet our mission as an agency while also doing our duty to protect the health and safety of employees. The post October 18th standard for a safe workplace is one where all workers are vaccinated, with limited exceptions, and where exposure to the virus and risk to others is minimal.

Given all of this information and how it relates to safety of our employees, I am unable to grant your requested remedy and your separation stands as issued.

(a) It is worth mentioning again that the only OFM guidance in the record of evidence is *U-24* which does not address masks and social distancing as a religious accommodation.

(b) The position taken by the Agency constituted a hypothetical hardship in violation of Title VII because it was conclusory and unsupported by data and other statistical evidence.

11. All of Agency's **exhibits and testimony** support the Agency's desire to return to a normal work environment similar to the one before the pandemic began. The Agency's assertion that since the Grievant was unvaccinated, she was a danger to others is true. However, everybody was and still is a danger to one another in regard to COVID-19, regardless of vaccination status. COVID-19 is with us as this decision and award is being written. There is nothing in the evidence to support an assertion that masks and social distancing would not be a reasonable religious accommodation. Nor is there any evidence that despite masks and social distancing, as a reasonable religious accommodation, would constitute an undue hardship to the Agency. In addition, if EEOC and CDC guidance is not followed, the reasons for not following the guidance must be supported with specific facts, not conclusory statements. Consider the conclusory testimony:

(a) On direct examination, Mr. Spikes testified that based upon OFM and DOH guidance, some approved accommodations were rescinded. *Spikes at 46:8-9*. Mr. Spikes never explained what specific guidance he received.

(b) On direct examination, Mr. Spikes testified that he relied upon "subject matter experts" regarding position descriptions. *Spikes at 51:19-52:5*. Mr. Spikes never stated what he was told. He never explained what area of expertise the "subject matter experts" possessed.

(c) On cross-examination, Mr. Spikes explained that the OFM and CDC consistently informed the agency that it was at "great risk" from the unvaccinated. *Spikes at*

40

*72:1-73:14.* However, he never explained what these agencies informed him regarding whether masks and social distancing was an acceptable accommodation given the "great risk."

(d) On cross-examination, Mr. Spikes stated that he received guidance for making decisions from OFM, CDC and DOH. *Spikes at 90:2-3.* Again, he never stated what guidance he received.

(e) Mr. Kelly Cunningham, Fish Program Director, testified that he received advice and guidance from the OFM in terms of the Grievant not qualifying for an accommodation and that he relied upon the advice. *Cunningham at 90:3, 102:1-21.* Other than this conclusion, Mr. Cunningham did not explain the specifics of the advice and guidance he received from the OFM.

(f) The burden of proof is on the Agency to show undue hardship. It is worth noting again that without specifics, the Arbitrator cannot determine if some of the information favored a finding that a reasonable religious accommodation could be provided without undue hardship.

12. There is **nothing in the exhibits and testimony** to indicate what type of guidance the Agency received not just from the Office of Financial Management, but also the Center for Disease Control and the Department of Health. Again, without specifics as to what guidance was provided, it is difficult to determine if the accommodation provided in *U-5* is an undue hardship on the Agency. Given *U-21*, discussed in item 1 above, and *U-20*, discussed in item 3 above, it is worth noting once again that some guidance may have favored the Grievant and implementation of *U-5*. The necessity of providing specifics to support the Agency's conclusions was critical to the Agency's case.

13. Despite the fact that the Agency's exhibits and testimony was conclusory, the Agency did not call any witnesses from the OFM, CDC, or the DOH, to support its conclusion that *U-5,* masks and social distancing could not be a reasonable religious accommodation because it would constitute an undue burden on the Agency.

14. The Agency has proven many things regarding COVID-19. It is proven that COVID-19 is dangerous and deadly; that we needed, received, and continue to need a vaccine; that the vaccine is working; that it has a duty to protect the health and safety of employees and to maintain a healthy and safe work environment; that the Proclamations mandate that all State employee be vaccinated, with few exceptions; that it has a strong desire to minimize viral exposure to the greatest extent possible; and that we are all "tired" and exhausted from living with COVID-19. However, it has not proven that masks and social distancing as set forth in *U-5* is an undue hardship on the Agency.

15. Two of primary goals of the Proclamations are to vaccinate Agency employees to protect the Agency's workforce **and** to provide religious accommodations for employees who were unable to be vaccinated because of religious beliefs. The evidence strongly indicates that the Agency was concerned about vaccinating as many employees

41

as possible. The Agency was complying with the Proclamations. However, the Agency's exhibits "strongly suggest" that the Agency did not consider masks and social distancing as a religious accommodation, from the time it decided to rescind the Grievant's religious accommodation, *E-12; U-6,* to the time it issued the Step 2 decision, *E-28*. This is evident from the fact that the Agency's witnesses, <u>Mr. Spikes and Mr. Cunningham, ignored the importance of the EEOC guidelines regarding masks, social distancing, or other possible accommodations such as testing</u>. The testimony of these two witnesses moved the "strong suggestion" to proof by a preponderance of the evidence that the Agency did not follow the Title VII guidelines referred to in the Proclamations to determine the Grievant's eligibility for a religious accommodation.

16. Given items 1 through 15 above, the Arbitrator finds that the Agency's implementation of *U-5* to the Grievant would not be beyond de minimis and is not an undue hardship to the Agency. The Arbitrator further finds that the Agency violated the Proclamations, Title VII, the CBA, and the MOU, by failing to reasonably accommodate the Grievant with *U-5*.

## VI.    <u>DECISION AND AWARD</u>.

The Shirley Grievance is granted. The Grievant is reinstated to the position she held prior to her separation from employment with the Agency. She shall be made whole, which of course includes lost wages and benefits.

The Agency shall reasonably accommodate the Grievant as set forth in forth in *U-5.*  The Arbitrator shall continue jurisdiction for thirty days from the date of this award to assist the parties with clarification of this decision and award, if clarification is necessary. If either party requests that jurisdiction continue within thirty calendar day period of this decision and award, jurisdiction shall continue until the issue(s) is resolved. [10]

Respectfully submitted to the Agency and the Union on this 28th day of November, 2022.


/S/
_____
MICHAEL ANTHONY MARR
Arbitrator & Mediator

---

[10]    The parties should know that this decision and award had several drafts. The first few were written in favor of the Agency. The issues in the Shirley Grievance appeared simple. Matters forth in Section VI.C.1 were not immediately apparent to the Arbitrator. The Arbitrator had difficulty justifying the Agency's position with each review of the drafts and evidence. Each review gave greater support for the Union's position and ultimately resulted in this decision and award.

# EXHIBIT B

IN ARBITRATION BEFORE
MICHAEL E. CAVANAUGH, J.D.,
ARBITRATOR

| | | |
|---|---|---|
| WASHINGTON DEPARTMENT OF FISH & WILDLIFE, | : : | |
| | : | ARBITRATOR'S |
| Employer, | : | DECISION AND AWARD |
| | : | |
| and | : | PERC Case No. 134845-P-22 |
| | : | |
| WASHINGTON ASSOCIATION OF FISH & WILDLIFE PROFESSIONALS, | : : | |
| | : | |
| Union. | : | |
| | : | |
| (John Hone Vaccine Mandate Arbitration) | : | |

**For the Employer:**

Carl Gaul
Elizabeth Delay Brown
Office of the Attorney General
PO Box 40145
Olympia, WA 98504-0145

**For the Union:**

Rhonda Fenrich
Fenrich & Gallagher PC
405 Lincoln St Ste 102
Eugene OR  97401

## I.      INTRODUCTION

The Employer (sometimes" "Department," "Employer," or "Agency") discharged

Grievant John Hone, a Wildlife Biologist II, for failure to meet the terms of Gov. Inslee's

Emergency Proclamation requiring that all employees of the State become fully vaccinated

against Covid-19. The Proclamation established exemptions from the mandate (and reasonable

accommodation), for certain employees, including those with bona fide religious beliefs against vaccination. Grievant applied for a religious exemption, and the Agency granted his application.

Initially, Employer representatives informed Grievant that his religious beliefs would be accommodated, if his supervisor approved, on the condition that he agree to mask and socially distance when his duties required in person interactions with other employees or the public. Grievant accepted those conditions and his supervisor, Mr. Winther, promptly informed HR that he had approved that accommodation. A few days later, however, the Department announced that it had refined its accommodation requirements, particularly for supervisors, and had decided that accommodation would be disallowed for jobs requiring collaboration, training, field work, and other interpersonal engagement as a major part of the essential functions. In the Department's updated view, those functions could successfully be conducted only in the physical presence of others, implicitly rejecting the masking and distancing accommodation previously approved for Grievant.[1]

The Association (sometimes "Union") contends that the Department violated the terms of an MOU between the parties (Exh. J-4) when it did not accommodate Grievant's religious beliefs and then terminated him for a nondisciplinary reason, i.e., that no reasonable accommodation could be provided. The Department asserts that it had no choice because of Grievant's inability to perform the essential functions of his job that required him, at times, to be in the physical presence of others. *See*, e.g., *Id.* ("your position must at times be done in the physical presence of others").

---

[1] *See*, Exh, E-9 (letter to Grievant from Kelly Cunningham, Fish Program Director, dated September 30, 2021). While Mr. Cunningham's decision letter did not specifically address masking/distancing, it did contend that "[t]here are no other accommodations for your position available which sufficiently mitigate or eliminate the risk associated with having an unvaccinated employee performing the essential functions of your position."

At a hearing held remotely on the Zoom platform on November 10, 2022, the parties had full opportunity to present evidence and argument, including the right to cross examine witnesses. Counsel chose oral closings, and with the completion of oral argument and my receipt of the transcript of the proceedings on November 29, 2022, the record closed.

On December 2, 2022, however, the Association filed a motion to reopen the record for the purpose of offering in evidence an arbitration decision arising from a similar matter between the parties, issued after the close of evidence in this case. After hearing the Department's objections, I granted the motion, and the Association promptly submitted an award by Arbiter Marr in the Ruthanna Shirley grievance. On December 7, 2022, at my request, the Department responded by email specifying differences between Grievant's case and Ms. Shirley's that, in its view, would require a different result here.[2]

Having now carefully considered the evidence and argument in its entirety, I am prepared to render the following Decision and Award.

## II.    STATEMENT OF THE ISSUES

Did the State violate the parties' MOU regarding implementation of the COVID-19 vaccine mandate by failing to reasonably accommodate John Hone? If so, what is an appropriate remedy?

*See*, Tr. at 9.

