# EXHIBIT C

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 1

FOR THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

                                              )
RUTHANNA SHIRLEY, JOHNATHAN HONE,             )
CARLY PETERS, CHARLES FRADY, MARCUS           )
SANCHEZ, MORGAN WINES, SAMUEL KOLB,           )
STEPHEN J. ANDERSON, THOMAS MOATS,            )
TRENTON DE BOER, DONALD BRADLEY               )
ALLEN, JOSHUA BELTZ, ERIC OSWALD,             )
DREW DELOZIER, LINDA LOPEZ, PAUL              )
CHERRY, ISAAC STUTES, JULI ANDERSON,          )
                         Plaintiffs,          )
            v.                                ) No. 3:23-cv-05077-DGE
                                              )
WASHINGTON STATE DEPARTMENT OF FISH           )
AND WILDLIFE, a Washington State              )
Governmental Agency, KELLY SUSEWIND,          )
an individual, AMY WINDROPE, an               )
individual, LONNIE SPIKES, an                 )
individual, STEVE BEAR, an                    )
individual, CRAIG BURLEY, an                  )
individual,                                   )
                         Defendants.          )

_____


VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

HARVEY RISCH, MD, PhD

_____


Witness located in Boynton Beach, Florida

(All participants appeared via videoconference.)




DATE TAKEN:   January 29, 2025
REPORTED BY:  Nicole A. Bulldis, RPR, FCRR, WA CCR 3384
              AZ CR 50955 | CA CSR 14441 | OR CSR 24-0130

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.          Harvey Risch, MD, PhD

Page 2

1                       A P P E A R A N C E S

2

3    FOR PLAINTIFFS:

4       (via Zoom)           DENNIS J. McGLOTHIN
                             Western Washington Law Group, PLLC
5                            10485 NE 6th Street, Suite 1820
                             Bellevue, WA 98004
6                            (425) 728-7296
                             docs@westwalaw.com

7

8    FOR DEFENDANTS:

9       (via Zoom)           MARY E. CREGO PETERSON
                             Hillis Clark Martin & Peterson P.S.
10                           999 3rd Avenue, Suite 4600
                             Seattle, WA 98104
11                           (206) 623-1745
                             mary.peterson@hcmp.com

12

13                           --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 3

1              DEPOSITION OF HARVEY RISCH, MD, PhD

2

3                  EXAMINATION INDEX

4  EXAMINATION BY                               PAGE

5  Ms. Peterson.......................................... 4

6  Mr. McGlothin......................................... 211

7  Ms. Peterson.......................................... 255

8  Mr. McGlothin......................................... 266

9

10                  EXHIBIT INDEX

11  EXHIBITS FOR IDENTIFICATION                   PAGE

12   1  Risch Curriculum Vitae............................. 60

13   2  Risch Report - 11/28/24............................ 76

14   3  Response to Lynch Report - 1/10/25................. 194

15

16                   --o0o--

17

18

19

20

21

22

23

24

25

Page 4

1      REPORTED REMOTELY FROM CLARK COUNTY, WASHINGTON

2          Wednesday, January 29, 2025; 10:02 a.m.

3                      --o0o--

4

5   HARVEY RISCH, MD, PhD,        witness herein, having been

6                                first duly sworn on oath,

7                                was examined and testified

8                                as follows:

9

10              E X A M I N A T I O N

11  BY MS. PETERSON

12      Q.   Good morning.  Could you -- my name's

13  Mary Peterson.  I represent the defendants in this case.

14  Thank you for being here today.

15          Could you introduce yourself for the record,

16  please?

17      A.   I'm Dr. Harvey Risch, Professor Emeritus of

18  Epidemiology at Yale School of Public Health.

19      Q.   And where are you physically located today?

20      A.   Today, during our winter sojourn, I'm in Boynton

21  Beach, Florida.

22      Q.   Hopefully, the weather is nice there.

23      A.   It's a beautiful day today.  We should do this

24  outside.

25      Q.   You know, it's funny.  Just as I was sitting

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Page 5

1  down, I was thinking the one thing I don't like about

2  being in depositions or in court is that you're stuck

3  inside all day.  It's just -- that's just the nature of

4  our work sometimes.

5      A.   Yes.

6      Q.   And who is your current employer?

7      A.   I still have a small grant, a subcontract that's

8  running through Yale, so I have some for that.  It's

9  part-time.  And I'm on the board of directors, medical --

10  the chief medical board of The Wellness Company, which is

11  a medical startup company.

12      Q.   And so for The Wellness Company, you mentioned

13  you're on the board.  Are you an employee of The Wellness

14  Company?

15      A.   I suppose, yes.  I get paid for my board

16  membership.

17      Q.   Are you also a shareholder or part owner of The

18  Wellness Company in any way?

19      A.   Yes, I am.

20      Q.   What percentage of the company do you own?

21      A.   I think 5 percent.

22      Q.   Do you get compensation from The Wellness

23  Company in connection with your 5 percent ownership?

24      A.   No.  The shares are not publicly traded and

25  they're not fully vested yet either.

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                      Harvey Risch, MD, PhD

Page 8

1      Q.   But it sounds -- but you said that was just

2  provided to you recently?

3      A.   Yes.  I think a day or two days ago maybe.

4      Q.   So you didn't rely on that information when you

5  issued your written reports in this case?

6      A.   That's correct.

7      Q.   Did that information that you were recently

8  provided change any of your opinions in this case?

9      A.   No.  It actually empirically confirmed my

10  opinions in the case.