## III.    FACTS

As part of its fish and wildlife management functions, the Department operates a salmon preservation program in the Columbia and Snake Rivers, funded through the Bonneville Power Administration, that pays members of the public to capture "pikeminnows," a species of fish that

---

[2] Although I have carefully reviewed Arbiter Marr's Award and find the fact pattern and legal/contractual issues to be strikingly similar, I have evaluated the case before me on its own facts and merits and did not find it necessary to rely on the final and binding nature of my colleague's award.

feeds on juvenile salmon. Under this program, anglers catch pikeminnows and turn them in to the Department to receive essentially a per-fish "bounty" (if the fish exceed a certain size). The Department stations DFW employees at boat ramps at designated times during the "on season" (six to seven months of the year, May through September and sometimes into October) to receive and pay for the predators the anglers have removed from the water.[3]

Mr. Hone supervised the employees who collected the pikeminnows from the public, although he testified that an experienced "lead" worker had molded the crew into a "well-oiled machine" that did not require much direct supervision or training from him, especially because there was little turnover on the crew. *See*, Tr. at 180-81 ("the crew lead had been there longer than me, so not a lot of supervision required . . . a new employee or two a season . . . the crew leader is who trained those people. I mean, he knows the job better than I"). During the rest of the year, Grievant has worked from home (a remote area in Eastern Washington) analyzing data and preparing reports. *See*, Tr. at 177 (Hone). During that time, he has interacted remotely with data-entry employees, one of whom has received an exemption from the vaccine mandate based on her "100% telework."[4]

On the Department's required Religious Accommodation Worksheet, Exh. E-8, Grievant described his working conditions as follows:

> Work in eastern Washington. Interact with people. Pasco office, everyone has a private office. Have been working from home. Will not be going back to the office. Can job well from home. Supervise 8 employees, 2 data people rarely see, other 6 are in the field daily. 6 months, supervise these 6. Most all the times outdoors at the station. Tight timeline, grab their keys at the office and go.

---

[3] This operation is entitled the Northern Pikeminnow Sport Award Fishery Program." *See*, e.g., Tr, at 13-14.

[4] It is undisputed that the data-entry employee is prohibited by the terms of *her* reasonable accommodation from meeting in person with Grievant, her supervisor. Tr. at 178 (Hone). I will analyze the importance of that fact, if any, in the Decision that follows.

> Everything else is done at boat ramps spread out over a large area, travel by vehicle, fisherfolks turn in fish.

Grievant also confirmed that he could telework, and that he could perform "essential functions while maintaining social distancing of six feet at all times during . . . work hours" because "[o]ur check stations, safety protocol, [form] a barrier around our vehicle with cones, so employees have [perimeter] greater than six feet." *Id.* (typos corrected). After a virtual interview with HR Consultant Joceile Moore, Moore informed Grievant that his accommodation, with his commitment to mask and socially distance in the physical presence of others, would be approved if his manager agreed. *Id.* There is no dispute that manager Winther promptly approved that accommodation. *See*, e.g., Exh. E-14 (October 11, 2021, letter from Winther to Director Cunningham after learning that he had denied the accommodation):

> HR must not have informed you that they had already sent me an accommodation agreement for John on 9/3/21 (which I agreed to via email the same day) and informed me that a memo confirming the agreement details would be forthcoming.

Despite this approval by a designated HR Consultant and Grievant's supervisor, Director Kelly Cunningham, the "appointing authority," had the final word according to the Department. Tr. at 118.

As noted, Director Cunningham disagreed with Mr. Winther's reasoning in support of an accommodation, i.e., that "[Grievant] only supervises folks a portion of the year, and therefore should have received an accommodation." Tr. at 120. That analysis apparently failed to convince Director Cunningham because, he testified, "the essential functions that are performed in the on season remain in effect during the off season." *Id.*[5] In any event, in describing the standards he

---

[5] I am not certain I understand Mr. Cunningham's intended meaning here. While the essential "on-season" functions remain in the job description, the evidence established that Mr. Hone had worked exclusively from home during the off-season without personal interaction with subordinates or others, at least during Covid. Perhaps Mr. Cunningham meant that Grievant *should have been* meeting in person to accomplish his supervision and training responsibilities, an argument I will consider as part of the Decision that follows.

utilized to evaluate potential accommodation to Mr. Hone's religious exemption, Director

Cunningham focused on what he labeled "forward-facing duties" as reflected in a job

description, testifying that because "a majority of the essential functions[6] were 'front-facing,' we

made a determination that an accommodation could not be made." Tr. at 113.[7]

Cunningham conceded that as the Department made this decision, the program was about

to enter the off-season during which Grievant would not have had to interact with the public or

subordinate employees at the boat ramps, but "he would end up having to interact with the public

again during the next season." Tr. at 115-16; Tr. at 120.[8] When asked during the hearing why

masking and social distancing would not effectively mitigate the risks, Cunningham noted that

he is not a medical professional, but he understood that prior to the vaccine mandate, "there were

---

[6] As I understand Mr. Cunningham's testimony, his "more than 50%" judgment referred to the number of discrete tasks in the description, not the accumulated time Grievant spent performing those tasks during the year. Perhaps that is not what he intended, but if so, I find that form of analysis problematic. It strikes me as illogical to rely on the *number of functions*, as opposed to the *percentage of work time required*, to judge what a "majority" of the position involves for purposes of analyzing a potential reasonable accommodation, e.g., whether a specific accommodation might present an "undue burden" within the meaning of anti-discrimination laws. *Cf.* Tr. at 89 (Hurst) (essentially speculating, based on a 2003 job description, that "at least 50%" of Grievant's essential functions require in-person performance because "a large portion of position is dedicated to supervising staff").

[7] As noted, the most recent formal job description for Grievant's position dated from 2003, although during DFW's consideration of the accommodation request, Employer representatives consulted with Supervisor Winther about updating the description. Winther testified that the Department never completed that process, and that he believed Grievant could appropriately perform many of the described duties through "telework" or other "remote" means. *See*, e.g., Tr. at 167 ("I realized that the telework component needed to be put in there if we were going to be allowed to modify John's position description . . . None of the telework options were put into that version. So that's why [the provisional updated job description is] not accurate").

[8] Other than this testimony from Mr. Cunningham, there is little or nothing in the record about whether a "provisional accommodation" could have been granted to Grievant for the off-season, which then could have been reviewed at the time his on-season duties resumed. Grievant had specifically requested that accommodation, *see* e.g., Exh. U-5 at 2:

> In May of 2022, I may very well come into contact with agency staff and the public just as I did that time of year in 2020 and 2021. So by wearing a face mask and social distancing (the accommodation you presented on September 3), why can I no longer complete the essential functions of my position? Better yet, lets pray the pandemic is gone by then and no one has to deal with it any longer.

outbreaks in various areas of the program even though masking/distancing had been employed."
Tr. at 116-17.

On cross examination, however, and irrespective of the merits of the masking/distancing approach to accommodation, Cunningham clarified that he simply had *no authority* to grant a reasonable accommodation to Mr. Hone based on such mitigating approaches because that element of accommodation had been "taken off the table" by upper DFW management:

> . . . based on the direction that we received in terms of how the agency was going to implement the mandate. So given what I said earlier about masking and social distancing being *off the table* for those types of positions that I described [supervisors and field staff], then yes, masking and socially distancing was *not an option for those employees*.

Tr. at 124-25 (emphasis supplied). At the same time, however, he confirmed that the Department has allowed volunteers, students, temporary DFW contractors, and the public to be in proximity to DFW employees without being vaccinated, although they must follow Covid mitigation protocols such as masking when those are applicable. *See*, e.g., Tr. at 127-28; *see also*, Exh. U-12 (updated guidance dated 3/12/22 requiring volunteers to mask when dealing with the public "indoors"). In any event, because DFW believed it could not accommodate Grievant's religious exemption, he received a nondisciplinary discharge coinciding with the effective date of Gov. Inslee's vaccine mandate, i.e., October 18, 2021. Exh. J-1.

Additional facts will be developed and discussed as part of my reasoning in support of the Decision in the next section.

## IV. DECISION

The crux of any religious accommodation analysis, after the Supreme Court's decision in *TWA v. Hardison*, is an individualized assessment of the nature and context of the performance of an employee's essential functions, including where and how they are performed (and in rare

cases, perhaps, by whom) and whether alterations in work locations, methods, or equipment (including PPE's), could enable safe and effective employee performance of those essential functions without imposing an undue hardship on the Employer. There is no dispute that this broad summary of the law applies to the dispute before me, arising under the parties' CBA and a specific MOU concerning implementation of Gov. Inslee's vaccine mandate in October 2021. Nor is there any dispute that the Department bears the burden of showing that no reasonable accommodation under these standards was available in the case of Mr. Hone.

After carefully considering what is a detailed and voluminous record containing proclamations, CDC guidelines, EEO regulations, job descriptions, reasonable accommodation guidelines under the EEOC Compliance Manual, and similar documents bearing on the issue before me (as well as the prior decision by Arbiter Marr)[9] I must find that the Department has failed to meet its burden.

A. Individualized Consideration

As previously noted, the crux of a reasonable accommodation process is an individualized examination of the context of an employee's workplace and the essential functions of the job for the purpose of determining whether alterations would enable an employee's safe performance without imposing an undue burden. When I asked during closing argument whether Grievant had received the individualized consideration required, counsel for the Department asserted that he had, pointing to HR representative Moore's meeting with Mr. Hone to go over his Reasonable Accommodation Worksheet, Exh. E-5. Tr. at 199[10] and Director

---

[9] Arbiter Marr's award also exhaustively considered this great volume of guidelines and recommendations in reaching his conclusion that the Department violated the MOU when it failed to adequately consider masking and distancing in denying Ms. Shirley a religious accommodation.

[10] Counsel described this meeting as "in person," *Id.*, although Moore apparently conducted the meeting virtually. *See*, e.g., Tr. at 183 (Hone) ("they said I was going to have a Teams meeting with [Moore].")

Cunningham's consideration of the partially updated 2003 job description. I agree that Ms. Moore met with Grievant and evaluated his individual circumstances. I also note, however, that in applying the standards applicable at the time, especially the use of masking and distancing, she *granted* the accommodation, subject to the approval of Mr. Winther, Grievant's supervisor. Mr. Winther approved. Consequently, I agree that, at least to this point, Mr. Hone had received "individualized consideration."

But a week or so later, with no further attempt at an "interactive process" with Grievant (before or after its decision) the Department "rescinded" the reasonable accommodation the Agency had just granted.[11] That rescission was clearly not based on a consideration of Mr. Hone's individualized circumstances. To the contrary, as Mr. Cunningham testified, the details of how masking and social distancing might sufficiently mitigate the Department's safety concerns in Mr. Hone's specific circumstances *simply was not considered* because it had been "taken off the table" by upper DFW management. Nor, as previously described, did the Department evaluate whether Grievant could be accommodated, at least temporarily, i.e., during the upcoming off-season, with the option of reassessing the reasonableness of the accommodation as the following "on-season" approached.

Taken together, the Agency's process reflected in this record does not establish that Grievant received the kind of individualized consideration of reasonable accommodation possibilities that the law, and thus the MOU, required. Rather, the Department simply assumed, with little or no evidence (at least that has been put in the record before me) that *any* supervisor

---

[11] There was some colloquy between the parties during the hearing about whether the Department never actually approved Mr. Hone's accommodation, or whether it was approved and then revoked. Deputy Director Windrope, however, the official who made the decision, *herself* described the process as "rescinding" the reasonable accommodation that had previously been granted to Grievant and others. *See*, Exh. U-21 ("One of the hardest decisions I made was to rescind 13 reasonable accommodations that were approved").

would be required to meet with subordinates, that it was impossible for a supervisor to meet the training and supervision requirements of the position without in-person interaction, and that no mitigating measures, e.g. masking and distancing, could acceptably minimize the risks. The law and the MOU required more.