11      Q.   You mentioned that you reviewed a complaint.  Do

12  you know whether it was an original complaint or an

13  amended complaint?

14      A.   I don't recall.

15      Q.   Do you recall when you received it?

16      A.   Hmm, not exactly sure.

17      Q.   Was it recently or a long time ago?

18      A.   You know, I honestly can't tell you, to be fair.

19      Q.   You also mentioned that you reviewed letters to

20  some plaintiffs regarding their accommodation decisions;

21  is that right?

22      A.   Yes.

23      Q.   How many of those letters did you review?

24      A.   I think three or four.

25      Q.   Do you recall which plaintiffs they were for?

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Page 11

1  infections.  The breakthrough infections were growing in

2  November/December of 2021, growing, you know, much more

3  intensely in January/February of 2022 and continuing, and

4  the agency did not seem to, from what I have read, to the

5  degree that I understand, did not mandate boosters to try

6  to control those growing infections, those growing

7  breakthrough infections, in their vaccinated employees.

8       Q.  Do you have any information about what the

9  agency did other than the complaint?

10      A.  I have to think about that.  I don't think so.

11      Q.  Did you assume everything that was said in the

12  complaint was true?

13      A.  To the degree that there were scientific

14  statements, I validated the scientific statements for --

15  with the literature, relevant medical scientific

16  literature as I understand it.  To the degree that there

17  are legal statements in the complaint, that's not my area

18  of expertise so I don't have beliefs or opinions on those.

19      Q.  And what about the factual statements in the

20  complaint, did you assume those were true?

21      A.  Could you give me an example of the kinds of

22  factual statements you're referring to?

23      Q.  Sure.  A factual statement about a particular

24  plaintiff.  I had this job, for example.

25              Did you assume a factual statement in the

5f82afd5-45ed-48cb-94ee-fe7ec8279cf5

Page 12

1    complaint was true?

2          A.    Yes.   In general, yes.

3          Q.    Were there any factual statements in the

4    complaint that you did not assume were true?

5          A.    Well, as I said, all of the statements based on

6    legal issues, I made no judgments about.

7          Q.    Is that because you don't have any legal

8    training?

9          A.    That's correct.

10         Q.    And you're not here today to offer any legal

11   opinions?

12         A.    Correct.

13         Q.    Do you have any EEOC training?

14         A.    No.   Well, actually, to a limited degree, Yale

15   faculty members doing grant-funded research are required

16   to go through all sorts of personnel training involving

17   EEOC-like circumstances.   And this has been the case for

18   at least the past decade, if not longer, and so I've had

19   all of that.   Now, the degree to which one would consider

20   this exactly relevant to the specifics of the EEOC might

21   be limited, but it kind of bears a little on that.

22         Q.    So you've had training as an employee in a

23   workplace related to different employment laws; is that

24   what you're saying?

25         A.    A little bit.

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 13

1          Q.    But you're not claiming here today to be an
2    expert on EEOC law or policy?
3          A.    That's correct.
4          Q.    Have you ever worked --
5          A.    There is just one other thing, though, about
6    this, which is in my reading of the EEOC, the EEOC does
7    address scientific questions and evaluating the burden of
8    infection risks in the workplace.  And since my expertise
9    extends to those questions, then I've responded to the --
10   those scientific questions.  Not to the propriety of what
11   EEOC says or not in terms of legal issues, but just the
12   scientific questions underlying those kinds of EEOC
13   decisions.
14         Q.    Are you saying that you have expertise in
15   evaluating the risks of infection in a workplace?
16         A.    Yes.
17         Q.    And tell me -- tell me about your expertise in
18   that area.
19         A.    I'm a Fellow of The American College of
20   Epidemiology.  I've been a practicing epidemiologist for
21   some 40-plus years.  I've taught epidemiologic theory in
22   practice at the elementary, intermediate, and advanced
23   level to generations of MPH and PhD epidemiologists,
24   post-docs, junior faculty.
25              I have a very well-established reputation in

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Page 14

1  epidemiology.  My training in epidemiology starts with my

2  medical school training, which, aside from including one

3  course on epidemiology for medical students, involved

4  substantial training in infectious diseases, immunology,

5  biochemistry, molecular biology, cell biology, and so on.

6  Infectious diseases and their diagnosis and treatment is

7  probably a quarter of the curriculum in medical school.

8  When I was there, I covered an entire thousand-plus-page

9  textbook on microbiology as part of that training.

10        For my PhD work after medical school, I got --

11 my PhD was in mathematical modeling of infectious

12 epidemics.  I published on that in medical literature.

13 And as part of my postdoctoral fellowship in epidemiology

14 at the University of Washington, I sat in on coursework,

15 like auditing, just not formal.  I sat in on coursework on

16 infectious and chronic disease epidemiology,

17 biostatistics, and et cetera.

18      Q.  And what -- prior to the pandemic, in your

19 professional career, what work did you do that related to

20 assessing the risks of infection in a workplace?

21      A.  So I'm an epidemiologist.  I'm not an industrial

22 hygienist, so my job isn't to go in and look at individual

23 jobs and the flows of infectious agents and surfaces and

24 air and all of those kinds of things that industrial

25 hygienists do.  My job is to evaluate the numbers of

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.        Harvey Risch, MD, PhD

Page 15

1   individuals who are affected by risks and what their

2   average population or specific circumstance risk is with

3   respect to infection transmission risks.  And so this

4   might -- you might think of as more of a supra --

5   s-u-p-r-a -- kind of view of workplace risks, and that's

6   what I'm referring to here.