B. Masking and Distancing

To be sure, if the record established beyond question that the Department was correct in its judgment that it could not accommodate Grievant, e.g., through virtual meetings with subordinates and/or masking and distancing if in-person supervising and training became essential, then the importance of DFW's failure to follow the interactive process could perhaps be excused. At a minimum, the remedial equation might be significantly altered here. But after carefully considering the entire record, I cannot find that the Department has met its burden to establish that masking and distancing were simply out of the question as effective mitigating approaches. That is, the Department essentially contends that there is simply no conceivable circumstance under which masking and distancing could have served the Department's purposes, at least in total, without imposing an undue burden. Thus, says the Department in effect, no inquiry into an individual's work situation—beyond evaluating a job description—was necessary.

I disagree. I can accept the Department's judgment, within its rights as an employer, that some of a supervisor's duties may require in-person interactions with co-workers, with subordinates, and with the public, at least from time to time (although in this case, given the credible testimony of Messrs. Winther and Hone, perhaps not nearly as frequently as the Department suggests).[12] Nevertheless, the evidence, in my view, does not meet the Employer's

---

[12] To the extent the Department's denial of accommodation here was based on the "more than 50% of his job duties" standard, the evidence fails to establish that more than 50% of his work *time* required in-person interaction with

burden to show that the use of masking and distancing as mitigating techniques was so out of the question as to justify a blanket refusal to even consider them as part of the required individualized and interactive reasonable accommodation process.

### 1. Subordinate Employees at the Boat Ramps

For example, supervising and training of the fish-checkers at the boat ramps no doubt *could* involve some personal interactions, but Mr. Hone testified credibly that an experienced lead employee had created a "well-oiled machine" requiring little or no training or supervisory involvement from him. That testimony is undisputed, and in fact was confirmed by his supervisor, Mr. Winther.[13] Moreover, the job description in the record, Exh. J-8, such as it is, provides only that Grievant is "responsible" for recruiting, hiring, training, etc., not that he must perform that function himself—and in person—in every single respect. *Id.*[14]

The evidence established, however, that one essential function of Mr. Hone's supervisory position was to conduct spot checks at the boat ramps to ensure that the process was functioning properly. But Grievant and Mr. Winther confirmed that he could do so (and Joceile Moore from HR had agreed) if he masked and maintained distance from the public given traffic barriers DFW had supplied to erect a safety zone around Department vehicles. The terms of Grievant's

---

subordinates, co-workers, and the public. Nevertheless, if the Department's evidence established that a significant portion of the job required personal interaction, and that no reasonable accommodation could be made for those duties, the Employer might prevail here.

[13] As an aside, the Department's attempt to undercut Mr. Winther's testimony supporting Grievant fell flat with me. Yes, Winther testified that he had worked with Grievant for twenty years and considered him "a friend," and confirmed that he would not want him to lose his job. He immediately added, however, "I would not want any of my employees to lose their jobs, that's correct, yes." Tr. 158. Despite the Department's arguments to the contrary, nothing in that exchange, or in the remainder of Mr. Winther's testimony, gave me any reason to doubt his honesty or the accuracy of the information he provided.

[14] The Association has correctly pointed out that if effective "supervision" always requires in-person interaction, why would the Department stipulate as part of the religious accommodation afforded the data-entry employee Grievant supervised that she was not to meet with her supervisor in person?

originally approved accommodation, of course, required him to mask and maintain distance from employees, as well, at the boat ramps, a condition to which Mr. Hone had agreed.

In evaluating whether masking and distancing might be sufficient under these circumstances, I note that CDC has long recognized that Covid transmission in outdoor settings is much less likely. For example, in July 2021 CDC recommended that unvaccinated people wear masks outdoors, especially in crowded areas (which Mr. Hone had agreed to do, as well as maintaining distance), but that the vaccinated need not wear masks "in most outdoor situations without prolonged close contact." *See*, e.g., https://www.npr.org/sections/goatsandsoda/2021/07/26/1020799661/coronavirus-faq-im-vaccinated-i-thought-i-could-give-up-masks-but-should-i (last accessed December 10, 2022). It is safe to assume that virtually every *employee* Grievant was likely to encounter at the boat ramps would themselves be vaccinated because of the mandate,[15] and they were working outdoors and would not be in prolonged "close contact" with Grievant (because he had committed to maintain appropriate distancing). Thus, it appears Mr. Hone's co-employees would not have been in danger from him under those circumstances—or at the very least, no more danger than employees working in the vicinity of volunteers, students, and temporary contractors who *also* may not have been vaccinated because DFW policy did not require it.

In sum, the Department has not supplied enough evidence for me to find that the original accommodation was *per se* unreasonable or unduly burdensome in the context of spot checks at the boat ramps.

---

[15] *See*, e.g., Exh. U-16 at 1 (as of the date the mandate went into effect, 96.7% of the employees of the Department were fully vaccinated).

To the extent Mr. Hone might have been required to personally replace an absent fish checker (whereas he testified that his function would be simply to make calls to find another employee to substitute, noting that he has only had to personally step in for a fish checker "once or twice in 24 years," Tr. at 182), there has been no showing that the same sorts of mitigation approaches, i.e. masking and distancing, at least in an outdoor setting, would have been insufficient.

2 Supervising and Training

With respect to recruiting, supervising, training, etc. the Department asserts, but has made little effort to show, that these functions must be performed in person, even if only on occasion. Nor, as already noted, did the Department inquire into the specific work conditions applicable to Mr. Hone's position as the job had developed over the years since the 2003 job description. Mr. Winther, of course, who knew Grievant's job well as it existed in late 2021, assessed that in fact Mr. Hone could perform the job effectively with remote tools, and with masking and distancing on the limited occasions physical presence might be necessary. HR Consultant Moore had agreed after going over the accommodation worksheet with Grievant.

On this record, then, I cannot find that this is a case in which there is no conceivable way for Mr. Hone to perform his supervision and training functions remotely, e.g. by telephone or on the computer with tools like Zoom or MS Teams.[16] Moreover, if in-person meetings with

---

[16] The Department's implicit assertion that remote supervising and training are insufficient is curious given that Zoom and Teams were considered appropriate venues for several important aspects of this case requiring human interaction—including, as noted, the HR Consultant's interview with Mr. Hone to go over the accommodation worksheet, as well as the hearing itself in this matter. I gather that the hearing in the *Shirley* matter was also conducted remotely. *See*, Shirley Award at 2 ("The Shirley Grievance was heard before the Arbitrator on October 19, 2022 using the Zoom.com platform"). If remote platforms are appropriate for important matters such as consideration of an employee's application for religious exemption and potential reasonable accommodation, as well as for full grievance hearings over such matters when they are contested, it is hard for me to imagine why a supervisor could not effectively utilize them for most or all of the training, evaluation, and general supervision required during a pandemic.

subordinates became absolutely necessary for some reason, it is entirely conceivable that they could be conducted outdoors (for much of the year) with masking and distancing, or indoors (with masking and distancing) in an uncrowded, well-ventilated area such as a large shopping mall, or even in a large office or conference room with open windows. *See*, e.g., the NPR report of CDC guidance referenced earlier (indoors, open windows can provide ventilation, and "high ceilings are also a bonus . . . with "good potential for dilution").

Again, I find that DFW has failed to carry its burden to prove that it would have imposed an undue hardship to implement the original accommodation.

3.  Sports Shows

One of Mr. Hone's Biologist II essential functions, however, is to attend angler shows on behalf of the Department, apparently to publicize the pikeminnow program and provide information to the public. Such shows were cancelled during the pandemic, but possibly resumed in 2022. Tr. at 194 (Hone). The Department argues persuasively that in-person attendance is necessary to perform this essential function, and although there is only generalized evidence in the record about where these shows are held, how often, in what kind(s) of facilities, how crowded they may be at times, etc.—all of which would be critical factors in evaluating whether the Department met its burden to establish that masking and distancing would be insufficient. The Department did not make such a showing.

Even if it had, however, the Department's argument might well fail in any event for a different reason. Specifically, even in the context of a limited, but sporadically reoccurring essential function to which an employee has a bona fide religious objection, employers must provide a reasonable accommodation—including, when necessary, shifting of essential functions. The EEOC has illustrated this principle by highlighting the case of a pharmacist with

sincere religious beliefs against contraception. A reasonable accommodation in that situation, says the EEOC, is for the pharmacist to turn the prescription over for filling to another pharmacist on duty (presumably then taking over the prescriptions the other pharmacist would have filled). *See*, EEOC Compliance Manual, Section 12-IV(A), Religious Accommodation, Example 44. Clearly, filling prescriptions for contraceptives is an essential function of a pharmacist's job, yet EEOC points out that if others may be assigned that function without imposing an undue burden on the employer, that accommodation is required.

As Example 44 illustrates, it is simply not the case that labeling a job duty an "essential function" constitutes a talisman that may be invoked to justify an employer's refusal to accommodate a religious objection in a specific case. Moreover, even when an accommodation might entail some "burden," e.g., "shift-swapping"[17] or other limited job reassignment which might result in some cost to the employer—an "infrequent" extra cost does not by itself justify an employer's refusal to assist in finding a substitute employee to perform that function, volunteer or otherwise, as a reasonable religious accommodation.[18]

It is not clear on this record, however, whether sending someone other than Mr. Hone to Sports Shows would have involved any added cost. Counsel could not say during closing argument, for example, whether a substitute would be salaried or hourly, Tr. at 229, although he asserted the cost would certainly be "greater than zero." *Id.* But even if the Department had to

---

[17] For example, a shift swap as an accommodation that might enable an employee to observe a sabbath or religious holiday.

[18] It is true, however, that the frequency of such added costs may be relevant to the undue burden analysis. *See*, EEOC Compliance Manual, *supra,* Undue Hardship, Section B(2) (Voluntary Substitutes and Shift Swaps). The Department has not even attempted that sort of analysis here, however.

occasionally send a substitute and that involved some overtime and/or travel expense,[19] "infrequent payment of overtime to employees who substitute is not considered an undue hardship." EEOC Compliance Manual, *supra*, Section C(2) (Voluntary Substitutes and Shift Swaps). I can see no valid reason to treat infrequent payment of travel time differently. In addition, "co-worker disgruntlement does not justify denying a religious accommodation"— assuming no one would be willing to voluntarily substitute for Mr. Hone. *See*, e.g. "*What You Should Know: Workplace Religious Accommodation*," ¶ 4, Technical Assistance Bulletin EEOC-NVTA-0000-20, issued March 6, 2014.

In sum, if the Department could show (as it has not done yet) that Mr. Hone could not safely attend angler shows, even while masking and maintaining distance, it might still have been required to afford him the accommodation of sending a suitable substitute. But the Agency refused even to entertain that possibility, nor has DFW met its burden to establish that it would have been an undue hardship to do so. Thus, the Department's argument about sports shows fails on the record before me.