7       Q.   And in this supra view of workplace risks, is

8   that something that can only be done after the fact

9   looking at data from a particular workplace about what

10  happened?

11      A.   Well, during the occurrence of a pandemic that

12  we experienced, there was a long period where there was no

13  after the fact.  It was a continuing circumstance where

14  the pandemic was continuing for months and years, and so

15  what happened in one month, the next month is after the

16  fact of that month, but it's also a month for its new

17  occurrences and so on.  And so this was a continuing

18  evolution of understanding of what was going on and how we

19  thought about it.

20      Q.   So back to my previous question.  Prior to the

21  pandemic, what work had you done that involved assessing

22  the risks of infection in a workplace?

23      A.   I did studies that looked at workplace exposures

24  as part of -- so the body of my career has been in looking

25  at risk factors and etiologies of different kinds of

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.        Harvey Risch, MD, PhD

Page 16

1    cancers, and those cancers as outcomes are only half of

2    the research agenda.  The other half is understanding the

3    exposures that cause those outcomes.  And so I've studied

4    in substantial depth exposures to various chemicals, to

5    foods, and food constituents, to workplace exposures, more

6    I would say of the noninfectious sort like toxic chemicals

7    in the workplace.  And I studied infectious exposures,

8    mostly bacterial exposures, some viral, in the causation

9    of pancreatic cancer, liver cancer, and maybe some others,

10   esophageal cancer, stomach cancer.

11            And so I would say that, again, I'm not

12   addressing industrial hygienist levels of exposure risks

13   in workplaces.  I'm addressing the quantitative risks of

14   infection occurrence in workplaces as an epidemiologist.

15        Q.   Prior to the pandemic, what experience did you

16   have addressing the quantitative risk of infection in a

17   workplace as an epidemiologist that was not related to

18   cancer?

19        A.   Hmm, I'd have to think of that.  Most of it was

20   related to cancer as an outcome, but as I've said, in

21   order to understand cancer etiologies, you have to

22   understand the exposures, and so the scientific knowledge

23   base about those exposures is half of the literature and

24   body of science that has to be understood.  So

25   specifically speaking, at the level you're speaking about,

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

1  no, I have not -- I did not do any intermittent workplace

2  evaluations.

3      Q.    Prior to the pandemic, did you claim to be an

4  expert in any particular infectious disease?

5      A.    Not specifically.

6      Q.    Do you now claim to be an expert in any

7  particular infectious disease?

8      A.    Well, I would say that expertise is a continuum.

9  And to the degree that I've spent the last four years

10 largely focused on SARS-CoV-2 and the COVID pandemic, and

11 reading many hundreds of papers and thinking about the

12 pandemic, refreshing my original education and PhD and

13 mathematical modeling of infectious epidemics and so on, I

14 would say that I've gained substantial expertise in the

15 COVID pandemic.

16     Q.    Do you claim to be an expert in how to treat

17 patients with COVID?

18     A.    No, that's -- those are clinical issues.  I'm

19 not clinically licensed to practice medicine.

20     Q.    Did you ever do a residency?

21     A.    No.

22     Q.    Did you ever apply to do a residency?

23     A.    No.

24     Q.    Have you ever treated a patient?

25     A.    No.

1    at age 73, I had devoted enough of my time to the

2    scientific research.

3         Q.    Were you pressured to retire in any way?

4         A.    No.

5         Q.    Did you feel encouraged to retire?

6         A.    Not really, no.  I mean, I think my own personal

7    feelings about it were that science is hard.  Getting

8    grant funding is hard and it was a constant pressure to

9    maintain grant funding and had become increasingly more

10   difficult, as I'd experienced in the last few years, the

11   last five years, seven years before I chose to retire, and

12   I said, "I'm just not enjoying these pressures anymore,"

13   and so that formed part of my reason for retiring.

14        Q.    In your job at Yale, did you have an obligation

15   to raise a certain amount of money through grant funding?

16        A.    There were expectations, but it was flexible.

17   The percents of salary funding by grants varied.  It was

18   offset by teaching responsibilities and advising and

19   committee membership and other academic activities.

20        Q.    Is there a process at Yale that a faculty member

21   needs to go through to become an emeritus?

22        A.    In general, it's automatic.  The dean of the

23   school applies for it during the last month of

24   appointment, and it goes to the university corporation,

25   the board of governors as it were, and they generally

Page 22

1    accept the dean's recommendations.  The dean of the

2    medical school, in which -- when I was a full-time faculty

3    member, the school of public health was also a department

4    in the medical school, so the dean of the medical school

5    was the relevant dean, and she put forth that application

6    and it was accepted by the corporation.

7         Q.    Do you know whether there were any negative

8    votes or any negative voices in connection with your

9    emeritus application?

10        A.    I have no information about what the corporation

11   said or did other than they approved it.

12        Q.    So you mentioned you work for Yale about

13   3 percent of your time; is that right?

14        A.    Yes.

15        Q.    What do you do with the rest of your time?

16        A.    Well, I'm enjoying retirement.  As I -- as in

17   this legal case, I've done a few legal cases related to

18   COVID.  I'm also, as I've said, on the chief medical board

19   of The Wellness Company which involves interactions with

20   the business side of the company and with my medical

21   colleagues there.  That takes some amounts of time.

22        Q.    And how much of your time would you say you

23   spend on legal cases related to COVID?