## V.    CONCLUSION

For the foregoing reasons, I find that the Department failed to afford Grievant the individualized consideration of his religious accommodation request that is required by the law and by the parties' MOU. In addition, at least as applied to Mr. Hone, the Department's *per se* rule against masking and distancing as part of an appropriate religious accommodation violated the law and the MOU. Thus, the grievance of John Hone must be granted, and I will order that DFW promptly reinstate Mr. Hone, subject to the terms of the original accommodation that had

---

[19] I assume that substituting a salaried employee would not have entailed overtime expense to the Department, and any travel expense for a salaried employee would have to be compared to the expenses Mr. Hone would have incurred himself as part of the "undue burden" analysis.

been granted and which was wrongfully rescinded,[20] and that he be made whole for lost wages and benefits, including seniority.

## AWARD

Having carefully considered the evidence and argument in its entirety, I hereby render the following AWARD:

1. The Employer violated the parties' MOU when it applied a *per se* rule refusing to consider masking and social distancing as part of a potential reasonable accommodation to Grievant's sincere religious belief against vaccination and also when it revoked, without an additional interactive process, an accommodation it had previously granted based in part on masking and distancing; therefore,

2. The grievance of John Hone must be GRANTED, and he shall be promptly reinstated without loss of seniority or benefits, subject to the reasonable accommodation previously granted as reflected in Exh. E-8, and he shall promptly be made whole for lost wages and benefits, subject to the customary offsets and deductions; and

3. The Arbitrator will retain jurisdiction to resolve any disputes over implementation of the remedy awarded that the parties are unable to resolve on their own; either party may invoke this reserved remedial jurisdiction by letter postmarked or email sent (original to the Arbitrator, copy to the other party) within 60 (sixty) days of the date of this AWARD or within such reasonable extensions as the parties may mutually agree (with prompt notice to the Arbitrator) or that the Arbitrator may order for good cause shown; and

4. Consistent with the terms of their Agreement, Article 27.3(F)(1), the parties shall bear the fees of the Arbitrator in equal proportion.

Dated this 19th day of December 2022.

Michael E. Cavanaugh, J.D.

---

[20] To be clear, I do not intend to prevent the Department from applying whatever reasonable standards it currently applies to religious accommodation requests—or as those standards may be reasonably amended from time to time—to Mr. Hone upon his reinstatement. Those standards must, however, be consistent with the law and with the parties' MOU.

# EXHIBIT C

BEFORE ARBITER BARBARA J. DIAMOND

| | | |
|---|---|---|
| Washington Association of Fish & Wildlife Professionals | ) ) ) | PERC Case No. 134848-P-22 |
| | ) | DECISION AND AWARD |
| Union | ) ) | |
| and | ) | |
| | ) | Tyler Kave Grievance |
| State of Washington Department of Fish and Wildlife | ) ) | |
| | ) | |
| Department | ) ) | |

## I.    BACKGROUND

This arbitration arises pursuant to a collective bargaining agreement between the Washington Association of Fish & Wildlife Professionals (the Union) and the Washington Department of Fish and Wildlife (the Department). The undersigned neutral arbitrator was mutually selected by the parties from a list provided by the Washington State Public Employment Relations Commission to resolve this dispute. Both parties stipulated that the grievance was properly before me to render a final and binding decision.

A hearing was held via Zoom videoconference on October 25, 2022.  All parties had a full opportunity to examine and cross-examine witnesses, to make arguments and to enter documents into the record. The parties submitted closing argument orally after the evidence was submitted. A transcribed record of the proceeding was received on or about November 8, 2022.

**Appearances:**

**For the Union:**

Rhonda Fenrich
Fenrich & Gallagher, P.C.
405 Lincoln Street, Suite 102
Eugene, Oregon 97401

**For the Department:**

Carl J. Gaul IV
Office of the Washington Attorney General
PO Box 40145
Olympia, Washington 98504

II.      **THE ISSUE**

Did the Department violate the vaccine Memorandum of Understanding by failing to reasonably

accommodate the Grievant? If so, what is the appropriate remedy?

III.     **RELEVANT PROVISIONS OF THE AGREEMENT**

**Memorandum of Understanding Between the State of Washington and Washington Association of Fish and Wildlife Professionals**

COVID-19 continues as an ongoing and present threat in Washington State. The measures we have taken together as Washingtonians over the past 18 months have made a difference and altered the course of the pandemic in fundamental ways.

COVID-19 vaccines are effective in reducing infection and serious disease and widespread vaccination is the primary means we have as a state to protect everyone. Widespread vaccination is also the primary means we have as a state to protect our health care system, to avoid the return of stringent public health measures, and to put the pandemic behind us.

It is the duty of every employer to protect the health and safety of employees by establishing and maintaining a healthy and safe work environment and by requiring all employees to comply with health and safety measures. As a result of the above noted situation, to help preserve and maintain life, health, property or the public peace, all employees of the state of Washington are now required to become fully vaccinated or covered by an exemption in accordance with the Governor's proclamation 21-14 1.

In recognition of the above, the parties agree to the following:

1.       All employees will take the necessary steps to be fully vaccinated by October 18, 2021, or be approved for an accommodation, unless otherwise authorized under this agreement. The definition of fully vaccinated may include FDA-approved booster shots. The parties agree to meet within thirty (30) days of any announcement that booster shots will become a requirement for continued employment and bargain the impacts in good faith to achieve the health and safety goal.

2.       Employees who have difficulty accessing vaccinations due to their remote location or other circumstance, will inform their supervisors or HR representative as soon as possible. The Employer will assist in identifying vaccination sites with available appointments.

2

3.     **Exemption process:**

    a.     Exemption instructions and materials will also be posted immediately to agency The Employer will provide employees instructions and a list of all necessary materials that need to be submitted to process an exemption within three (3) business days of request SharePoint systems or secured network drives with an email notice to all staff.

    b.     Employees will inform their supervisor or HR representative, either verbally or in writing, as soon as possible if they wish to request a medical or religious exemption. Employees are encouraged to submit the request no later than **Monday, September 13, 2021**. However, to the extent that requests are received after that date, agencies will continue with processing requests received up to October 18, 2021. Requests received after this date will not be subject to the provisions contained in Section 9b.

    c.     If the Employer requires a second medical opinion in the exemption process, the Employer will cover all associated costs. The medical appointment, including travel time, will be considered work time.

    d.     Employees whose exemption requests are not approved will secure a vaccination appointment and provide verification of being fully vaccinated by October 18, 2021, or be subject to non-disciplinary separation.

    e.     Only HR staff or staff who are bound to protect confidential and sensitive information will handle and process exemption documentation. All information disclosed to the Employer in the exemption process will be kept confidential. This information will only be accessed by the Employer on a need-to-know basis.

4.     **Accommodations for medical or religious exemptions**

    a.     Employees who are approved for medical or religious exemptions will automatically proceed to the accommodation process. The Employer will conduct diligent review and search for possible accommodations within the agency.  Employees requesting an accommodation must cooperate with the Employer in discussing the need for and possible form of any accommodation.

        Consistent with current practice, all information disclosed to the Employer during the accommodation process will be kept confidential. This information will only be accessed by the Employer on a need-to-know basis.

    b.     Upon request, an employee will be provided a copy of their reasonable accommodation information that is maintained by the Employer.

    c.     The Employer will determine whether an employee is eligible for a reasonable accommodation and the final form of any accommodation to be provided. The Employer will attempt to accommodate the employee in their current position prior to looking at accommodations in alternative vacant positions.

    d.     In the event that an accommodation is not available for an employee with an approved medical or religious exemption, they will be subject to non-disciplinary separation as

3

stated in 3(d).

\*\*\*

9.    **Conditions of Employment**

a.    If an employee is not fully vaccinated by October 18, 2021 and has officially submitted retirement paperwork to DRS, the employee may use accrued vacation leave or leave without pay until their retirement date. This provision expires on December 31, 2021. The use of accrued leave shall be subject to the definitions and provisions contained in the Collective Bargaining Agreement.

b.    If an employee has initiated their exemption request by September 13, 2021 and cooperates with the process and the exemption is still being reviewed on October 18, 2021, the employee will suffer no loss in pay until the exemption decision is provided. If an employee's exemption request has been approved but an accommodation has not been identified, the employee may use a combination of annual leave and leave without pay after October 18, 2021. If the exemption request is denied or an accommodation is not available, the employee may use a combination of annual leave and leave without pay for up to forty-five (45) days to become fully vaccinated. Failure to provide proof of beginning the process of becoming fully vaccinated within ten (10) calendar days of denial will result in non-disciplinary separation. Failure to provide proof of full vaccination within the forty-five (45) day period will result in non-disciplinary separation.

c.    If an employee receives the first dose of the vaccination late and fails to become fully vaccinated by October 18, 2021, the employee may use leave without pay for up to thirty (30) calendar days to become fully vaccinated and retains the right to return to their previous position or a vacant position in the same job class at their work location provided the employee has become fully vaccinated and the Employer has not permanently filled their previous position. This provision expires on November 17, 2021.

d.    If an employee has not initiated an exemption request and fails to provide proof of vaccination by October 18, 2021, the employee will be subject to non-disciplinary separation.

e.    Employees who are subject to non-disciplinary separation shall be eligible for state employment upon becoming fully vaccinated.


IV.    **STATE AND FEDERAL LAW**

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

**Section 2000e-2 (Section 703)**

(a)  Employer practices

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**29 CFR § 1605.2 – Reasonable accommodation without undue hardship as required by section 701(j) of title VII of the Civil Rights Act of 1964**

**(a)  Purple of this section.** This section clarifies the obligation imposed by title VII of the Civil Rights Act of 1964, as amended, (sections 701(j), 703 and 717) to accommodate the religious practices of employees and prospective employees. This section does not address other obligations under title VII not to discriminate on grounds of religion, not other provisions of the title VII. This section is not intended to limit any additional obligations to accommodate religious practices which may exist pursuant to constitutional, or other statutory provisions; neither is it intended to provide guidance for statutes which require accommodation on bases other than religion such as section 503 of the Rehabilitation Act of 1973. The legal principles which have been developed with respect to discrimination prohibited by title V11 on the bases of race, color, sex, and national origin also apply to religious discrimination in all circumstances other than where an accommodation is required.

**(b)  Duty to accommodate**
**(1)** Section 701(j) makes it an unlawful employment practice under section 701(a)(1) for an employer to fail to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business.[2]

[2] See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 74 (1977)

**(2)** Section 701(j) in conjunction with section 703(c), imposes an obligation on a labor organization to Reasonably accommodate the religious practices of an employee or prospective employee, unless the labor organization demonstrates that accommodation would result in undue hardship.

**(3)** Section 1605.2 is primarily directed to obligations of employers or labor organizations, which are the entities covered by title VII that will most often be required to make an accommodation. However, the principles of § 1605.2 also apply when an accommodation can be required of other entities covered by title VII, such as employment agencies (section 703(b)) or joint labor-management committees controlling apprenticeship or other training or retraining (section 703(d)). (See, for example, § 1605.3(a) "Scheduling of Tests or Other Selection Procedures.")

**(c) Reasonable accommodation.**
**(1)** After an employee or prospective employee notifies the employer or labor organization of his or her need for a religious accommodation, the employer or labor organization has an obligation to reasonably accommodate the individual's religious practices. A refusal to accommodate is justified

only when an employer or labor organization can demonstrate that an undue hardship would in fact result from each available alternative method of accommodation. A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship.