24        A.    Hmm, I don't know.  I'd say 20 percent.

25        Q.    And how much of your time would you say you

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                      Harvey Risch, MD, PhD

Page 53

1      Q.   In your field, is there a particular journal

2  that is considered to be the best?

3      A.   My field is quite broad.  So even in cancer

4  epidemiology, there's multiple cancer journals, let alone

5  epidemiology as a whole so I don't particularly rank the

6  journals anymore.  I've been involved with some very

7  high-quality journals, I would say.  JNCI, Journal of the

8  National Cancer Institute, is a high-quality journal.  The

9  American Journal of Epidemiology is probably a

10  high-quality journal.  Those are scientific journals, not

11  medical journals, per se.  Medical journals is a whole

12  different axis of reasoning because they deal with

13  clinical topics, not just scientific topics.

14      Q.   And during your career as a cancer

15  epidemiologist, did you publish in medical journals or

16  scientific journals or both?

17      A.   Both.  More often scientific journals, but both.

18      Q.   And prior to 2020, your professional career

19  has -- had been as a cancer epidemiologist; is that right?

20      A.   Largely cancer dealing with the outcomes of

21  interests that I had studied.

22      Q.   We've been going for about an hour and a half.

23  Why don't we take a break, 10 or 15 minutes?

24      A.   That's okay with me.

25            MS. PETERSON:  All right.

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 64

1      A.    No.

2      Q.    Why not?

3      A.    Because I don't consider it to be an academic

4  appointment.

5      Q.    Is it typical --

6      A.    Could I --

7      Q.    Go ahead.

8      A.    Just like my lay essays, op-eds, and media are

9  not listed in my CV because I don't consider them academic

10 scholarship either.

11     Q.    So your intent with this CV is only to list what

12 you consider to be academic scholarship and related

13 activities?

14     A.    Yes.

15     Q.    Do you have a different document where you keep

16 track of your other experience?

17     A.    Actually, no.  I probably should, but no.

18     Q.    You mentioned that you have more than 400

19 publications; is that right?

20     A.    Approximately.

21     Q.    And are those all peer-reviewed publications?

22     A.    Almost entirely, I think.

23     Q.    And how many of those relate to COVID or

24 pandemic-related topics of the 400?

25     A.    Four or five maybe.

1      Q.    Four to five papers?

2      A.    Yes.

3      Q.    Do you know whether in 2023 -- and I'm happy to

4  scroll through the list if you'd like.  Do you know

5  whether, in 2023, you had any published papers related to

6  COVID or the pandemic?

7      A.    Well, we're looking at one on the screen right

8  now, the first one.  They are listed for 2023.

9      Q.    Okay.  Other than -- other than this -- and

10 you're looking at the one that said, "Plausibility, not

11 science, has dominated public discussions of the COVID

12 pandemic"?

13     A.    Yes.

14     Q.    And what journal was that published in?

15     A.    The American Journal of Economics and Sociology,

16 I think.

17     Q.    Is that a -- is that a medical journal?

18     A.    It's a scientific journal.

19     Q.    And this -- I see the entry says, "Online ahead

20 of print."  What does that mean?

21     A.    That means the journal has put it up on its

22 public-facing website for people to read after being

23 accepted for publication.

24     Q.    And do you know whether it has, in fact, come

25 out in the published version of the journal?

Page 69

1   didn't have any effect on the opinions you've reached in

2   this case; right?

3       A.   I think that's correct.

4       Q.   In 2023, did you have any other pandemic or

5   COVID-related articles?

6       A.   You mean scientific articles?

7       Q.   Yes.

8       A.   I don't think so.

9       Q.   And I'm happy -- I'm happy to scroll.  Starting

10  here on Page 5 and scrolling down to Page 6, I'll just

11  scroll down so you can take a look at your articles for

12  2023.

13      A.   (Deponent reviews exhibit.)

14      Q.   And we'll move on to Page 7.

15      A.   Okay.  So no others that I can see.

16      Q.   Okay.  So no other COVID or pandemic-related

17  articles in 2023?

18      A.   Through October of that year.  I don't recall

19  whether something else might have come in at the end of

20  the year.

21      Q.   Okay.  Do you recall whether you've had any

22  peer-reviewed publications related to COVID in late 2023

23  to now?

24      A.   I think so.  I'm not the first author or the

25  senior author on those, so I haven't followed them all

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

1  that carefully.  I read them and made comments on them.

2      Q.   So these would be papers where you had some kind

3  of a minor role?

4      A.   Correct.

5      Q.   And as you sit here now, do you recall what they

6  were?

7      A.   There was one by Dr. Peter McCullough who I

8  think was the senior author.

9      Q.   And in what journal was that published?

10     A.   I don't recall.

11     Q.   What was the topic of the article?

12     A.   It was looking at the presence of vaccine

13  components in autopsy samples of people who had died.

14     Q.   And that doesn't have anything to do with your

15  opinions in this case; right?

16     A.   Correct.

17     Q.   Do you recall in 2022 whether you had any

18  articles published related to COVID or the pandemic?

19     A.   I don't think so.  But if you want to go down

20  and look, it would be here.

21     Q.   Sure.  We'll start on Page 7 where I see 2022,

22  and I'll just scroll down for you.

23     A.   Okay.

24        (Deponent reviews exhibit.)

25        So, no, I don't see any.

Page 71

1      Q.   What about in 2021, did you have any published

2  articles related to COVID or the pandemic?