**(2)** When there is more than one method of accommodation available which would not cause undue hardship, the Commission will determine whether the accommodation offered is reasonable by examining:

> **(i)** The alternatives for accommodation considered by the employer or labor organization; and

> **(ii)** The alternatives for accommodation, if any, actually offered to the individual requiring accommodation. Some alternatives for accommodating religious practices might disadvantage the individual with respect to his or her employment opportunities, such as compensation, terms, conditions, or privileges of employment. Therefore, when there is more than one means of accommodation which would not cause undue hardship, the employer or labor organization must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities.

**(d) Alternatives for accommodating religious practices.**

**(1)** Employees and prospective employees most frequently request an accommodation because their religious practices conflict with their work schedules. The following subsections are some means of accommodating the conflict between work schedules and religious practices which the Commission believes that employers and labor organizations should consider as part of the obligation to accommodate and which the Commission will consider in investigating a charge. These are not intended to be all-inclusive. There are often other alternatives which would reasonably accommodate an individual's religious practices when they conflict with a work schedule. There are also employment practices besides work scheduling which may conflict with religious practices and cause an individual to request an accommodation. See, for example, the Commission's finding number (3) from its Hearings on Religious Discrimination, in appendix A to §§ 1605.2 and 1605.3. The principles expressed in these Guidelines apply as well to such requests for accommodation.

> **(i)** Voluntary Substitutes and "Swaps".
> Reasonable accommodation without undue hardship is generally possible where a voluntary substitute with substantially similar qualifications is available. One means of substitution is the voluntary swap. In a number of cases, the securing of a substitute has been left entirely up to the individual seeking the accommodation. The Commission believes that the obligation to accommodate requires that employers and labor organizations facilitate the securing of a voluntary substitute with substantially similar qualifications. Some means of doing this which employers and labor organizations should consider are: to publicize policies regarding accommodation and voluntary substitution; to promote an atmosphere in which such substitutions are favorably regarded; to provide a central file, bulletin board or other means for matching voluntary substitutes with positions for which substitutes are needed.

\*\*\*

6

**(e) Undue hardship.**

**(1)** Cost. An employer may assert undue hardship to justify a refusal to accommodate an employee's need to be absent from his or her scheduled duty hours if the employer can demonstrate that the accommodation would require "more than a de minimis cost".[4] The Commission will determine what constitutes "more than a de minimis cost" with due regard given to the identifiable cost in relation to the size and operating cost of the employer, and the number of individuals who will in fact need a particular accommodation. In general, the Commission interprets this phrase as it was used in the Hardison decision to mean that costs similar to the regular payment of premium wages of substitutes, which was at issue in Hardison, would constitute undue hardship. However, the Commission will presume that the infrequent payment of premium wages for a substitute or the payment of premium wages while a more permanent accommodation is being sought are costs which an employer can be required to bear as a means of providing a reasonable accommodation. Further, the Commission will presume that generally, the payment of administrative costs necessary for providing the accommodation will not constitute more than a de minimis cost. Administrative costs, for example, include those costs involved in rearranging schedules and recording substitutions for payroll purposes.

[4] Hardison, supra, 432 U.S. at 84.

**(2)** Seniority Rights. Undue hardship would also be shown where a variance from a bona fide seniority system is necessary in order to accommodate an employee's religious practices when doing so would deny another employee his or her job or shift preference guaranteed by that system. Hardison, supra, 432 U.S. at 80. Arrangements for voluntary substitutes and swaps (see paragraph (d)(1)(i) of this section) do not constitute an undue hardship to the extent the arrangements do not violate a bona fide seniority system. Nothing in the Statute or these Guidelines precludes an employer and a union from including arrangements for voluntary substitutes and swaps as part of a collective bargaining agreement.

V.    **FACTS**

Grievant held the position of Natural Resource Technician 2 and was a member of a prescribed burn team.[1]  This job is primarily performed outdoors in the field with a prescribed burn team office located in Yakima, Washington. When the state's COVID vaccination mandates were issued, Grievant sought and obtained an exemption based upon his religious beliefs.  He was separated from his employment on October 18, 2021, after the Department determined it could not provide an accommodation without undue hardship. The Union grieved the denial under a Memorandum of

[1] The team plans and implements controlled burns to remove fuel from the ground as part of the state's forest health strategy.

Understanding negotiated in response to the state's COVID vaccination requirements and this arbitration ensued.

**Background**

Lonnie Spikes is the human resources director for the Department where he has worked since July 2019. He testified that he was employed during the start of the COVID-19 pandemic and that an order was originally given sending employees home while the Department figured out how to reduce exposure to the disease. This included employees who work in fish hatcheries and in the field.[2] Eventually, field employees such as Grievant returned to work with masking and social distancing protocols, called the Safe Start Guides, which were under continuing revision in collaboration with the Department of Health. This helped reduce the spread of COVID in the workplace, although it was still an everyday occurrence for employees to call out sick.

Starting in August 2021, Washington Governor Jay Inslee issued proclamations eventually requiring all employees at state agencies to become fully vaccinated against COVID-19 or to receive an exemption to the requirement based upon disability or religious status. The proclamation was based upon public health and safety. The Union represents over 900 employees in the Department so in response to the proclamation, the parties engaged in mid-contract negotiations culminating in a fully executed memorandum of understanding (MOU). The MOU acknowledged the need for universal employee vaccinations as a public safety measure but echoed the requirement stated in the proclamation that the Department honor the requirements of Title VII and other federal laws by issuing necessary exemptions (accommodations) to individuals.

Spikes was required to provide guidance to the Department's Executive team to facilitate the exemption process under the MOU. At the time, the Department's existing policies prohibiting

---

[2] During the shutdown, the Department provided training opportunities for Department members via teleconference, and they were also able to do some planning duties.

discrimination were still in effect.[3]  Under existing practices, the accommodation process involved an employee coming to the Department seeking an accommodation.  The Department would engage in an interactive process to find a reasonable way the employee could do the essential functions of the job with some sort of accommodation in place. To implement the exemption process here, the Department sent an all-staff email concerning the proclamation and the Department's intent to comply with it. The communication informed those who believed they would fall under a religious or medical exemption of the paperwork needed for completion.  The process would start when an employee filled out a worksheet listing what they thought they needed as an accommodation. The risk management team would then review the position description, verify its accuracy, and determine the essential functions of the position.  Next, this information would be forwarded to management for discussion on what could be done to accommodate the individual employee.

The Department received approximately 100-120 requests for religious exemptions and attempted to accommodate everyone who received an exemption using guidance provided by Deputy Director Amy Windrope.  In a memo dated September 24, 2021, Windrope wrote that "reasonable accommodations may be approved for non-supervisory employees able to perform ALL of the functions of their work 100% tele-working or in field settings and in either case, without interacting with any staff, the public or external partners."  If a worker was given an accommodation and the "extremely unlikely event" occurred that they must report to the office, they were required to wear a face covering and continue to socially distance.  In a subsequent email, Windrope clarified that accommodations would be granted only to individuals who did not interact with others:

> Given these key considerations, we have revised our approach to reasonable accommodations. Essentially, employees with an approved vaccine exemption who are

---

[3] Department Policy 3007, dated June 25, 2021, prohibits discrimination based upon religious affiliation/creed. Policy 3015 requires efforts toward diversity, equity, and inclusion. Policy 3005, dated March 26, 2021, detailed the role of supervisors and managers in supporting the agency's DEI mission. EX 3. Policy 4001 created a process for providing reasonable accommodations for employees with disabilities. EX 4. The record contains no separate process for affording religious accommodations.

9

able to perform ALL of the functions of their work through 100% teleworking or in field settings, and in either case, without interacting with staff, the public, or external partners may be approved for reasonable accommodations. Due to the inherent expectation that supervisors meet in person with staff they manage and with their colleagues, supervisors are not able to perform 100% of their work through telework.

Spikes explained that this meant no accommodation would be given to an employee if an essential function of the job involved being able to work with others in person, to eliminate undue risk to the employee and persons with whom they interacted. Using this standard, the Department reviewed the position description for each employee seeking an accommodation and obtained input from supervisors, appointing authorities, and the individual employees.  Individual input was obtained by sitting down one-on-one virtually with each applicant and hearing their case as far as what they could do to mitigate the vaccine requirement.

Spikes further testified that there would have been such an interview with Grievant; that there would have been worksheets and notes to document the interview; and that the entire process was followed with Grievant.  Grievant's completed worksheet is dated September 27, 2021.[4]  It includes his answers to the questions concerning his work as a Natural Resources Technician, including that he performed duties involving other people in "meetings on some days, working in the bay, driving to our unit, we will be 2 people in rig usually. We do not have to be first aid/cpr certified."  The form notes that Grievant responded to the mask question affirmatively, stating, "Yeah, when we are on the fire line it is kind of hard. We wear masks close to fires anyways."  He answered the question about whether he could maintain social distancing as follows: "Yeah we have a big office, we are usually more than 6 feet when we go out. When we are fully staffed we will be take 2 people in a vehicle. If we put someone in a drivers seat and then someone diagnolly [sic] then we should be able to, its [sic] like 5 feet."   EX 14.

Spikes explained that Grievant's estimate that they could remain five feet apart in the vehicle did not meet the requirement of social distancing, which required that people maintain a six-to-eight-

---

[4] The form states that the interview was by "Justin Spruiell" and lists the HR consultant as Marnie West.

foot distance, so the "spray" from speaking did not reach the other person.  Because a vehicle is an enclosed space, and the crew can be in vehicles for over an hour driving to a work location, Spikes testified that traveling was a "pretty big part of their job."  The Department offered the accommodation of reassignment to employees who could not be accommodated. He was unclear about whether Grievant requested a reassignment.  In either case, Grievant did not meet the deadline of being either vaccinated or accommodated by October 18, 2021.  The Department sent him notice that he was therefore facing separation for non-disciplinary reasons.[5]

Spikes further testified that in the reasonable accommodation process, the Department allows for job modification. With respect to Grievant, Spikes was not personally involved in the process, but was confident that the risk management team would have considered job modifications.  As far as outcomes, the Department did not allow any modifications which permitted an unvaccinated employee to interact with other in person. The only accommodations offered in the Department were cases where employees could 100 percent telework and not be around others at any time.  No supervisors were accommodated because the Department required them to meet in person with their subordinates.

In Grievant's case, Spikes did not know whether the team considered allowing Grievant to drive to work sites using his personal vehicle. He did not see any records showing that the team specifically addressed the issue. He doubted this would be allowed in an area where fires are being set.  He would have expected Grievant's supervisors, who are subject matter experts, to be able to consider this sort of question.  Grievant would have had the opportunity to raise the use of his personal vehicle during the interactive process.  Spikes did not believe Grievant raised that possibility but stated he would have to check the records to be sure. He did not know whether there was a rule prohibiting employees from

---

[5] A non-disciplinary separation meant that the employee did not meet the conditions of employment but was free to reapply for their former position. In disciplinary situations, employees are not permitted to do so.  In a non-disciplinary separation, the employee might receive a positive reference depending upon their work history, whereas in a disciplinary separation, the employee would likely receive a negative reference.

taking their vehicles into the field.  The only accommodations other than 100 percent telework were for employees who could do their jobs without interacting with anyone else, including coworkers, supervisors, members of the public, and so on. For example, there were a few employees in HR who came into the back office in the dark hours of the morning who were permitted to work in the building. He acknowledged that the accommodation process is meant to create exceptions to how things are normally done, but without removing any essential functions.