3      A.   I think I did.  Again, if we could scroll down.

4           (Deponent reviews exhibit.)

5           There's one.  There's one, Medical Hypotheses,

6  and the first author is Dr. Paul Alexander.

7      Q.   And so the entry at the bottom of Page 10, the

8  last entry on the page?

9      A.   Yes.

10     Q.   And when that says "Medical Hypotheses," is that

11 the name of the journal?

12     A.   Yes.

13     Q.   Is that a peer-reviewed journal?

14     A.   I believe so.

15     Q.   And what did this -- did this article -- it

16 looks like this article is -- relates to early treatment

17 of COVID; is that right?

18     A.   Yes.

19     Q.   Does this article -- this article related to

20 early treatment, then, doesn't have anything to do with

21 your opinions in this case; right?

22     A.   Correct.

23     Q.   Let's get -- we're continuing on in 2021.

24     A.   There's one of Peter McCullough that's there on

25 the middle of the page.

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

1     Q.    And it looks like that -- what journal is that
2  in?
3     A.    American Journal of Medicine.
4     Q.    Is that a peer-reviewed journal?
5     A.    I believe so.
6     Q.    And it looks like this is another article about
7  early treatment; is that right?
8     A.    Yes.
9     Q.    So that doesn't have anything to do with your
10  opinions in this case?
11     A.    Correct.
12     Q.    Continue scrolling down.  It looks like we've
13  hit the end of 2021.  So it looks like you had -- you had
14  two articles on pandemic-related topics in 2021; is that
15  right?
16     A.    Yes.
17     Q.    And neither of them related to your opinions in
18  this case.
19     A.    Correct.
20     Q.    Now, let's look at 2020.  And there wouldn't be
21  any reason to look for publications related to the
22  pandemic before 2020; right?
23     A.    Correct.
24     Q.    Okay.  So this will be -- this will be the last
25  year we look at.  So for 2020, do you recall any

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Page 76

1   of 2020.  Do you recall whether you had any other COVID

2   papers in 2020?  I'm happy to keep scrolling, if you'd

3   like.

4        A.   I don't think so.

5        Q.   Okay.  Okay.  Now, we've gotten to 2019, and did

6   you see any other COVID papers in 2020?

7        A.   No.

8        Q.   Okay.  So have we -- have we looked at on this

9   résumé all the publications that you recall in

10  peer-reviewed journals related to COVID or the pandemic

11  that you have been an author of?

12       A.   Yes, except for ones in 2024.

13       Q.   And none of those publications relate to your

14  opinions in this case.

15       A.   That would be correct.

16                    (Exhibit No. 2 introduced.)

17       Q.   (By Ms. Peterson) Okay.  I'm showing you what I'd

18  like to have marked as Exhibit 2.  It's a two -- I'm

19  sorry -- it's a 19-page document.

20            Doctor, do you recognize this?

21       A.   Yes.

22       Q.   What is it?

23       A.   This looks to be the report that I submitted for

24  my opinions in this case.

25       Q.   And is this report accurate?

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 92

1   to follow the governor's mandate.  So I don't see the

2   point of even addressing the propriety of the mandate here

3   because the agencies were required, as I understand it, to

4   follow it to the letter of the law anyway.

5         Q.    Then why do you -- why do you start your opinion

6   here talking about the mandate?

7         A.    Well, I think that's background that -- as I've

8   said, I think that had the vaccines been supported by

9   suggestions that people take them, by incentivizing

10  without draconian incentives that people take them, you

11  know, even in the case from 1905, the smallpox Cambridge

12  Jacobson case, the penalty that the court found for not

13  taking the vaccine was in today's dollars about $150.  So

14  incentivizing was not an option in any of this.  It went

15  straight from zero to mandate, and I think that this is

16  part of the background of the case.  That's why I was

17  talking about --

18        Q.    So in your view -- in your opinion, it was a

19  good idea to encourage people to get vaccinated, but a bad

20  idea to force them to do it; is that right?

21        A.    In the first half of 2021, correct.  In the

22  second half of 2021, the vaccines were failing and so that

23  gets tempered to the degree that they had failed in that

24  time period.

25        Q.    And your view that the vaccines were failing in

Page 93

1  the second half of 2021, is that a view that is generally
2  accepted by scientists in the -- in the epidemiological
3  scientific community?
4      A.   As I said, I have not interviewed the
5  representative sample of scientists in the epidemiologic
6  community to know whether they think that or not.
7      Q.   So you don't know whether that view is generally
8  accepted or not among epidemiologists?
9      A.   I'm -- I go on the data that are out there that
10  are as objective as can be obtained and derived and draw
11  conclusions from the data themselves, not on what people
12  think about the data.  You know, Karl Popper, the
13  philosopher of science, famously said that studies about
14  what scientists believe have no relationship to studies of
15  how nature behaves.  You know, science -- scientists have
16  been wrong so many times when science has evolved that
17  questioning what scientists believe is not an effective
18  way of understanding science.  One has to go back to the
19  data and the studies and understand what they found.
20      Q.   Do you know whether your view that the vaccines
21  were failing in the second half of 2021 is generally
22  accepted as accurate within the scientific community?
23      A.   I think I just answered that question.
24      Q.   Is the answer to that:  No, you don't know?
25      A.   No.  The answer is I haven't done a study of

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Page 94

1    scientists to address what they think about it.

2        Q.    Do you know whether your views related to the

3    pandemic are considered outliers?