Eric Gardner is the wildlife program director for the Department, where he has worked for ten years.  Previously, he held the positions of deputy director and wildlife diversity division manager.  His role in the implementation of the vaccine mandate was to evaluate requests for reasonable accommodation. Specifically, he ensured that staff worked with appropriate HR personnel to review position descriptions with a focus on the essential functions of the job, in order to assess the ability to provide accommodations.  His role included gaining input from first line supervisors who had firsthand knowledge of the positions in question.

Throughout the pandemic, members of the burn teams were required to mask and socially distance. As the Department looked to reopen for business, it was determined that mere masking and social distancing were not sufficient to gain the full functionality of the job. In Grievant's case, his position description stated that a natural resource tech 2 works both independently and within a crew. It is a career seasonal position primarily hired to be on the ground performing forest management prescribed fire work as part of a team.  While most of the job is prescribed fire work, there is also associated work related to the operation and maintenance of equipment.  Other duties, such as forest thinning, is similar work without fire and a different way to manage forests.

Gardner explained that Grievant's position required frequent travel into the field in order to conduct the burns so that forests are well managed and do not present a fire hazard to communities. The team travels to various locations, including traveling within large areas within the work site itself.

These locations are not near a post of duty.  The job requires making sure that all gear is loaded and then driving on back country, forest roads to the location where the burn will be implemented.  Crews are not generally expected to travel alone. Crew vehicles must be capable of functioning in back road environments where roads might not be well maintained.

The expectation is that the team shows up with their gear using state equipment rather than using solo vehicles.  Using a state vehicle for a single employee would not be a reasonable use of state resources.  There is a limited motor pool and vehicles which are shared. The Department can access other vehicles as needed. Gardner never heard the possibility of Grievant using a personal vehicle to access field sites. The use of personal vehicles would need to be approved by a supervisor, because it incurs a mileage fee and additive cost to the program. He has never been asked if Grievant could drive a personal vehicle to these sites.  In addition, the work is performed in a team environment, working in proximity, and gathering for briefings face to face in the field.  Team members need to be there to assist and help each other, albeit outside. These functions could not be accommodated.[6]

In Grievant's case, the chain of command created an overarching document describing the different roles and functions at each level within the burn team. After this, they generated a recommendation in the form of a draft letter which concluded that no accommodation could be provided to Grievant. Gardner reviewed it and agreed that under the governor's mandate and provided guidance, no accommodation could be granted.  He signed the letter and sent it back to the chain of command and HR to deliver. Throughout the process, Gardner followed Department policies and guidance.

---

[6] Gardner testified that in the 20 months prior to Grievant's separation, there were no COVID outbreaks on his team of which Gardner was aware.  During that time, the crew used masking and social distancing whenever possible. However, these practices were not considered sufficient in light of the development of the vaccine and the Department's responsibility to provide a safe working environment. No reasonable accommodations were granted to any field staff member of the wildlife program. Social distancing in the field could impede team members' ability to ensure each other's safety.

Paul Dahmer is the land stewardship and operations section manager for the Department, where he has worked for over 33 years. He supervises natural resource technicians including those on the prescribed fire team and reviews their position descriptions.  He has been out in the field observing the activities of the teams.  A typical workday for the team could be preparing for a prescribed fire. The team would come to the office and head out in trucks to the site of the prescribed fire plan.  There is a prescribed fire team office in Yakima with a shop, bay, and office space.  The crew gathers at that location in the morning and then heads out to work.  The bay is a big, open garage with large garage doors where crew members work on equipment and vehicles may be stored.

The crew travels together in the large pickup trucks, which have been outfitted as engines and have two rows of seating.  Typically,  two or more crew members ride in the vehicle depending upon the nature of the job task.  The farthest apart they could sit would be four or five feet, with a driver at the wheel and a passenger in the backseat on the opposite side.  If the crew is preparing for burns, they will meet at the site and plan what they are doing for the day, such as digging fire lines in the soil to prevent fire crossing from one area to another.  If a burn is to be done, the crew works in a line lighting fire throughout a designated area.  The crew normally returns to the office at the end of the day, although if that is not practical, they may camp in the area or get a hotel, so they are closer to the work site the following day.[7]

Work was performed in this manner during the 18 months prior to the vaccination mandate, with workers wearing masks and maintaining six feet or more distance, when possible.  Because the work is very arduous, with crews often carrying heavy packs and doing hard physical work, wearing a mask the entire time was not practical. The understanding was they could physically distance in the field.  If they could keep that distance, they were not required to wear masks.  There is always a risk  of

---

[7] He was not aware if there was a prohibition on Department employees taking their own vehicle in an accommodation setting as opposed to riding in a vehicle with others.

injury in the field and crew members need to be able to assist each other if someone gets injured.

Sheila Smith is a scientific technician 4 with the Department, where she has worked for over 31 years, and is also the Union president.  She has been on the Union executive committee for around 10 years and president for at least seven to eight years.  The Union represents the vast majority of Department employees, including biologists and technicians, who are the "boots on the ground."  She was involved in the negotiation of the MOU related to the implementation of the Governor's vaccine requirements.  The Union was given a draft MOU and they were able to negotiate some of the processes through it.  The Union did not agree at the table that the only way to control COVID-19 was for every single employee to be vaccinated.  The Union did agree that vaccines were effective in reducing infection and serious disease and that widespread vaccination was the primary means the state was using to protect everyone.

In bargaining the reasonable accommodation process, the Department never told the Union that the only accommodations available would be either 100% telework or occupying a position with no human contact. The Department did not state that masking and social distancing would be insufficient as an accommodation, or that field employees would not be accommodated. Because field staff make up three-quarters of the bargaining unit, the Union would have approached negotiations differently if they knew that no field staff would be able to receive accommodations.

**Testimony of the Grievant**

Grievant began working for the Department as a forest technician 2 on March 1, 2021 and was employed until October 18, 2021.  He was hired during the pandemic and was required to wear masks and social distance by staying 6 feet apart from coworkers.   Grievant applied for a religious exemption to the vaccine mandate but was separated after the Department failed to grant him an accommodation.

Grievant sent his request for a religious exemption based upon his Christian faith.  A few days later, he had an interview with Justin Spruiell from HR and went over why he filed for an exemption. The

15

person from HR asked him if there were ways to improve the work area or get around.  He told them that he could provide his own N95 mask, which was better than a cloth mask.  The main issue Spruiell asked him about was travel, which Grievant explained. In the beginning, when he was first hired, they had seven trucks.  Three were checked out of the Ellensburg office so each crew member could travel in a separate vehicle.  When burn season began, the crew lost two members, so they were down to a crew of five.  Each member still had their own vehicle and drove separately.  When the HR person asked what they could do better, he said that next year, when there were more than five people, they could travel two people to a truck, which is what he put on the form.  This would be in March 2022.

He was also asked if he was willing to continue wearing a mask, and he said yes.  He said everything they had been doing was following procedures in the burn plans and maintaining office safety.  Ninety-five percent of his work was in the field or out in the bay where they were masked and stayed at least six feet apart.  In the field, the crews do not work side by side. They are not meant to be close to each other. If they are digging line or on the hand line monitoring the burn, trees come down. In those situations, two people do not stand close together because that would endanger two people. They are always at least six feet apart when working on a fire.  In pre-burn situations, they do not work closer than six feet in proximity. Even if fire jumped the line, crew members would stay at least six feet apart to avoid swinging a tool and hitting someone. Typically, they stay approximately ten feet apart.  In other words, they distance from each other as part of their normal work, not because of COVID.

Grievant was willing to maintain these procedures.  Since the start of COVID, they had no outbreaks within his work unit. When he discussed getting an accommodation with his supervisors, they had no problem with it.  It was a surprise to everyone that nobody was accommodated.  His program manager might have been the person who had a problem with it, but no one else.  His work duties and essential functions would not have to be changed for him to safely perform his job.  He was not aware of any situation that would have made people unsafe, as they could still do burns as they had been doing,

16

still maintain equipment, and still dig fire lines.  The breakout meetings could still occur outside while socially distanced.  When the crew stays overnight at a burn location, they are each in their own tents. They stay 50-100 feet apart, so they do not have to hear each other snore.  Burn areas are very large so there is no problem doing this.  He recalled telling the Spruiell that they were each  driving in their own separate trucks and that he was willing to continue do so, or even drive his own vehicle.

## VI.    POSITIONS OF THE PARTIES BRIEFLY SUMMARIZED

### Position of the Union

1.      The Department failed to call the person from HR who discussed accommodations with Grievant. There was no evidence that the Department considered anything about the workplace and his actual working conditions, as the state did not call any witnesses who were involved firsthand in the process. No supervisors who worked with Grievant testified.

2.      With respect to travel, Grievant had his own vehicle to himself for the entire time he worked for the State. The State did not show that they lacked enough vehicles or that he had to ride with other people.  Grievant testified he did not.

3.      The Department did not follow its own accommodation process because they only allowed accommodations if a person could 100 percent telework or never be around other people. A reasonable accommodation can include restructuring of the job process, such as allowing Grievant to travel by himself. The Department did not look at that.  Essentially the State would only provide accommodations for individuals who never interact with others. Here, Grievant could remain masked if he had to be around people.

4.      The case of *Garvey v. City of New York* stands for the idea that the vaccine mandate imposed there was arbitrary and capricious, because unvaccinated workers were not put on leave immediately nor was there a City-wide vaccination mandate for residents. The same is true here. Members of the public were permitted to come into Department facilities even if unvaccinated as could contractors. This discrimination shows that it would not have been an undue hardship to allow Grievant to work under the same guidelines as the public or contractors who came onto job sites.

5.      Undue hardship is defined as more than a de minimis cost. Grievant did not ask for anything more than to continue what he was already doing: driving an agency vehicle by himself. He was also willing to drive his own vehicle. The state claims they never heard this, but no one who actually spoke to Grievant testified.  The state did not claim they lacked enough vehicles for Grievant to continue to drive his own truck. There would be no additional cost. Due to safety reasons, in a wildland burn situation, the crew is always more than six feet apart for safety reasons.

6.      The Department failed to conduct an individualized, fact specific inquiry and weigh the accommodation against undue hardship.  CDC guidelines found masking and social distancing to be a reasonable accommodation.  The Department essentially excluded an entire classification (field workers) from accessing any accommodations, which was inherently unreasonable.

**Position of the Department**

1.      The Department conducted an individualized accommodation process for Grievant and determined that no reasonable accommodation could adequately mitigate the risks associated with having an unvaccinated person in the position of Natural Resources Technician 2.