4        A.    I have no idea.

5        Q.    Have you ever heard from other members of the

6    epidemiological community who are critical of your views?

7        A.    Yes.

8        Q.    And explain to me those circumstances.

9        A.    Well, the dean of the school of public health

10   in 2020, after I had published my opinions and reviews of

11   the evidence for hydroxychloroquine, labeled me as a

12   scientific contrarian.  I don't know if contrarian is

13   negative or positive these days, but that would indicate

14   that he thought my views were novel.

15       Q.    And that's the dean of the School of Public

16   Health at Yale where you were employed?

17       A.    Yes, he's no longer dean.

18       Q.    Is there any other members of your scientific

19   community, that is, epidemiologists, who have come out

20   publicly criticizing your views?

21       A.    Yes.

22       Q.    And who else has criticized your views?

23       A.    People -- some of the other editors on the

24   American Journal of Epidemiology disagreed with my

25   understandings of the work that I did in reviewing the

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 96

1      A.    No.

2      Q.    So no other member of the epidemiological

3   community could review your work and try to replicate it

4   or discredit it; right?

5      A.    Well, so I might have mentioned this, and I'm

6   trying to think of a lay article on Brownstone.  I'm not

7   sure.  I'd have to go look to see whether I mentioned any

8   of this.  I think I did.  I think there's one article in

9   Brownstone Institute where I spoke about the CDC's 2023

10  data, so that's out there.  I've had no criticism about

11  that.  That was not intended to be peer-reviewed, and that

12  reporting data provided by other studies is not research.

13  It's a review of research, and that's a different

14  question.

15     Q.    Have you put your review of the efficacy of

16  vaccines in late 2020 -- in the second half of 2021, have

17  you put that out there publicly so that your peer

18  epidemiologists could review it, try to replicate it, or

19  reach their own conclusions?

20     A.    No to the first half.  Trying to replicate,

21  there's no replication because there's no new data being

22  measured or derived.

23     Q.    And your view that the vaccines should not have

24  been mandated is based on your view that vaccines were not

25  effective in the second half of 2021; is that right?

1　　　A.　　And -- yes.　Not effective enough in --

2　　　Q.　　Not effective enough.

3　　　　　　Did -- in your view, in the second half of 2021,

4　were -- did vaccines have any effectiveness?

5　　　A.　　They might've had some.

6　　　Q.　　And what would that have been?

7　　　A.　　To reduce the risk of infection transmission a

8　little bit.　There was -- there's opposing studies in that

9　time period.　There was a study done of 50,000 healthcare

10　employees at Cleveland Clinic that showed the more -- this

11　is Shrestha, S-h-r-e-s-t-h-a, is the first author,

12　something like that -- that showed that the more doses of

13　vaccines one took, the greater risk of infection.　So that

14　would be negative efficacy, however, that's only one study

15　among numbers of studies.　So there was clear evidence

16　that the vaccines weren't doing what they promised of

17　reducing transmission, and, you know, an almost complete

18　way is 95 percent effective, which is what we were

19　promised by the original randomized trials early on in

20　late 2020, early 2021.

21　　　　　　So in that -- and so the second question about

22　mandates that we haven't addressed yet is what's the

23　rationale for a mandate if everybody could choose to take

24　the vaccine anyway?　The CDC at the time said that the

25　only contradictions -- contraindications to getting

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.          Harvey Risch, MD, PhD

Page 98

1   vaccinated were getting a severe immune reaction called
2   anaphylaxis, and the risk of that was estimated in the
3   paper by Blumenthal in that period to be about one person
4   in 100,000, which means, according to those data, that
5   99,999 people out of 100,000 could've chosen to take the
6   vaccines without a contraindication according to CDC.
7            And so the question is why does somebody have to
8   be mandated to prevent the spread of the infection when
9   everybody else -- virtually everybody else in the
10  population could choose to be -- to take the vaccines to
11  protect themselves if they so chose?
12       Q.   And if that's what you believe is the relevant
13  question, how does an epidemiologist scientifically answer
14  that question?
15       A.   That's not exactly a scientific question.  The
16  question, it bears on epidemiologic scientific data, but
17  that's a values question that's not for me to make.  I'm
18  only posing this as a question.
19       Q.   So you agree that that's not part of your
20  expertise as an epidemiologist to answer that question.
21       A.   The moral question is not a scientific question.
22       Q.   What is the scientific question you believe you
23  were asked to answer in this case?
24       A.   The scientific question is were -- is there
25  accommodations that could have been offered to plaintiffs

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 121

1      If you add 36 to 81, doesn't that lead to a

2    45 percent increase in the number of employees who

3    theoretically would get COVID?

4          A.    Yeah.  But if you add 81 to 36, you get, you

5    know, a 200 percent increase.

6          Q.    And as an epidemiologist, do you have a

7    scientific view about whether it is reasonable for an

8    employer to want to reduce the risk of COVID in its

9    workplace?

10         A.    As I said, this was a risk-benefit equation that

11   needed to be done, and my point in this is that the

12   employer tolerated those estimated 81 infections without

13   policy changes.

14         And you're asking should the employer have

15   tolerated in addition another 36, and I'm saying they

16   tolerated 81.  Why would they put the onus on 36 when

17   they've already tolerated 81?

18         Q.    And is there an epidemiological formula or

19   standard that epidemiologists in your field rely on when

20   making this sort of what you've called a cost-benefit

21   analysis?

22         A.    I think I've explained it pretty well here of

23   comparing the number of estimated infections in one side

24   of the policy versus a number on the other side of the

25   policy.