2.      State and federal guidance acknowledged that vaccines were the best way to prevent transmission and death from COVID-19. The Department had a duty to protect Grievant and members of his team from risk.

3.      In his interview, Grievant admitted that one of the essential functions of his job was traveling to and from work sites, which could not be done while maintaining social distancing. Although the team traveled in separate vehicles for a time, this was only because they were understaffed. Even if he could have been provided a temporary accommodation pending new hires, this is at odds with the requested remedy of return to his former employment.

4.      The only relevant information is what was available to the Department at the time. This did not include information about separate rigs or anticipation that he could have continued driving to burn sites.  Grievant's testimony is contradicted by hard evidence, especially in the worksheet. Nobody had ever heard the idea of Grievant using his own vehicle to reach work sites until the hearing. That testimony relied upon assumptions that the vehicle was fit to travel on back roads, carry gear, and continue working through rough conditions. It was not part of the interactive process per the evidence that was presented.

5.      Undue hardship exists if an accommodation has more than minimal cost or burden on the Department. Adding an additional state vehicle to the caravan of employees to go to work sites would be more than a de minimis cost.

6.      Under all applicable laws, including Title VII, Grievant could not be accommodated in his position and should not be returned unvaccinated to his position or granted back pay.


**VII.    DISCUSSION**

**Merits**

        The parties' MOU establishes the process for employees seeking religious exemptions from the

state's vaccine mandate, including timelines that both applicants and the Department must meet.   The

Department is responsible for notifying employees about their rights to seek religious or medical

exemptions and for providing them with the proper forms.  If the employee timely commences the

process, Section 4(a) states that "the Employer will conduct a diligent review and search for possible

accommodations within the agency."[8]  Employees seeking accommodation are required to "cooperate with the Employer in discussing the need for and possible form of any accommodation."  Once this process is complete, "the Employer will determine whether an employee is eligible for a reasonable accommodation and the final form of any accommodation to be provided. The Employer will attempt to accommodate the employee in their current position prior to looking at accommodation in alternative vacant positions."  In other words, the Department makes the final determination of whether the accommodation can be met.

        To carry out these requirements, the Department developed additional procedures to implement the MOU.  Department witnesses testified that after a request for accommodation paperwork is received, the Department's risk management team reviews the applicant's position description, verifies its accuracy, and determines the essential functions of the position.  This information is forwarded to management for discussion as to what they could do to accommodate the individual.  Management then solicits input from supervisors who are closer to the work and have firsthand knowledge of the positions in question.  With that information, management  determines whether an exemption is available. Department witnesses testified that this process was followed here.

        For his part, Grievant fulfilled his duties set out in the MOU.  Specifically, he filled out a request for religious accommodation, returned it in a timely manner, and attended a meeting shortly thereafter with Jason Spruiell from HR.  Grievant testified that in this meeting, the discussion focused on whether he could be accommodated in traveling from the Yakima office to various work locations.  Such travel occurs routinely and involves the use of state-owned trucks, which transport firefighting equipment on backroads to remote areas where prescribed burns take place.  Grievant testified that he shared with Spruiell that the crew was down to five members and had been driving separate trucks since he started

---

[8]  In the on-line version of the Merriam-Webster dictionary, the term "diligent" is defined as " characterized by steady, earnest, and energetic effort **:** **PAINSTAKING** a *diligent* worker.

with the Department.  He testified that he told Spruiell that in the spring, when the crew was staffed up to seven, he expected that they could drive two to a vehicle and distance about 4 feet, but that he would also be willing to drive his own vehicle at that time.

The Department contested that Grievant shared this information during the interview. Gardner further testified that using a state vehicle for a single employee would not be a reasonable use of state resources.  However, it was not clear that Gardner knew that this was the existing practice under COVID, even if crews normally traveled together. Ultimately, the Department denied the accommodation on the basis that the farthest apart crew members could sit in a state truck would be four or five feet, with a driver at the wheel and a passenger in the backseat on the opposite side.  Because this distance was deemed insufficient to keep crew members safe, Grievant's accommodation was denied.

As to this outcome-determinative issue, the Department claims Grievant did not share that he was already driving a separate vehicle nor that he would be willing to deploy his own vehicle.  As a result, these potential accommodations were not considered by the chain of command. Grievant testified that he did bring up these issues. To resolve this dispute, the Union argues strongly that the Department's failure to call Spruiell to testify should result in a ruling in Grievant's favor.  On this point, arbitrators do take the failure to call witnesses with direct knowledge of the facts as a significant factor in the fact-finding process.   As stated in *Elkouri & Elkouri*:

> The failure of a party to call as a witness a person who is available to it and who should be in a position to contribute informed testimony may permit the arbitrator to infer that had the witness been called, the testimony adduced would have been adverse to the position of that party.

*Elkouri & Elkouri*, How Arbitration Works, at 8-51.

Under this well-accepted standard, the Department's failure to call Spruiell to rebut Grievant's testimony must be given significant weight. Grievant testified credibly that he shared the current transportation practice and options for what might occur in the spring.  In response, the State did not produce the notes from the interview to support its position that Grievant did not raise these solutions.

There was no information in the record that Spruiell was unavailable or an explanation of why his notes from the meeting were not produced. As a result, Grievant's version of what occurred in the interview will be given more weight than the testimony of management, which was not first-hand information. In light of these factors, I conclude that Grievant did bring up that he was currently driving a truck alone and that he was willing to continue to do so in the spring, whether in a state or personal vehicle.

In light of this finding, it follows that the accommodation process did not occur in the manner the Department managers testified was the normal process.  The managers who testified did not have the information that Grievant had been traveling to work sites by himself for his entire career with the Department.  They did not know Grievant brought up the idea of traveling in his own vehicle.  As a result, the Department did not conduct a "diligent" review of the possible accommodations which could have been provided to Grievant that would have avoided the termination at the time it occurred.  The Union has thus proven at least a prima facie case that the MOU was violated when Grievant was separated from his employment.

**The Department's Defenses**

Next, the question is whether any of the Department's defenses mitigate against a finding that the MOU was violated.  Here, the Department argues that allowing Grievant to drive a separate state vehicle would have been an undue hardship due to the cost, as anything over a *de minimis* cost is not required by Title VII.  By counter, the Union points out that Grievant did not ask for anything more than to continue what he was already doing: driving an agency vehicle by himself.

On this question, there are several important evidentiary considerations.  First, the record does not establish that the Department evaluated the cost of one additional truck or if actual staffing levels in the spring would have permitted one crew member to drive alone. Because crew members were transporting equipment, it is possible that an additional vehicle would have been part of the normal complement of trucks.  Second, Grievant had been driving a separate truck for the entire 5 months he

was employed, despite the Department's contention that this practice would be unduly costly.

Accordingly, Grievant could have been accommodated without undue hardship at the time he was

terminated, because doing so involved no additional cost above the status quo.  Thus, I must conclude

that the Department's failure to fully evaluate the options presented by Grievant at the time of his

separation cannot be excused based upon the argument that they constituted at undue hardship at that

time.

Second, the Department argues that Grievant admitted he could only distance from his team

members "90 to 95 percent of the time." To the Department, this testimony was an admission that at

least 5-10 percent of the time, Grievant would be in direct contact with others, creating a safety issue

which would justify denying the accommodation request.   The Department's argument must be

carefully reviewed.  If Grievant was not able to mask and distance even for short periods, this would

overcome the Union's argument that he could safely continue in his job without being vaccinated.

However, a close reading of the record does not support that Grievant's duties required being

near other workers even some of the time.  Grievant testified credibly that crew meetings occurred

outdoors while distanced; that the crew already maintained 6-10 feet or more social distance while

cutting fire lines to avoid injury; that the maintenance and repair work done while masked in the large

open "bay" allowed significant distancing; and that when the crew members stay overnight on location,

they are in individual tents and are dispersed in the forest setting.  Notably, Grievant's supervisors were

not called to testify that the crews routinely, or even occasionally, were together in enclosed office

spaces or other environments which would have posed a safety risk due to COVID.

On this record, Grievant's work did not involve going into a typical office environment with

others even for short periods. Therefore, there was no reasonable basis to conclude that there were

times that Grievant could not maintain social distancing and masking, either outdoors or in the bay at

the time he was terminated. Although Grievant's testimony might have permitted that inference, there

was nothing more in the record to make that admission a solid basis for denying an accommodation.

Thirdly, the Department asserted that situations might arise when Grievant might need to provide aid to an injured coworker, which would not be possible while maintaining social distance. Certainly, if Grievant were expected to provide such aid, the Department would have the right to protect all workers from possible exposure to disease by requiring every crew member to be vaccinated. However, the record presented did not support the Department's contention.  The accommodations worksheet reflects that Grievant told Spruiell that he "did not need to be first aid/cpr certified." Although Grievant's position description lists "First-aid/CPR certification or similar certification such as first responder" as a *desired* qualification, it was not listed as a *requirement.* Therefore, providing aid to coworkers was not an *essential function* of the job.  Accordingly, the accommodation process would not permit the Department to rely on the need to provide first aid as a basis for denying an exemption to Grievant.

For these reasons, the Department's failure to consider Grievant's proposed accommodations, i.e., continuing to travel in a separate state vehicle or his own vehicle, violated the MOU. Because my review focuses on accommodations available at the time of the termination, the only accommodation Grievant requested was to maintain the status quo.  Because this would have resulted in no additional expenditures, the undue hardship claim was not ripe for consideration and cannot justify the separation from employment. The defenses presented by the Department are therefore insufficient to overcome the conclusion that the Department violated the MOU by its failure to complete its duty to diligently consider all potential accommodations.

**Remedy**

It is blackletter law that the role of the Arbitrator in granting a remedy is to restore the parties to the position they would have been in had their agreement not been violated. The Union has proven that Grievant was terminated in violation of the MOU.  In the grievance, the Union sought the following

relief: 1) Rescind the termination notice. 2) reinstate Grievant to his prior position with the State; 3) repay him for all lost wages and benefits; 4) engage in a true individualized accommodation process; and 5) award any additional remedy deemed reasonable.

The Department opposes the award of reinstatement and back pay, asserting that even if Grievant could have been provided a temporary accommodation pending new hires, this would be at odds with the requested remedy of return to his former employment.   The Department's position makes logical sense. If Grievant would have been separated in the spring of 2022, his reinstatement cannot include back pay from that time or allow reinstatement now. However, the burden was on the Department to establish that Grievant would have been separated in the spring of 2022 due to the Department's inability to offer him a separate vehicle.

Here, the Department possessed information concerning its inventory of trucks in the spring of 2022 and the size of its Yakima crew.  If the Department wished to establish that there was no available truck for Grievant to drive separately in the spring of 2022, or that cost would have been an undue hardship, it had a duty to establish this defense by evidence.  There was no evidence from the spring of 2022 presented. Accordingly, the Department failed to prove that events in the spring of 2022 would have resulted in Grievant's being terminated for lack of a reasonable accommodation at that time.  For these reasons, Grievant will be reinstated with back pay, subject to the conditions set out herein.