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Page 122

1    Q.    Is there -- is there, within your scientific

2    field, an established percentage of infections that is too

3    high?

4    A.    No.

5    Q.    Is there an established percentage of infections

6    that is considered to be okay scientifically?

7    A.    No.

8    Q.    That's not a question that you can answer as an

9    epidemiologist; right?

10   A.    Correct.  That's a value adjustment, not a

11   scientific question.

12   Q.    I've gone back to Page 3, and there's a chart

13   here that says "US (studywide) trends in COVID-19

14   seroprevalence."  Do you see that?

15   A.    Yes.

16   Q.    Why did you include this chart?

17   A.    This was the basis of my assertion that, by the

18   end of 2023, it was empirical that almost everybody in the

19   US population had had COVID.

20   Q.    And why include a chart showing how things stood

21   at the end of 2023 instead of how things stood in August

22   to October of 2021?

23   A.    Well, I included that chart too further down,

24   but the point -- this was the background section where I

25   spoke about that I predicted from obvious epidemiologic

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                                    Harvey Risch, MD, PhD

Page 137

1    vaccine efficacy.

2         Q.   And as an epidemiologist, do you think it is

3    reasonable for an employer in the later half of 2021 when

4    infection levels were rising to want to take action to

5    protect its employees and the public?

6         A.   As long as it's done proportionately in good

7    policy.

8         Q.   And whether something is good policy isn't your

9    specialty; correct?

10        A.   Well, I -- my specialty is proportionally.

11   That's what we've been talking about in these calculations

12   here.

13        Q.   And your view of whether something is

14   proportionally appropriate in this case is based on

15   comparing the number of estimated breakthrough infections

16   with the number of people who requested an exemption from

17   vaccination; is that right?

18        A.   Yes.

19        Q.   And if that number of people who requested

20   exemption from vaccination was different than the 36

21   people you predicted here, you would want to reevaluate

22   that opinion, wouldn't you?

23        A.   Well, number one, that's hypothetical and

24   speculative, but, number two, it would have to have been

25   substantially larger in order to compete numerically with

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 144

1      Q.    But you don't know whether any of these

2    plaintiffs were engaged in either type of activity; right?

3      A.    Well, I know some were; some were workers in the

4    field.

5      Q.    Which ones?

6      A.    Well, I don't remember that.  I read the

7    complaint and it spoke to some of that, I believe.

8      Q.    And you assume that what the complaint said was

9    accurate?

10     A.    I had no reason to discount any of that

11   material.  But overriding all of this is I express no

12   expertise in industrial hygiene and the evaluation of

13   risks in workplaces on the basis of hygiene-type

14   measurements.  That's not part of my expertise in public

15   health, and so there was no reason for me to consider any

16   of this.

17     Q.    So you're -- so you're not making any --

18   expressing any opinions about whether masking or social

19   distancing would've been effective in a particular

20   workplace or not?

21     A.    I have opinions about that based on evidence

22   from -- that I have read throughout the pandemic and that

23   they were not effective, but that we didn't know that to

24   the degree of certainty we know now.  We didn't know that

25   in the period of 2021, say.

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Page 182

1    affects your opinions in this case?

2         A.   I don't think so.  It was limited to systems of

3    adverse events that have been documented empirically

4    and/or in theory to some of the different kinds of

5    outcomes like cancer.

6         Q.   You mentioned -- oh, I'm sorry.  Go ahead.

7         A.   And so this -- that's part of a totally

8    different discussion on each individual's reasoning about

9    getting the vaccine or not.  There was a benefit equation

10   from that.

11        Q.   You mentioned chapters in books.  Do you have

12   any chapters in books that relate to your opinions in this

13   case?

14        A.   I have a chapter in a book that relates to COVID

15   and the vaccines.  I think the book was Canary in a COVID

16   Mind, or something like that, a chapter, and there was two

17   volumes of that.  My chapter was in the first one, and

18   that got translated into French surprisingly and -- no,

19   it's something else that got translated into French, but

20   that's out there in the international market and that's

21   also not related to the reasoning and opinions in this

22   case.

23        Q.   And what about your work for The Wellness

24   Company, is that -- does that have any connection to your

25   opinions in this case?

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.          Harvey Risch, MD, PhD

Page 183

1      A.    No.   The -- my involvement in The Wellness
2   Company was initially to create a forum for telemedicine
3   where patients could go and obtain standard-of-care early
4   treatment for COVID infections, primary care.   That
5   amplified into providing various supplements and other
6   things, but my interest was in the telemedicine side of
7   things.   So that was -- that's a totally different axis
8   than my reasoning in this case.
9      Q.    But in the well -- for The Wellness Company, you
10   recommend products; right?
11      A.    I have recommended with various degrees of
12   certainty about the efficiencies, the utility of products,
13   a few of the many products that they list.   I don't
14   advocate for all of them by any means.
15      Q.    And you recommend one called the spike booster
16   or something like that?
17      A.    Spike Support.
18      Q.    Spike Support?
19      A.    Yes.
20      Q.    What is that product?
21      A.    It's a product that involves nattokinase and
22   some other natural derived ingredients that are understood
23   biochemically to help disassemble spike protein in the
24   blood.   Its main use is for long COVID, to reduce symptoms
25   of long COVID.

Page 184

1      Q.   And is this something that's been FDA-approved?

2      A.   No, but, again, it's not asserting that it could

3   be used for treatment.  It's being listed as a supplement.