Finally, the Union requested in the grievance that the Department be ordered to complete the accommodation process.  The award shall include that obligation.  In conducting the accommodation process on remand, the parties must abide by the terms of the MOU to engage in an individualized process.  The Department cannot rely upon the assumption that field workers who are crew members can never be provided accommodations, as some field workers may have highly unusual working conditions including the benefit of working outdoors, where there are lowered risks of COVID transmission.  In the process on remand, the Department retains the right under the MOU to assess the

24

accommodation sought by Grievant and to determine whether it constitutes an undue hardship under the facts and circumstances present on remand.  It is anticipated that the parties will work diligently to determine whether Grievant can be maintained in his position in a manner which is safe and does not present an undue hardship to the Department.

In reaching my conclusions I addressed only those matters I deemed necessary for a proper resolution, but did consider all the arguments of the parties, including the evidence on which they relied, even if not specifically addressed in this opinion.


**AWARD**

Based upon careful consideration of the evidence and arguments of the parties, the undersigned awards the following AWARD:

1. The Grievance is sustained. The State violated the MOU by failing to complete the reasonable accommodation process as required by that agreement.

2. Grievant shall be reinstated with full back pay and benefits, including seniority and applicable pension contributions.

3. As requested by the Union, the parties shall complete the requested accommodation process within 60 days of the date of this opinion.

4. If the parties are unable to reach agreement concerning the remedy, I retain jurisdiction solely for the purpose of resolving such disputes.

5. As provided in agreement, the fees of the arbitrator shall be borne equally between the parties.


Respectfully submitted,

*Barbara J. Diamond*

Barbara J. Diamond, Arbiter
Portland, Oregon

December 5, 2022

25

# EXHIBIT D

I heard yesterday from 2 Tracers – that they are hearing stories all day from people who are vaccinated and getting COVID. In fact, one event was a party to celebrate everyone being vaccinated… It required people to bring their vaccination card to get in … and they've already identified 9+ people who got Covid at that event. One tracer said every case she talked to that day was already vaccinated. So, they're anxious to hear what you're all thinking about quarantine and masking guidance for vaccinated folks.

Then Meagan hear from Steve Pergam about a party that some SCCA staff attended and at least one is positive but likely multiple SCCA staff. This si the info I got from Steve:

IP at SCCA notified him of a positive staff member who was fully vaccinated and as they spoke about it Steve had heard about the event this staff member went to from a friend of his who decided not to go. It was described as a "burning man like" event but indoors, sounds like 100(s) of people attended. Required vaccine cards for entry.

Vance has given a heads up to Joanie about this event so we can look more into it and I will follow up with the IP that talked to Steve about it to see if we can get more info. I will get the name and contact info for the positive employee as SCCA as it might be good to talk directly to them to get more info about the party itself.

Sorry for the bad news,
James


James Lewis, MD, MPH (he/him)
Medical Epidemiologist – COVID-19 Healthcare Response
Communicable Disease Epidemiology & Immunization Section
Public Health - Seattle & King County

# EXHIBIT E

| | |
|---|---|
| **From:** | Duchin, Jeff |
| **To:** | Kay, Meagan |
| **Cc:** | Pogosjans, Sargis; Kawakami, Vance; Lewis, James; Bogan, Sharon; Cole, Kate |
| **Subject:** | Re: Media Tomorrow - |
| **Date:** | Thursday, July 29, 2021 1:13:15 PM |

absolutely, that was the key message last week and will continue, thanks!

_____

Jeffrey S. Duchin, MD (he/him)
Health Officer and Chief, Communicable Disease Epidemiology & Immunization Section
Public Health - Seattle and King County
Professor in Medicine, Division of Infectious Diseases, University of Washington
Adjunct Professor, School of Public Health
401 5th Ave, Suite 1250, Seattle, WA 98104
Tel: (206) 296-4774; Direct: (206) 263-8171; Fax: (206) 296-4803
E-mail: jeff.duchin@kingcounty.gov

---

**From:** Kay, Meagan <Meagan.Kay@kingcounty.gov>
**Sent:** Thursday, July 29, 2021 1:10 PM
**To:** Duchin, Jeff <Jeff.Duchin@kingcounty.gov>
**Cc:** Pogosjans, Sargis <spogosjans@kingcounty.gov>; Kawakami, Vance <Vance.Kawakami@kingcounty.gov>; Lewis, James <jamelewis@kingcounty.gov>; Bogan, Sharon <Sharon.Bogan@kingcounty.gov>; Cole, Kate <kacole@kingcounty.gov>
**Subject:** RE: Media Tomorrow -
I think it's worth mentioning that although we aren't at high levels of outbreaks identified at this point, the trend has reversed and that is concerning. People (esp unvaccinated, but even those who are vaccinated) who are convening in public indoor settings – are taking a risk given the Delta variant's transmissibility. I think this helps reinforce mask message.

**From:** Duchin, Jeff <Jeff.Duchin@kingcounty.gov>
**Sent:** Thursday, July 29, 2021 12:57 PM
**To:** Kay, Meagan <Meagan.Kay@kingcounty.gov>
**Cc:** Pogosjans, Sargis <spogosjans@kingcounty.gov>; Kawakami, Vance <Vance.Kawakami@kingcounty.gov>; Lewis, James <jamelewis@kingcounty.gov>; Bogan, Sharon <Sharon.Bogan@kingcounty.gov>; Cole, Kate <kacole@kingcounty.gov>
**Subject:** Re: Media Tomorrow -

Thanks. Given our discussions over the past few days, do you all feel outbreak trends are reliable/worth highlighting? Clearly need to share illustrative examples with key prevention messages. Was not planning to discuss vax status of outbreak cases separate from community - do you think it is important to highlight given it is similar? Was thinking the key info from outbreak vax status is secondary transmission and severity.

_____

Jeffrey S. Duchin, MD (he/him)
Health Officer and Chief, Communicable Disease Epidemiology & Immunization Section
Public Health - Seattle and King County
Professor in Medicine, Division of Infectious Diseases, University of Washington
Adjunct Professor, School of Public Health

401 5th Ave, Suite 1250, Seattle, WA 98104
Tel: (206) 296-4774; Direct: (206) 263-8171; Fax: (206) 296-4803
E-mail: jeff.duchin@kingcounty.gov

---

**From:** Kay, Meagan <Meagan.Kay@kingcounty.gov>
**Sent:** Thursday, July 29, 2021 12:37 PM
**To:** Duchin, Jeff <Jeff.Duchin@kingcounty.gov>
**Cc:** Pogosjans, Sargis <spogosjans@kingcounty.gov>; Kawakami, Vance <Vance.Kawakami@kingcounty.gov>; Lewis, James <jamelewis@kingcounty.gov>; Bogan, Sharon <Sharon.Bogan@kingcounty.gov>; Cole, Kate <kacole@kingcounty.gov>
**Subject:** RE: Media Tomorrow -

Got it.

For the outbreak trends (pulling from the epi report pages 12 and 13):

We have 67 active outbreak investigations right now, with 33 outbreaks identified this month. This is the lowest number of outbreaks identified in a month since May of 2020 and the number of outbreaks identified per month has been on a decreasing trend since April of 2021. **However, over the last two weeks, there has been an increasing trend in outbreaks (n=15) by 200.0% compared to the previous two weeks (n=5), which is concerning.** Nearly half of the outbreaks reported in July (n=15) were in non-healthcare workplaces, 7 occurred in schools/childcares, 7 in healthcare settings (3 in LTC and 4 in non-LTC healthcare), 3 in community settings, and 1 in a homeless service site. Vaccination status of cases associated with outbreaks was provided in the email from Aley yesterday – will that suffice? We won't be able to characterize the outbreaks with more than half vaccinated compared to those with mostly unvaccinated cases this week.

We are working on summarizing 3 other noteworthy outbreaks (retirement, box/underground, and a childcare one) in addition to the one we just sent you about the athletic club. Should be ready for tomorrow's briefing.

The other main things to reinforce for the public are the importance of masks for everyone and the new testing guidance for everyone (even vaccinated asx with known exposure) – I think those would be the key messages this week.

---

**From:** Duchin, Jeff <Jeff.Duchin@kingcounty.gov>
**Sent:** Thursday, July 29, 2021 12:12 PM
**To:** Kay, Meagan <Meagan.Kay@kingcounty.gov>
**Cc:** Pogosjans, Sargis <spogosjans@kingcounty.gov>; Kawakami, Vance <Vance.Kawakami@kingcounty.gov>; Lewis, James <jamelewis@kingcounty.gov>; Bogan, Sharon <Sharon.Bogan@kingcounty.gov>; Cole, Kate <kacole@kingcounty.gov>
**Subject:** Media Tomorrow -

I know COMMS pings some/all of you for weekly media briefing TP but I don't know what they ask you for. I will summarize recent epi from the report, no need to do anything on that front. What I need from you is the outbreak situation/trends and key the investigation summaries we've spoken about and any info we can share on vax status of cases countywide (such as what we did last week, for cases/hosp/deaths updated); and anything else you think is important to communicate to public at this time re: disease epi or prevention perspective. COMMS provides IMMS team status separately. Thank you!

Questions?

Jeff

_____
Jeffrey S. Duchin, MD (he/him)
Health Officer and Chief, Communicable Disease Epidemiology & Immunization Section
Public Health - Seattle and King County
Professor in Medicine, Division of Infectious Diseases, University of Washington
Adjunct Professor, School of Public Health
401 5th Ave, Suite 1250, Seattle, WA 98104
Tel: (206) 296-4774; Direct: (206) 263-8171; Fax: (206) 296-4803
E-mail: jeff.duchin@kingcounty.gov

# EXHIBIT F

From:       Duchin, Jeff
To:         Bogan, Sharon; Pogosjans, Sargis
Cc:         Kay, Meagan
Subject:    Re: Revised infographic related to vax/unvax incidence
Date:       Monday, August 2, 2021 5:19:26 PM
Attachments: image001.png
             image002.png
             image003.png
             image004.png
             image005.png
             image006.png
             image007.png
             image008.png
             image009.png

And just noticed this is missing but important: Recent data suggests that although vaccinated people have high-level protection from serious infections, if they do get COVID-19 they may be able to spread it to others.

Jeffrey S. Duchin, MD (he/him)
Health Officer and Chief, Communicable Disease Epidemiology & Immunization Section
Public Health - Seattle and King County
Professor in Medicine, Division of Infectious Diseases, University of Washington
Adjunct Professor, School of Public Health

**From:** Duchin, Jeff <Jeff.Duchin@kingcounty.gov>
**Sent:** Monday, August 2, 2021 2:39 PM
**To:** Bogan, Sharon <Sharon.Bogan@kingcounty.gov>; Pogosjans, Sargis <spogosjans@kingcounty.gov>
**Cc:** Kay, Meagan <Meagan.Kay@kingcounty.gov>
**Subject:** Re: Revised infographic related to vax/unvax incidence

Sorry - forgot: might be good to acknowledge that vaccine protection may wane over time and studies are monitoring for this so that boosters can be recommended if needed.

Jeffrey S. Duchin, MD (he/him)
Health Officer and Chief, Communicable Disease Epidemiology & Immunization Section
Public Health - Seattle and King County
Professor in Medicine, Division of Infectious Diseases, University of Washington
Adjunct Professor, School of Public Health