4   We have some degree of evidence that it works in the

5   clinical experience, so Dr. McCullough and others have

6   been using it.  I don't have that clinical experience so I

7   don't advocate on that basis.  There are some theoretical

8   papers about some of the ingredients and laboratory work

9   suggesting it would be useful and other evidence that the

10  nattokinase and other things do get absorbed into the

11  bloodstream to do what we think they do.  This is kind of

12  new and ongoing and empirical, and that's where we are

13  with things.

14     Q.   And have you performed any research to determine

15  whether this is safe before recommending it to people?

16     A.   Well, me, myself, no, but all of the ingredients

17  are recognized as safe as supplements go.

18     Q.   Have you performed -- have you performed any

19  research to know whether the compilation that your company

20  has created is safe?

21     A.   I, myself, have not.

22     Q.   Are you aware of whether the company has?

23     A.   No.

24     Q.   Is that important to you before you recommend a

25  product?

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.

Harvey Risch, MD, PhD

Page 185

1    A.    Yes.   Yeah.   We're very careful about gathering
2  the clinical information of people who use this, who
3  report to us.
4    Q.    And by gathering the clinical information, do
5  you mean anecdotal information from doctors who recommend
6  it to their patients?
7    A.    Well, I object to use of the term anecdotal.
8  Anecdotal means one or two people.  If you collect a case
9  series of individuals, that's not anecdotal.   That's a
10  case series.
11    Q.    And is The Wellness Company doing that,
12  collecting a case series for all the people that use the
13  product?
14    A.    No.  But for people like Dr. McCullough who uses
15  it in his clinical practice, in his cardiology practice,
16  who has been keeping records of that, there is some
17  growing body of knowledge about it.
18    Q.    Do you also recommend Spike Support Gummies for
19  children?
20    A.    I have not advocated for that product.
21    Q.    Why not?
22    A.    Because I have -- I don't have access to
23  convincing evidence one way or the other about it.
24    Q.    What's the difference between the evidence that
25  you have for Spike Support for adults versus Spike Support

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.                    Harvey Risch, MD, PhD

Page 186

1    for children?

2        A.    Children are not small adults, and the evidence

3    in adults is not necessarily extrapolatable to children.

4        Q.    When you do your work as an epidemiologist, do

5    you wear a lab coat?

6        A.    No.

7        Q.    Have you ever?

8        A.    In medical school.

9        Q.    Since medical school, have you ever worn a lab

10   coat?

11       A.    On rare occasions when I go into my lab.  I'm

12   not the main lab person in my lab that I had at Yale.  So

13   in that circumstance, yes; but other than that, no.

14       Q.    When you do your work as an epidemiologist, what

15   does that physically look like?  Is that you sitting at a

16   computer, you know, looking at spreadsheets and things, or

17   what physically does it look like when you're doing your

18   work?

19       A.    Well, work has changed in 40 years.  More

20   recently, it is a lot of computer work.  It used to be

21   going to the library and reading a lot before all of our

22   information technology changed.  It involves hiring people

23   to carry out field studies, defining the methods to be

24   used for performing the field studies and monitoring all

25   of that, writing documents for, you know, informed

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.          Harvey Risch, MD, PhD

Page 259

1     A.    Not necessarily.  I -- you're asking me to do a

2    calculation in my head that I can't do right now.

3     Q.    Because you haven't done that calculation in

4    connection with your opinions in this case.

5     A.    That is correct.

6     Q.    And you have not done any research in connection

7    with your opinions in this case related to other potential

8    methods of accommodation like masking or social distancing

9    or some of the other things Mr. McGlothin mentioned to

10   you; correct?

11     A.   I did not entertain those because those are

12   policy issues that did not -- I did not feel were in the

13   purview of what -- the science that I was evaluating.

14     Q.    And you do not know what the individual

15   plaintiffs' job responsibilities were in this case;

16   correct?

17     A.    Correct.

18     Q.    And you do not know whether the employer felt

19   those responsibilities could be effectively carried out on

20   an ongoing basis remotely or not, do you?

21     A.    Well, if I recall correctly, the complaint to

22   the degree that I accepted what's in the complaint, as

23   you've mentioned many times, said that they were required

24   to come in for meetings with supervisors.  The implication

25   there that that was the only or main reason why they had

5f92afd5-45ed-48cb-94ee-fe7ec8279cf5

Shirley, et al. v. Washington State Department of Fish and Wildlife, et al.    Harvey Risch, MD, PhD

Page 268

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON )
                         ) ss
4    COUNTY OF CLARK     )

5

6          I, Nicole A. Bulldis, RPR, a Certified Court
     Reporter, do hereby certify under the laws of the State of
7    Washington:

8          That the foregoing deposition upon oral
     examination of Harvey Risch, MD, PhD, was taken
9    stenographically by me, via Zoom, on January 29, 2025, and
     transcribed under my direction;

10
           That the witness was duly sworn by me to testify
11   truthfully, and that the transcript of the deposition is
     full, true, and correct to the best of my ability;
12
           That I am not a relative, employee, or counsel of
13   any party to this action or relative or employee of such
     counsel, and that I am not financially interested in the
14   said action or the outcome thereof.

15

16         Reading and signing was requested pursuant to FRCP
     Rule 30(e).

17

18         IN WITNESS WHEREOF, I have hereunto set my hand

19   this 11th day of February 2025.

20

21

22         _____
           Nicole A. Bulldis, RPR
23         WA CCR No. 3384

24

25