1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                              AT TACOMA

10

11   RUTHANNA SHIRLEY et al.,                 CASE NO. 3:23-cv-05077-DGE

                         Plaintiff,           ORDER ON CROSS MOTIONS
12        v.                                  FOR SUMMARY JUDGMENT
                                              (DKT. NOS. 69, 75)
13   WASHINGTON STATE DEPARTMENT
     OF FISH AND WILDLIFE et al.,
14

15                       Defendant.

16
                          I       INTRODUCTION
17
            This matter comes before the Court on cross motions for summary judgment (Dkt. Nos.
18
     69, 75).  For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 69) is
19
     GRANTED IN PART and DENIED IN PART.  Plaintiff's motion (Dkt. No. 75) is DENIED.
20
                          II      BACKGROUND
21
     A.  Factual Background
22
            On February 29, 2020, Washington Governor Jay Inslee declared a State of Emergency in
23
     Washington in response to the deadly COVID-19 outbreak.  (Dkt. No. 68-1 at 2).  He issued
24

Proclamation 20-05, which imposed a "stay-home" order across the state and prohibited social, recreational, and religious gatherings. (*Id*. at 2.) Eighteen months later, Governor Inslee issued Proclamation 21-14 ("the Proclamation"), which required state employees to be fully vaccinated by October 18, 2021, to continue employment with the state. At that point, more than 346 million doses of the Food and Drug Administration ("FDA") approved COVID-19 vaccine has been administered in the United States and the medical community agreed that serious side effects were rare. (*Id*. at 3.) Because "COVID-19 vaccines are effective in reducing infection and serious disease," the Proclamation concluded that "widespread vaccination is the primary means we have as a state to protect everyone." (*Id*.) However, the Proclamation carved out an exception to the vaccination requirement for employees who were entitled to disability related accommodations or accommodations related to a sincerely held religious belief under relevant anti-discrimination laws, including Title VII and the WLAD. (*Id*. at 4.) This litigation concerns a number of Plaintiffs who requested religious accommodations from WDFW.

      1. <u>Ruthana Shirley</u>

Plaintiff Shirley is a "devout Christian" who works as a fish and wildlife biologist at the WDFW. (Dkt. No. 85 at 5.) Shirley states that: "God made it clear I needed to file for a religious exemption to protect my body which is His, so it was then that I sent my supervisor [an] email inquiring how to submit for a religious accommodation." (*Id*. at 7.) On September 3, 2021, a human resources employee at WDFW, Joceile Moore, conducted an interview with Shirley about her request for an exemption. (Dkt. No. 85 at 17.) Moore documented that Shirley identified as a Christian, considered her body to be a holy temple, and had never received a vaccine from a healthcare provider as an adult. (*Id*.) Moore then emailed Shirley's supervisor and requested that he confirm whether Shirley would be able to: 1) perform the essential

functions of her job while teleworking or while wearing a mask at all times and 2) perform the essential functions of her work while maintaining a social distance of six feet at all times from all other people. (*Id*. at 20.) Shirley's supervisor agreed to these accommodations. (*Id*.) Shirley then received a notice from Kelly Cunningham, the program director at WDFW, informing her that her accommodation request had been granted and that noncompliance would subject her to disciplinary action. (*Id*. at 22.)

However, on September 30, 2021, WDFW rescinded Shirley's accommodation (Dkt. No. 85 at 11) along with the accommodations of numerous other individuals. (Dkt. No. 88-4 at 3.) The agency had determined that supervisors needed to be vaccinated, due to their interactions with others. Shirley received a letter stating that "no reasonable accommodation" could be found for her position because her job "must at times be done in the physical presence of others." (Dkt. No. 85 at 11.) The letter stated that reassignment might be a possibility. (*Id*.) Shirley reached out to her supervisors at the agency to inquire about why their position had changed but was not able to gain information beyond learning about the position on supervisors. (*Id*. at 162.) Shirley then applied for reassignment and was informed there was no position she could be reassigned to within the agency. (*Id*. at 24.) Shirley was then terminated. (*Id*.)

Shirley proceeded to file a grievance through her union, the Washington Association of Fish and Wildlife Professionals ("WAFWP"). The arbitrator concluded that WDWF had not made a good faith effort to find a reasonable accommodation for her and, accordingly, that it had violated the Proclamation by terminating her. (*Id*. at 67.) The arbitral award reinstated her to the position she held prior to her termination and ordered WDWF to provide backpay. (*Id*.) It further ordered that WDWF must "reasonably accommodate" Shirley. (*Id*.) Shirley returned to work on January 2, 2023. (*Id*. at 3.)

1

2.  <u>Jonathan Hone</u>

2

Plaintiff Hone began as a fish biologist at WDFW in February of 2001. (Dkt. No. 82 at

3

1.)  Hone's "sincerely held religious beliefs prevented [him] from getting the Covid 19 vaccine

4

because it is [his] duty to protect [his] body as a temple of God." (*Id*. at 2.)  Like Shirley, Hone

5

applied for a religious exemption and sat for an interview with Moore. (*Id*. at 16.)  He informed

6

Moore that he was a devout Christian and had never received a vaccine as an adult. (*Id*.)  He

7

informed Moore that his work allowed for him to work from home for half the year and to

8

supervise employees "outdoors at the station" and "at boat ramps spread out over a large area"

9

for the other six months of the year. (*Id*.)  Hone's accommodation was granted by his supervisor,

10

who wrote in an email that he "believe[d] in the absolute sincerity of John's request and can

11

confirm that this request is fully consistent with John's words and actions over the past 20+ years

12

that I have been his direct supervisor." (*Id*. at 10).  On September 30, 2021, Hone received

13

communication from Cunningham informing him that although his religious exemption had been

14

approved, WDFW was "unable to identify a reasonable accommodation" for him because his

15

position "must at times be done in the physical presence of others." (*Id*.)  Although Hone

16

requested reassignment, WDWF informed him that there were no qualifying positions within the

17

agency to which he could be reassigned. (*Id*. at 19.)  On November 30, 2021, Hone was

18

terminated. (*Id*.)

19

Hone proceeded to file a grievance through WAFWP.  The arbitrator concluded that

20

WDWF had not conducted an individualized assessment of whether they could reasonably

21

accommodate Hone and therefore that it had violated the Proclamation by terminating him.

22

(Dkt. No. 26 at 114.)  The arbitral award reinstated him and ordered that he be "made whole for

23

lost wages and benefits, including seniority." (*Id.* at 114–115).

24

3. <u>Additional Plaintiffs</u>

Plaintiffs Charles Frady (Dkt. No. 81 at 1), Drew DeLozier (Dkt. No. 80 at 1), Issac Stutes (Dkt. No. 86 at 1–2), Julia Anderson (Dkt. No. 78 at 1), Linda Lopez (Dkt. No. 84 at 1), Paul Cherry (Dkt. No. 79 at 1), Samuel Kolb (Dkt. No. 83 at 1), Stephen Anderson (Dkt. No. 76 at 1), Trenton DeBoer (Dkt. No. 77 at 1), and Donald Allen (Dkt. No. 115 at 1) all requested religious accommodations; were found to have sincere religious beliefs; were informed that they could not be accommodated; and were told that they could request reassignment.  Frady missed the deadline for requesting reassignment (Dkt. No. 70-1 at 142) as did Cherry (Dkt. No. 70-1 at 88–89.)  Allen did not seek reassignment.  (Dkt. No. 115 at 1) ("I was not comfortable, nor was I able to articulate my faith in a way that would allow me the ability to move to an accommodation stage.").  Likewise, Lopez did not seek reassignment (Dkt. No. 71 at 2); Stephen Anderson did not submit a resume for reassignment (Dkt. No. 70-1 at 76); and DeBoer withdrew from the reassignment process (Dkt. No. 71 at 2–3).  Stutes participated in the process and was offered a job at 50% of his salary; because the pay cut was not feasible, he sought alternative employment. (Dkt. No. 70 at 217.)

**B. Procedural Background**

Plaintiffs filed their amended Complaint on May 28, 2024.  (Dkt. No. 26.)  Because this litigation involves more than ten plaintiffs, the Parties stipulated, and the Court ordered, that the Parties could each file two contemporaneous dispositive motions, one dealing with arguments common to all plaintiffs and one asserting arguments applicable only to individual plaintiffs. (*See* Dkt. No. 60.)  This order takes up the cross motions on the claims of individual plaintiffs. Specifically, Defendants move to dismiss Plaintiffs' eighth and eleventh claims—failure to accommodate under the WLAD and religious discrimination under Title VII—on summary

1    judgment.  (Dkt. No. 69 at 4.)  Defendants also seek summary judgment on the question of

2    whether prior arbitral decisions involving Plaintiffs Shirley and Hone have a preclusive effect in

3    this litigation.  (*Id.*)  Plaintiffs Shirley and Hone cross move for summary judgment on their

4    WLAD claim and "to establish that issue preclusion attaches to the findings of the Arbitrators in

5    the union grievance arbitrations brought against WDFW on behalf of Moving Plaintiffs."  (Dkt.

6    No. 75 at 2.)

7                    **III      LEGAL STANDARD**

8            Summary judgment is proper only if the pleadings, the discovery and disclosure materials

9    on file, and any affidavits show that there is no genuine issue as to any material fact and that the

10   movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

11   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

12   showing on an essential element of a claim in the case on which the nonmoving party has the

13   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

14   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

15   for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

16   (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

17   metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a

18   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

19   requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

20   *Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

21   *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

22           The determination of the existence of a material fact is often a close question.  The court

23   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

24

e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## IV    DISCUSSION

### A. Legal Background: Title VII and the WLAD

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" that individual's religion. 42 U.S.C. § 2000e-2(a)(1). An employer must "reasonably accommodate" an employee's religious practice unless such accommodation would impose "undue hardship on the conduct of the employer's business." *Id*. § 2000e(j). Likewise, "under the WLAD, employers may not refuse to hire, discharge, bar from employment, or discriminate against in compensation or other terms of employment any person because of their religion." *Strandquist v. Washington State Dep't of Soc. & Health Servs*., No. 3:23-CV-05071-TMC, 2024 WL 4645146, *9 (W.D. Wash. Oct. 31, 2024) (citing Wash. Rev. Code § 49.60.180); *see also Kumar v. Gate Gourmet, Inc*., 325 P.3d 193, 203 (Wash. 2014) (en banc). The WLAD also "creates a cause of action for failure to reasonably accommodate an employee's religious practices." *Kumar*, 325 P.3d at 203. "To sustain a WLAD failure-to-accommodate claim, [a plaintiff] must put forward evidence

1    supporting substantially the same elements as a Title VII failure-to-accommodate claim."

2    *Strandquist,* 2024 WL 4645146, at *9.

3           To allege a prima facie case of religious discrimination under Title VII, a plaintiff must

4    plead that "(1) a bona fide religious belief of the employee conflicted with an employment

5    policy; (2) the employee informed the employer of the conflict; and (3) the employee was

6    penalized in some way because of the conflict."  *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859

7    F.2d 610, 614 (9th Cir. 1988).  "Once an employee establishes a prima facie case of failure to

8    accommodate religion, the burden shifts to the employer to show 'either that it initiated good

9    faith efforts to accommodate reasonably the employee's religious practices or that it could not

10   reasonably accommodate the employee without undue hardship.'"  *Bolden-Hardge v. Off. of Cal.*

11   *State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023) (quoting *Tiano v. Dillard Dep't Stores,*

12   *Inc.*, 139 F.3d 679, 681 (9th Cir. 1998)).

13          **B.  Claim Preclusion and Issue Preclusion**

14          Plaintiffs argue that Shirley and Hone's WLAD and Title VII undue hardship claims

15   "involve the same issue and the same nucleus of facts as the arbitration," and therefore that

16   "[i]ssue preclusion is appropriate."  (Dkt. No. 75 at 23.)  Defendants assert Plaintiffs' arbitration

17   decisions either have "no preclusive effect" or only have preclusive effect as to Plaintiffs'

18   individual Title VII claims and should preclude Shirley and Hone from "recovering more

19   damages" on their Title VII claims.  (*Id*. at 3.)  In other words, Defendants blur the line between

20   issue and claim preclusion, arguing that *if* the Court permits the application of preclusion, it

21   should bar the Title VII claims in their entirety.  (Dkt. No. 154 at 1–2.)

22          As the Supreme Court has described:

23          The preclusive effect of a judgment is defined by claim preclusion and issue preclusion,
             which are collectively referred to as 'res judicata.'  Under the doctrine of claim

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 69, 75) - 8

1

preclusion, a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.  Issue

2

preclusion, in contrast, bars successive litigation of an issue of fact or law actually

3

litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.

4

*Taylor v. Sturgell*, 553 U.S. 880, 392 (2008) (cleaned up).

5

A series of Supreme Court cases specifically consider the circumstances under which a

6

plaintiff's right to pursue a Title VII claim in federal court may be precluded by the plaintiff

7

having previously submitted the claim to arbitration under the terms of a CBA.  *Alexander v.*

8

*Gardner–Denver Company* involved a plaintiff who had submitted a discrimination claim to

9

arbitration under his union's CBA.  *See* 415 U.S. 36 (1974).  He then sought to bring a Title VII

10

claim based on identical facts.  The Court held that, when an arbitrator's authority under a CBA

11

is limited to resolving contractual rights, the arbitrator's decision "[can] not prevent the

12

employee from bringing the Title VII claim in federal court 'regardless of whether certain

13

contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII.'"

14

*14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 262 (2009) (quoting *Gardner-Denver*, 415 U.S. at

15

53–54).  "The purpose and procedures of Title VII indicate that Congress intended federal courts

16

to exercise final responsibility for enforcement of Title VII; deferral to arbitral decisions would

17

be inconsistent with that goal," the *Gardner–Denver* court concluded.  *Gardner-Denver*, 415

18

U.S. at 56.  The Court further emphasized that "the factfinding process in arbitration usually is

19

not equivalent to judicial factufinding," as "[t]he record of the arbitration proceedings is not as

20

complete; the usual rules of evidence do not apply; and rights and procedures common to civil

21

trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are

22

often severely limited or unavailable."  *Id*. at 57–58.  Accordingly, the Court indicated that the

23

findings of the arbitrators could be entered into evidence and weighted as deemed appropriate by

24

1    the district court, but not afforded preclusive effect.  *Id.* at 60.  *Gardner–Denver* squarely

2    controls the application of *claim* preclusion in this matter; Plaintiffs Shirley and Hone are not

3    precluded from bringing their Title VII claims.

4          The Supreme Court subsequently applied the *Gardner-Denver* holding to Fair Labor

5    Standards Act ("FLSA") claims.  *See Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728

6    (1981).  Then, in *McDonald v. City of West Branch, Michigan*, the Court extended *Gardner–*

7    *Denver* and *Barrentine* to § 1983 actions, holding that "a federal court should not afford

8    preclusive effect to an award in an arbitration proceeding brought pursuant to the terms of a

9    collective-bargaining agreement."  466 U.S. 284, 292 (1984).  Tellingly, the *McDonald* court

10   opined that "the doctrines of res judicata *and collateral estoppel* [are] inapplicable in [] § 1983

11   action[s]."  466 U.S. 284, 289 (emphasis added).  The Court once more emphasized that "arbitral

12   factfinding is generally not equivalent to judicial factfinding" and reiterated its earlier position in

13   *Gardner-Denver* that "[t]he policy reasons for rejecting the doctrines of election of remedies and

14   waiver in the context of Title VII are equally applicable to the doctrines of res judicata *and*

15   *collateral estoppel*."  *Id.* at 289 n.8 (quoting *Gardner-Denver,* 415 U.S. at 49 n.10) (emphasis

16   added).

17         Thus, *Gardner-Denver* and its progeny suggest that federal courts should be hesitant to

18   apply collateral estoppel to issues decided by an arbitrator while interpreting a collective

19   bargaining agreement—even if those issues are identical to those upon which a statutory claim is

20   premised.  Indeed, multiple federal courts of appeals have found a strong presumption or rule

21   against the application of collateral estoppel to federal antidiscrimination claims.  *See Nance v.*

22   *Goodyear Tire & Rubber Co.*, 527 F.3d 539, 547–49 (6th Cir. 2008) (interpreting *Gardner–*

23   *Denver* line of cases as forbidding application of collateral estoppel in ADA claims when a

24

1  previous arbitration addressed employee's rights under a CBA); *Coleman v. Donahoe*, 667 F.3d

2  835, 854 (7th Cir. 2012) (courts should not give preclusive effect to arbitration decisions in later

3  federal discrimination claims); *Siddiqua v. New York State Dep't of Health*, 642 F. App'x 68 (2d

4  Cir. 2016) ("*Gardner–Denver* does not apply only to claim preclusion. It also prohibits a court

5  from dismissing [plaintiff's[ FMLA claims by giving preclusive effect to findings of fact made

6  by the Arbitrator[.]"); *Wiedemann v. City of Oklahoma City*, 76 Fed. Appx. 931, 932 (10th Cir.

7  2003).[1]   As the *Nance* court explained: "Arbitration does not carry with it the right to a trial by

8  jury, arbitrators are not generally required to give the reasons for their decisions, the record of

9  arbitral proceedings generally is not as complete as a trial record, judicial review of arbitration

10  decisions is more limited than review of district court proceedings, the Federal Rules of

11  Evidence and of Civil Procedure do not apply, and other rights such as testimony under oath,

12  cross-examination, discovery, and compulsory process are restricted."  *Nance*, 527 F.3d at 549.

13  Accordingly, "[w]hen an employee . . . seeks to vindicate her federal rights to be free from

14  discrimination, we must review all factual issues—including contractual ones—de novo[,]" the

15  court concluded.  *Id.*

16  　　　The Ninth Circuit has confirmed that courts must treat arbitration claims and Title VII

17  claims as "distinct" even when a "Title VII claim arises from the same set of facts as his

18  arbitration claim."  *Aleem v. Gen. Felt Indus., Inc.*, 661 F.2d 135, 137 (9th Cir. 1981).  In the

19  context of considering the effect of a state agency's judicial review of an arbitration decision, the

20  *Aleem* court concluded that "[t]he maintenance of the Title VII action after judicial review of the

21

22  _____

[1] The Fifth Circuit is an outlier and has concluded *Gardner-Denver* and its progeny "counsel
23  against only *claim preclusion*, not issue preclusion," and thus indicated that issue preclusion may
sometimes attach to an arbitrator's fact findings. *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 186–87
24  (5th Cir. 2014) (emphasis in original).

1    arbitration decision [] does not . . . render the second action barred by res judicata" and found

2    that "[c]ollateral estoppel is equally inapplicable[.]"  *Id.*  The court reasoned that because "an

3    arbitrator is confined to interpreting the collective bargaining agreement" and "arbitration

4    procedures are much more informal" than those in federal court, the typical rules of res judicata

5    and collateral estoppel were inappropriate as applied to the Title VII statutory scheme.  *Id.*

6         The Supreme Court carved out a narrow exception to *Gardner-Denver* in a series of cases

7    dealing with the effect of collective bargaining agreements that explicitly *compel* arbitration of

8    statutory claims.  In *Gilmer v. Interstate/Johnson Lane*, the Court found that an employee can

9    waive his or her right to an ADEA judicial remedy in an arbitration agreement. 500 U.S. 20, 23–

10   26 (1991).  This holding was affirmed in *Circuit City Stores, Inc. v. Adams*, which held that an

11   employer may compel arbitration of statutory claims pursuant to an arbitration clause in an

12   employment contract. 532 U.S. 105, 123–124 (2001).  In the most recent decision, *14 Penn*

13   *Plaza LLC v. Pyett*, the Court confirmed that the holding of *Gardner-Denver* does not apply to

14   CBAs where "the collective-bargaining agreement's arbitration provision expressly covers both

15   statutory and contractual discrimination claims."  556 U.S. 247, 264 (2009).  As the Seventh

16   Circuit explained in *Coleman*, *14 Penn Plaza* represents a narrow exception to the rule against

17   the preclusive effect of arbitration decisions in later federal antidiscrimination claims: a court

18   may only apply issue or claim preclusion to such arbitration decisions if the CBA expressly

19   mandated arbitration of statutory claims.  *Coleman*, 667 F.3d at 854.

20        Multiple district courts are in accord with this reading of the Supreme Court caselaw.  As

21   one recently summarized "[t]he weight of the authority supports the proposition that *Gardner-*

22   *Denver* and its progeny is not limited to claim preclusion, but also bars courts from applying

23   issue preclusion to findings made in arbitration pursuant to a CBA, when that CBA does not

24

expressly cover statutory claims." *Bell v. CSX Transportation, Inc.*, 733 F. Supp. 3d 385, 397

(D. Md. 2024); *see also Gautier v. Celanese*, 143 F. Supp. 3d 429, 437 (W.D. Va. 2015) (under

*Gardner-Denver* and its progeny, "the court may not give preclusive effect—either under a

theory of claim preclusion or a theory of issue preclusion—to the arbitration decision");

*Figueroa v. Garland*, Civ. No. 21-7849-GHW, 2022 WL 17539114, at *7 (S.D.N.Y. Dec. 6,

2022) ("Findings made in arbitration pursuant to a 'collective-bargaining agreement [that does]

not cover statutory claims,' however, are not preclusive in later federal-court proceedings for

relief under antidiscrimination statutes") (quoting *Penn Plaza*, 556 U.S. at 247, 129 S.Ct. 1456);

*Ortega*, 2013 WL 12116377, at *14 ("The holding of *Gardner-Denver* applies equally to bar

application of the doctrine of collateral estoppel as it does to bar the doctrine of res judicata.");

*Stephens v. Douglas Cnty. Fire Dist.* No. 2, No. 2:15-CV-115-RMP, 2016 WL 9462336, *3

(E.D. Wash. Sept. 7, 2016) ("the Court declines to give the arbitrator's findings of fact preclusive

effect").

This Court is in accordance: binding caselaw indicates that federal courts should not

afford arbitral decisions preclusive effect unless there is a clause in the CBA that explicitly

mandates arbitration of statutory claims. [2]  Accordingly, the arbitral awards of Shirley and Hone

---

[2] The Ninth Circuit's recent decision in *Hansen v. Musk* does not alter the Court's application of the *Gardner-Denver* line of cases to this litigation. *See* 122 F.4th 1162 (9th Cir. 2024).  In *Hansen*, the court considered whether the confirmed arbitration decisions of claims that were submitted to mandatory arbitration under the Dodd-Frank Wall Street Reform and Consumer Protection Acts (Dodd-Frank Act) could have an issue preclusive effect on claims brought in federal court under Sarbanes-Oxley Act of 2002 ("SOX").  Thus, the court analyzed the narrow question of whether a confirmed arbitration award resolving an arbitrable statutory securities claim could preclude a separate statutory claim made nonarbitrable by statute. The court found that factors that would counsel against applying issue preclusion to the confirmed arbitral awards were not present. *Id.* at 1172–1173.  "Unlike the factors the Court found controlling in *McDonald*, for example, Hansen points to no deficiency in the arbitrator's experience or expertise in adjudicating federal statutory claims," the court explained.  *Id.* at 1173. Likewise,

1  are not afforded preclusive effect in this matter.  Instead, "we must review all factual issues—

2  including contractual ones—de novo."  *Nance*, 527 F.3d at 549.

3          Moreover, even assuming *arguendo* there is not a strong presumption against the

4  application of issue preclusion, the Court concludes that issue preclusion does not apply in this

5  instance.  "Traditional preclusion doctrine holds that an issue resolved by a prior proceeding is

6  precluded from relitigation if "(1) the issue at stake was identical in both proceedings; (2) the

7  issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair

8  opportunity to litigate the issue; and (4) the issue was necessary to decide the merits."  *Hansen*,

9  122 F.4th at 1172 (quoting *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040–44 (9th Cir.

10 2017)).[3] "[I]ssue preclusion is unavailable when a different legal standard applies, even to the

11 same facts." *PharmacyChecker.com LLC v. LegitScript LLC*, 710 F. Supp. 3d 856 (D. Or. 2024);

12 *see also Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1971) (per curiam)

13 ("Issues are not identical if the second action involves the application of a different legal

14 standard, even though the factual setting of both suits is the same."); *Sw. Pet Prods. v. Koch*

15 *Indus.*, 32 F. App'x 213, 215 (9th Cir. 2002) (where a "different rule of law applies," issues not

16 identical).

17

18  _____

19  "Hansen also does not identify any deficiencies in the arbitration procedures themselves," the
    Court noted.  *Id.*  Because Hansen contemplated the preclusive effect of confirmed arbitral
20  adjudications of *federal statutory claims*, its holding does not suggest that the arbitration of
    *contractual* rights under a CBA ought to be afforded similarly issue-preclusive effect in Title VII
    litigation.

21  [3] In determining whether issues are identical, courts in this circuit look to whether there is
22  substantial overlap between the evidence advanced in both proceedings, whether the new
    evidence or argument involves the application of the same rule of law, whether pretrial
23  preparation and discovery related to the matter presented in the first action reasonably be
    expected to have embraced the matter in the second, and how closely the claims in the two
24  proceedings are related.  *Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017).

1     The CBA clearly provides that "a grievance is an allegation by an employee or a group of

2 employees that there has been an act that violates this Agreement which occurred during the term

3 of this Agreement." (Dkt. No. 131-8 at 66.) The "purpose" of the grievance procedure is to

4 "provide for an orderly method of resolving disputes over the provisions of this Agreement."

5 (*Id.*) The CBA *only* provides for arbitration of such "grievances"—it does not mention statutory

6 arbitration. (*See id.*) In the Shirley arbitration, the parties stipulated to the following issue

7 statement: "Was the State of Washington's termination of the grievant appropriate under

8 Governor Inslee's proclamation regarding COVID-19, and if not, what is the appropriate

9 remedy?" (Dkt. No. 85 at 55.) Likewise, in the Hone arbitration, the issue was similarly framed:

10 "Did the State violate the parties' MOU regarding implementation of the COVID-19 vaccine

11 mandate by failing to reasonably accommodate John Hone?" (Dkt. No. 82 at 109.) Thus, the

12 language of the CBA and the framing of the issues indicates that, as in *Gardner-Denver*, the

13 arbitrators were considering *contractual* disputes under the terms of the CBA—not statutory

14 issues. *See Gardner-Denver Co.*, 415 U.S. at 53 ("[T]he arbitrator has authority to resolve only

15 questions of contractual rights, and this authority remains regardless of whether certain

16 contractual rights are similar to, or duplicative of, the substantive rights secured by Title VII.").

17 Indeed, the arbitrator in the Hone dispute specifically described the matter as "arising under the

18 parties' CBA and a specific MOU concerning implementation of Gov. Inslee's vaccine mandate

19 in October 2021." (Dkt. No. 82 at 114.) Defendant's opening statement in the Shirley

20 arbitration likewise specified" "In this grievance, Shirley claims that my client,

21 [WDFW]…violated a memorandum of understanding between[W]DFW and [WAFWP] when it

22 did not provide her with a reasonable accommodation for a religious exemption to a vaccine

23 mandate." (Dkt. No. 155 at 4–5.) In this way, the plain text of the CBA, the issue statements,

24

1    and the statements of the Parties during the proceedings, and the statements of the arbitrators

2    themselves indicate that the arbitrators were tasked with deciding whether a breach of the CBA

3    and MOU had occurred, not statutory claims.

4           In analyzing the disputes, both arbitrators referenced Title VII.  However, neither

5    conducted a complete analysis, and nor can the "legal standard" be said to be the same when the

6    arbitrators' jurisdiction was limited by statute to contract issues and damages.  *See* Wash. Rev.

7    Code § 4.80.030(2)(a).  For example, the words "prima facie case" are not mentioned once in the

8    Hone arbitration; there is no indication of whether the arbitrator found that Hone had a bona fide

9    religious belief.  (Dkt. No. 26 at 99–115.)  *See E.E.O.C.* 859 F.2d at 614.  And although the

10   Hone award references terms like "undue hardship," the decision does not clearly apply the legal

11   standard outlined in binding Ninth Circuit caselaw.  Indeed, there is not a *single* Ninth Circuit

12   decision referenced. (*See* Dkt. No. 26 at 99–115.)  Likewise, the Shirley decision includes no

13   analysis of *why* Shirley established a prima facie case.  (Dkt. No. 85 at 56.)  As the Supreme

14   Court has emphasized, although an arbitrator may "look for guidance from many sources, his

15   award is legitimate only so long as it draws its essence from the collective bargaining

16   agreement."  *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597

17   (1960).  Here, while the arbitrators "look[ed] to Title VII," the arbitral decisions and the case at

18   hand do not hinge on the application of the same legal standard—one is contractual, and one is

19   statutory.  *See Peterson* 451 F.2d at 1292 (9th Cir. 1971).  For this reason, the court finds that

20   the issues are not "identical," and nor were they "actually litigated" in arbitration.  *Hansen*, 122

21   F.4[th] at 1172.

22          For similar reasons, the Court finds that the Shirley and Hone arbitral awards are not

23   entitled to issue preclusion on Plaintiff's WLAD claims.  The Washington legal standard for

24

determining collateral estoppel is quite similar to the federal test.  To establish issue preclusion, a plaintiff must show: "(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied."  *Billings v. Town of Steilacoom*, 408 P.3d 1123, 1131 (Wash. Ct. App. 2017).  If the prior decision was an arbitral award, the court considers three additional factors: whether the arbitrator acted within his or her competence, the differences between the arbitral procedures and court procedures, and public policy considerations.  *Worland v. Kitsap Cnty.*, 546 P.3d 446, 450 (Wash. Ct. App. 2024). Thus, "collateral estoppel may apply to issues resolved in labor arbitrations."  *Id.*  For the reasons identified *supra*, the Court concludes that it does not apply here.  The issues are not identical and there are significant differences between the day long arbitral procedure in question and the proceedings in federal court.  As the Court explained, in the Hone and Shirley arbitrations, rights and procedures common to civil trials—such as discovery, rigorous fact-finding, the right to a trial by jury, the rules of evidence—did not apply.

In sum, the arbitral awards of Shirley and Hone do not have preclusive effect on any claims in this litigation.

## C. EEOC and Washington State Tort Claim Procedural Requirements

Title VII "provides that upon dismissing a charge of discrimination, the EEOC must notify the claimant and inform her that she has ninety days to bring a civil action." *Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1121 (9th Cir. 2007) (citing 42 U.S.C. § 2000e-5(f)(1)).  "[T]his ninety-day period operates as a limitations period." *Id.* "If a litigant does not file suit within ninety days '[of] the date EEOC dismisses a claim,' then the action is time-

1   barred." *Id*.  Likewise, in Washington, before a plaintiff may sue a government actor, the

2   plaintiff must file a state tort claim for damages.  *See* Wash. Rev. Code § 4.92.100.  The

3   Washington statute provides that "no action subject to the claim filing requirements of RCW

4   4.92.100 shall be commenced against the state, or against any state employee . . . for damages

5   arising out of tortious conduct until sixty calendar days have elapsed after the claim is presented

6   to the office of risk management."  *Id*.  "The filing requirements of RCW 4.92.100 and 4.92.110

7   are mandatory and operate as a condition precedent to recovery."  *Mangaliman v. Wahington*

8   *State DOT*, No. CV11-1591 RSM, 2014 WL 1255342, *4 (W.D. Wash. Mar. 26, 2014).  The

9   Washington Supreme Court has confirmed that the pre-claim notice requirements extend to

10  WLAD claims.  *Id*. (citing *Blair v. Washington State University*, 740 P.2d 1379 (Wash. 1987)).

11  When a party fails to comply with the statutory tort claim requirements under Washington law,

12  "dismissal is appropriate."  *Bearden v. City of Ocean Shores*, 644 F. Supp. 3d 876, 890 n.10

13  (W.D. Wash. 2022); *Mangaliman,* 2014 WL 1255342, at *4.

14          Multiple Plaintiffs claims are time barred by these provisions.  Stutes never filed a claim

15  with the EEOC.  (Dkt. No. 70 at 219).  Accordingly, Stutes' Title VII claim is DISMISSED on

16  summary judgment.  Likewise, Cherry did not file a claim with the EEOC.  (Dkt. No. 70-1 at

17  91).  Accordingly, Cherry's Title VII claim is DISMISSED on summary judgment.  DeLozier

18  received his right to sue letter on September 28, 2022 and was added as a plaintiff in the instant

19  litigation on May 28, 2024.  (Dkt. No. 71-1 at 61.)  Accordingly, DeLozier's Title VII claim is

20  DISMISSED on summary judgment.  Lopez received her right to sue letter on September 22,

21  2022 and was added to the instant litigation on May 28, 2024.  (Dkt. No. 71 at 58.)  Accordingly,

22  Lopez's Title VII claim is DISMISSED on summary judgment.

23

24

1    Kolb did not file a tort claim until after this litigation commenced.  (Dkt. No. 71-1 at 3).

2    Accordingly, his WLAD claim is DISMISSED on summary judgment.

3    **D.  Prima Facie Case**

4    Defendants assert that Plaintiffs Julia Anderson, Stephen Anderson, DeLozier, Frady, and

5    Lopez do not meet the legal standard for demonstrating a sincerely held religious belief.  (Dkt.

6    No. 69 at 27.)  Defendants do not question the sincerity of the other Plaintiffs' religious beliefs;

7    accordingly, those arguments are ceded for the purposes of resolving these motions.  Likewise,

8    Defendants do not dispute that all Plaintiffs informed Defendants about their beliefs by

9    submitting religious exemption requests and were subsequently separated from WDFW.  (*See*

10   Dkt. Nos. 81 at 1, 80 at 1, 86 at 1–2, 78 at 1, 84 at 1, 79 at 1, 83 at 1, 76 at 1, 77 at 1, 115 at 1.)

11   Thus, Defendants only challenge the first element of Julia Anderson's, Stephen Anderson's,

12   DeLozier's, Frady's, and Lopez's prima facie case and do not dispute that the other Plaintiffs

13   have made out a prima facie showing of failure to accommodate religion under Title VII.

14   A religious belief falls within Title VII's definition of religious practice if it is sincerely

15   held and "occupies in the life of its possessor a place parallel to that filled by the God of those

16   [religions] admittedly qualifying for the exemption."  *United States v. Seeger*, 380 U.S. 163, 176

17   (1965); *see also* 29 C.F.R. § 1605.1 ("[T]he Commission will define religious practices to

18   include moral or ethical beliefs as to what is right and wrong which are sincerely held with the

19   strength of traditional religious views.").  Thus, a court's focus in evaluating a religious belief for

20   the purposes of Title VII is to evaluate the role that the belief occupies in the life of the

21   individual, not analyze whether the belief itself is "consistent or rational."  *Keene v. City & Cnty.*

22   *of San Francisco*, No. 22-16567, 2023 WL 3451687, *2 (9th Cir. May 15, 2023); *Doe v. San*

23   *Diego Unified Sch. Dist*., 19 F.4th 1173, 1176 n.3 (9th Cir. 2021) ("We may not and do not

24

1    question the legitimacy of [plaintiff's] religious beliefs."). "This principle does not mean that

2    courts must take plaintiffs' conclusory assertions of violations of their religious beliefs at face

3    value," however.  *Bolden-Hardge v. Office of California State Controller*, 63 F.4th 1215, 1223

4    (9th Cir. 2023).  Accordingly, courts have dismissed claims that rest upon threadbare assertions

5    and recitations of statutory language and those that fail to describe an actual conflict between the

6    religious belief and an employer's vaccine mandate.  *See White v. Columbia Sportswear Co*., No.

7    3:24-CV-00006-SB, 2024 WL 5080032, *8 (D. Or. Oct. 28, 2024) (collecting cases).

8         Defendants put forth Plaintiff's deposition transcripts to argue that "that suspicion about

9    the efficacy and trustworthiness of the vaccines were reasons for their objections."  (*Id*.)  Frady

10   confirmed that part of why he was reticent to take the COVID-19 vaccine was because of how

11   rapidly it was developed, which made him concerned for its safety.  (Dkt. No. 70-1 at 138–140.)

12   He repeatedly cited concerns with putting "chemicals" in his body but was not able to explain

13   why taking a drug like Novocain was consistent with his beliefs while the COVID-19 vaccine

14   was not.  (*Id*.)  Lopez stated that she did not get the vaccine because "it just didn't feel right" and

15   because she is "healthy so [has] no need for it."  (*Id*. at 179.)  Lopez further affirmed that she

16   "just didn't feel like the vaccine, period, was [] safe . . . . [a]nd it was mandated, so something

17   that gets mandated I don't feel like it's something I want."  (*Id*. at 183.)  Julia Anderson was not

18   able to explain why she feels that the polio and rubella vaccines are safe and effective but the

19   COVID-19 vaccine is "unclean." (*Id*. at 47.)  She also testified that her research about the

20   COVID-19 vaccine lead her to conclude that it causes "autism" and "death" (*id*. at 48); and

21   believes that it contains "neurotoxins, hazardous substances, attenuated viruses, animal parts,

22   foreign DNA, albumin from human blood, carcinogens, and chemical wastes."  (Decl at 2.)

23

24

1    Stephen Anderson testified that the COVID-19 vaccine causes "injury and death."  (Dkt. No. 70-

2    1 at 68).

3         In response, Plaintiffs argue that overlap between religious beliefs and secular concerns

4    are permitted under Title VII.  (Dkt. No. 132 at 12.)  Stephen Anderson identifies as a Christian

5    and describes in detail the conflict between his religious beliefs and taking the vaccine (Dkt. No.

6    116 at 1), as do Julia Anderson (Dkt. No. 117 at 2), Lopez (Dkt. No. 125 at 2), Frady (Dkt. No.

7    121 at 2), and DeLozier (Dkt. No. 80 at 2–3, 10–11).  DeLozier testified that he has never taken a

8    vaccine as an adult.  (Dkt. No. 80 at 2.)  All Plaintiff's cite scripture and state clearly how the

9    vaccine requirement conflicted with their faith.  Likewise, Frady indicated during his

10   accommodations process that he has never accepted a vaccine as an adult (Dkt. No. 81 at 43), as

11   did Lopez (Dkt. No 88 at 18).  Plaintiff's further assert that the fact that Defendant's acceptance

12   of Plaintiffs' belief as sincere prevents the re-litigation of the matter.  (*Id*. at 14.)  However,

13   "[t]he fact that [the Department] determined that Plaintiff held a sincerely held religious belief

14   does not establish that Plaintiff has pled, with particularity, that he held 'a bona fide religious

15   belief,' much less one that conflicted with a requirement of [ ] [his] employment."  *Bartholomew*

16   *v. Washington*, 693 F. Supp. 3d 1107, 1113–14 (W.D. Wash. 2023).

17        The Court concludes that the record taken as a whole demonstrates that there exists a

18   triable question of fact regarding the bona fide nature of Frady's, DeLozeir's, Stephen

19   Anderson's, Julia Anderson's and Lopez's religious beliefs.  *See Anderson*, 477 U.S. at 255

20   ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate

21   inferences from the facts are jury functions, not those of a judge, whether he is ruling on a

22   motion for summary judgment or for a directed verdict.").  Drawing all inferences in the light

23   most favorable to the Plaintiffs, the Court finds that although some of the concerns are secular in

24

1    nature and seriously call into question the sincerity of any religious objection to taking a vaccine,

2    a jury could potentially find their accommodation requests were rooted in at least in part in

3    religious objections. (*See* Dkt. Nos. 78, 80, 84, 76, 81, 116, 120, 117, 121, 125.) "The legitimacy

4    of these faith-based concerns are factual and credibility issues for the jury—not the Court."

5    *Piccolo v. Mayo Clinic*, No. CV-22-02007-PHX-DJH, 2025 WL 821773, *8 (D. Ariz. Mar. 13,

6    2025).  At minimum, Plaintiffs have demonstrated overlapping religious and secular objections,

7    which "do not place a requested accommodation outside the scope of Title VII."  *Thompson v.

8    Asante Health Sys.*, 2023 WL 7348812, at *3 (D. Or. Sept. 21, 2023).  "A court generally may

9    not discount a plaintiff's religious belief based on the court's determination that the belief is

10   inconsistent, unreasonable, or at odds with the beliefs of the plaintiff's co-religionists; what

11   matters is whether the position is based on an honest conviction."  *Varkonyi v. United Launch

12   All., LLC*, 2024 WL 1677523, at *3 (C.D. Cal. Feb. 21, 2024) (citing *Thomas v. Rev. Bd. of

13   Indiana Emp. Sec. Div.*, 450 U.S. 707, 715-16 (1981)).

14          In summary, although there is significant evidence suggesting the beliefs of some or all

15   of these Plaintiff's is *not* bona fide, the Court cannot find as a matter of law that no reasonable

16   jury could conclude that their alleged religious objections were sincerely held.

17   **E.  Reasonable Accommodation**

18          Assuming Plaintiffs have established a prima facie case of Title VII failure to

19   accommodate, the burden shifts to Defendants to show that "they initiated good faith efforts to

20   engage in the interactive process or that they could not do so due to undue hardship."  *Dunbar v.

21   Twentieth Century Fox Television*, No. CV 22-1075-DMG (JCX), 2024 WL 2107712, *7 (C.D.

22   Cal. Mar. 8, 2024).  Title VII "directs that any reasonable accommodation by the employer is

23   sufficient to meet its accommodation obligation."  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S.

24

60, 68 (1986).  An employer is not obligated to "accept any accommodation, short of 'undue hardship,' proposed by an employee."  *Am. Postal Workers Union, San Francisco Loc. v. Postmaster Gen.*, 781 F.2d 772, 776 (9th Cir. 1986).  Rather, an employer need only offer an accommodation that would "effectively eliminate" any conflict between the employee's sincerely held religious beliefs and the employer's work requirements while "preserv[ing] the affected employee's employment status."  *Id.* at 776–777; *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 292 (2d Cir.), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021), and *cert. denied sub nom. Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022) ("[A]n employer must offer a *reasonable* accommodation that does not cause the employer an undue hardship. Once 'any reasonable accommodation is provided, the statutory inquiry ends.'").

Additionally, the accommodations process is a two-way street that is premised on "bilateral cooperation" between the employer and employee; each side is required to contribute to efforts to formulate a reasonable accommodation.  *Ansonia Bd. of Educ.*, 479 U.S. at 69 (citation omitted) ("bilateral cooperation is appropriate" in the Title VII interactive process); *E.E.O.C. v. AutoNation USA Corp.*, 52 Fed. App'x 327, 329 (9th Cir. 2002) ("This court has recognized that 'Title VII is premised on bilateral cooperation'") (quoting *Am. Postal Workers Union v. Postmaster Gen.*, 781 F.2d 772, 777 (9th Cir. 1986)). "The employee has a duty to cooperate in the accommodation process."  *Kelly v. Cnty. of Orange*, 101 F. App'x 206, 207 (9th Cir. 2004).  However, for the employer, a meritorious undue hardship defense precludes liability premised on failure to engage in an interactive process.  *McGinn v. Hawaii Symphony Orchestra*, 727 F. Supp. 3d 915, 938 (D. Haw. 2024); *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988) ("[i]f an employer can show that no accommodation was possible without undue hardship, it makes no sense to require that he engage in a futile act.").

1    A number of Plaintiffs did not fully participate in the reassignment process. Frady

2    missed the deadline for requesting reassignment (Dkt. No. 70-1 at 142) as did Cherry (Dkt. No.

3    70-1 at 88–89.) Allen did not seek reassignment. (Dkt. No. 115 at 1) ("I was not comfortable,

4    nor was I able to articulate my faith in a way that would allow me the ability to move to an

5    accommodation stage."). Likewise, Lopez did not seek reassignment (Dkt. No. 71 at 2); Stephen

6    Anderson did not submit a resume for reassignment (Dkt. No. 70-1 at 76) (describing the

7    accommodations process as "a show"); and DeBoer withdrew from the reassignment process

8    (Dkt. No. 71 at 2–3). Defendants assert that "[these] Plaintiffs who failed to participate in the

9    accommodation process cannot state Title VII and WLAD reasonable accommodation claims,

10   and the Court should therefore enter summary judgment for Defendants with respect to those

11   claims." (Dkt. No. 69 at 36.)

12   Based on these facts, the Court cannot find that Frady, Allen, Cherry, Lopez, and DeBoer

13   have stated a failure to accommodate claim under Title VII or the WLAD. *See Kelly* 101 F.

14   App'x at 207; *AutoNation USA Corp.*, 52 F. App'x at 329 (an employee is required to make good

15   faith attempt to satisfy needs through means offered by the employer after employer takes initial

16   step towards accommodating); *Am. Postal Workers Union, San Francisco Loc. v. Postmaster*

17   *Gen.*, 781 F.2d 772, 777 (9th Cir. 1986) ("we [have] specifically recognized the existence of a

18   concomitant duty on the part of an employee to cooperate in reaching an accommodation.").

19   Accordingly, their Title VII and WLAD claims are DISMISSED as a matter of law.

20   Stutes, on the other hand, participated in the reassignment process and was offered a job

21   at approximately 50% of his then-current salary. (Dkt. No. 70 at 213.) Because "he could not

22   afford to live on that salary." he sought alternative employment. (Dkt. No. 131-4 at 4.) "[T]he

23   determination of whether or not the employment status of the affected employee is reasonably

24

1    preserved may be objectively assessed by the trier of fact." *Postmaster Gen.*, 781 F.2d at 777.

2    In a similar case, a court in this district recently concluded that "[a] reasonable jury could find

3    that the transfer . . . was not a reasonable accommodation because the $50,000 reduction in

4    [plaintiff's] annual salary did not reasonably preserve his employment status." *Strandquist*, 2024

5    WL 4645146, at *10.  So too here. Whether Defendant's offered a reasonable accommodation to

6    Stutes cannot be established as a matter of law on the current record and is a fact question that

7    must be put to a jury.

8         It is undisputed that WDWL informed Shirley, Hone, DeLozier, Kolb, and Julia

9    Anderson that there was no reassignment possibility available for them.  Plaintiffs assert that

10   there was no individualized or interactive process undertaken to accommodate them and that the

11   decision not to accommodate them was the result of a sweeping policy. (Dkt. No. 132 at 6.)

12   Defendants do not deny that any employee who held responsibilities that would "put them in

13   contact" with other people were considered impossible to accommodate.  (Dkt. No. 69 at 42–42.)

14   Instead, Defendants argue that no accommodation was possible without undue hardship.  *See*

15   *Townley* 859 F.2d at 615 (9th Cir. 1988).

16   **F.  Undue Hardship**

17        For Defendant's to prevail on their summary judgment motion as to Shirley (Title VII

18   and WLAD claims), Hone (Title VII and WLAD claims), Stutes (WLAD claim), DeLozier

19   (WLAD claim), Kolb (Title VII claim), and Julia Anderson (Title VII and WLAD claims), they

20   must prove as a matter of law that the accommodations proposed and/or previously approved for

21   these Plaintiffs created an undue hardship.

22        To demonstrate "undue hardship," an employer "must show that the burden of granting

23   an accommodation would result in substantial increased costs in relation to the conduct of its

24

particular business." *Groff v. DeJoy*, 600 U.S. 447, 473 (2023).  "Courts consider economic and non-economic costs, including safety and health risks." *Efimoff v. Port of Seattle*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *8 (W.D. Wash. Nov. 13, 2024) (citing *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010).  In conducting the undue hardship analysis, courts must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Groff*, 600 U.S. at 470–471.  If an employer determines a particular accommodation will cause undue hardship, the employer must at least consider alternative accommodations in order to satisfy the Title VII standard.  *Groff*, 600 U.S. at 473 ("[c]onsideration of other options, such as voluntary shift swapping, would also be necessary"); *Conner v. Raver*, No. 22-CV-08867-JST, 2023 WL 5498728, *6 (N.D. Cal. Aug. 24, 2023) (consideration of other options is necessary under Title VII); *Smith v. City of Mesa*, No. CV-21-01012-PHX-DJH, 2023 WL 8373495 (D. Ariz. Dec. 3, 2023) (consideration of alternatives necessary under Title VII.).  "Courts within the Ninth Circuit recognize that it is appropriate to confine the [undue hardship] analysis to the information available to the employer when it made its undue hardship decision." *Efimoff*, No. 2:23-CV-01307-BAT, 2024 WL 4765161, at *9 (collecting cases) (internal quotation marks omitted).  Because Defendants bear the burden of proof to establish undue hardship at trial, to prevail on this defense at summary judgment they must show that "no reasonable trier of fact could find against" them.  *Intelligent Peripheral Devices*, 1998 WL 754606, at *2.

The spread of COVID-19 can create "valid health and safety concerns that can constitute an undue hardship." *Strandquist*, No. 3:23-CV-05071-TMC, 2024 WL 4645146, at *11 (citing *Doe*, 19 F.4th at 1180 (9th Cir. 2021)).  Likewise, "the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an

1    undue hardship analysis." *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D.

2    Cal. 2023).  Nevertheless, "undue hardship is an affirmative defense that requires Defendants to

3    engage in a fact-specific analysis and prove that permitting [Plaintiffs] to work using PPE and

4    testing would not have adequately mitigated safety risks[.]" *Strandquist,* 2024 WL 4645146, at

5    *11 (citing *Beuca v. Washington State Univ*., No. 23-35395, 2024 WL 3450989, at *2 (9th Cir.

6    July 18, 2024) (reversing district court's conclusion that allowing unvaccinated healthcare

7    worker to continue working posed an undue hardship as a matter of law and remanding for "a

8    fact-specific inquiry")).

9           Because there is little to no evidence in the record indicating that Defendant's engaged in

10    an employee-by-employee fact-specific analysis, or that Defendant's considered alternative

11    accommodation options, the Court must conclude that a triable issue of fact remains on

12    Defendant's undue hardship defense.  *Groff*, 600 U.S. at 473; *Beuca,* 2024 WL 3450989, at *2;

13    *c.f. Strandquist,* 2024 WL 4645146, at *11.

14           Hone states that he could perform all of his job functions as a fish biologist remotely or

15    outdoors while wearing PPE, as he had been doing for approximately eighteen months prior to

16    his termination.  (Dkt. No. 122 at 2.)  There was no "discussion or interaction or dialogue with

17    [Hone] or [his] supervisor," about alternative accommodations like working remotely or

18    outdoors and masked at a distance, Hone states.  (*Id*.)  Similarly, Kolb states that "as a field

19    biologist," he would be able to be outside and masked and socially distanced when he had to

20    interact with others. (Dkt. No. 123 at 2).  Kolb experienced "no case-by-case discussion" about

21    how to accommodate a position that already "had a low level of person-to-person interactions."

22    (*Id*. at 2.)  Shirley stated that he supervisor "stated multiple times that my job was easily done

23    working from home" and that "any in person interactions [that] needed to take place" could be

24

1  done outside, with social distancing, and while wearing a mask. (Dkt. No. 127 at 2.)  There was

2  no "interactive dialogue" about these proposed alternatives, Shirley states. (*Id*.)  Stutes states

3  that he "patrolled almost exclusively in remote areas and human contact could easily be limited

4  to socially distant in the open air" and that he would have been willing to wear a "mask and

5  gloves" if he needed to be proximate to others while outside, such as in the event of needing to

6  perform an arrest. (Dkt. No. 128 at 4.)  Stutes similarly describes no "discussion, dialogue,

7  engagement or any 'individualized' approach to finding an accommodation solution." (*Id*. at 3)

8  Anderson asserts that she was able to perform her entire job remotely other than mail processing,

9  for which she proposed a flexible schedule that would prevent her from being in the presence of

10  anybody else. (Dkt. No. 117 at 3.)  DeLozier states that he was "able to perform all essential

11  functions of [his] job 100% remotely except for on-site field work, which I was able to perform

12  alone or masked and staying at least six feet distance from any other person." (Dkt. No. 120 at

13  4). However, DeLozier asserts that "[n]o one discussed any of thse issues with me prior to

14  denying my accommodation and informing me I would be terminated." (*Id*.)

15       In response, Defendants point to the fact that each Plaintiff received an individual

16  interview in connection with their accommodation request. (Dkt. No. 139 at 13.)  However, the

17  record indicates that the Plaintiffs were informed that they *were* entitled to accommodations after

18  these interviews.  There is not an indication, however, that individualized dialogue occurred with

19  the Plaintiffs after the determination that they could not be reassigned was reached. *Groff*, 600

20  U.S. at 473 (consideration of options is necessary); *Beuca,* 2024 WL 3450989, at *2 (fact

21  specific inquiry necessary).  In support of their argument that "the record clearly establishes

22  undue hardship," Defendants state that "Plaintiffs admitted" in their declarations that they held

23  positions that would "put them in direct in-person contact" with other people. (Dkt. No. 139 at

24

17).  Defendants also point to the expert testimony of Dr. Lynch, who explains that working

outdoors does not necessarily reduce the risk of COVID among certain professions: "police

officers have some of the highest recorded times spent outdoors, but also have some of the

highest risks of COVID exposure and infection and COVID-19 was the leading cause of police

officer deaths in 2020, 2021, and 2022," he explains. (Dkt. No. 74-1 at 225.)

While COVID-19 indisputably gave rise to health and safety crises that continued undue

hardship in certain settings, the affirmative defense requires Defendant's to prove that permitting

Plaintiffs to work with accommodations (masks, distancing, outdoors, remote, etc.) "would not

have adequately mitigated safety risks" at WDFW.  *Strandquist,* 2024 WL 4645146, at *11. The

materials submitted by Defendants support the efficacy of the COVID vaccine and show that

"vaccination was and is the single best tool available for stemming the spread of COVID-19 and

its variants."  (Dkt. No. 74-1 at 267.)  However, not utilizing the "single best tool" does not

necessarily constitute undue hardship.  Although Defendant's evidence supports the established

scientific consensus that vaccination is far and away the best tool for combatting COVID-19,

"that is not the same as proving, as a matter of law, that any accommodation allowing an

unvaccinated [WDFW] worker with a religious exemption to keep working posed an undue

hardship." *Strandquist,* 2024 WL 4645146, at *11.

This case is readily distinguishable from those in which defendants produced case

specific evidence of undue hardship in their respective places of work.  In *Lavelle-Hayden v.*

*Legacy Health*, the Defendant—a hospital—provided the court with evidence that COVID-19

transmission was still occurring even with safety measures in place. No. 3:22-CV-01752-IM,

2024 WL 3822712, at *15 (D. Or. Aug. 14, 2024).  The hospital showed that a "higher rate of

vaccination generally coincided with a decrease in COVID-19 case counts at [the hospital's]

facilities" which was important because the relevant patient population included "many [who] were particularly susceptible to severe illness and death due to their age and/or pre-existing medical conditions, or at a heightened risk of infection." *Id*. at 12, 15. Similarly, in *Mohamed v. Full Life Care*, the defendant healthcare facility showed that "periodic testing, masking, or eliminating the in-person component of [plaintiff's] job—would have either failed to adequately protect Defendants from liability for exposing their clients to harm or would have been cost-prohibitive in the context of Defendants' business." *Mohamed v. Full Life Care*, No. C22-1010-KKE, 2024 WL 4371584, *2 (W.D. Wash. Oct. 2, 2024).  Here, Defendants have shown that COVID-19 vaccination was the best way to reduce viral transmission and by far the most effective method of addressing the pandemic.  What they have failed to show, however, is that allowing Plaintiff's their accommodations would have posed an undue hardship within the specific context of the workplace at WDWF during the relevant time period.  They have also not shown how accommodating the Plaintiff's would have proved "cost-prohibitive in the context of Defendants' business." *Mohamed*, 2024 WL 4371584, at *2.  Ultimately, the evidence on the record suggests that Defendant's likely made an across-the-board determination that employees who could not work 100% remotely could not be accommodated.

In sum, viewing the evidence in the light most favorable to Plaintiff's, a reasonably jury could reject Defendants' undue hardship defense.  The issue of undue hardship remains a fact issue for the jury.

## G.  CONCLUSION

Accordingly, Plaintiff's motion for summary judgment (Dkt. No. 75) is DENIED. Defendant's motion for summary judgment (Dkt. No. 67) is GRANTED IN PART and DENIED IN PART:

1    -    Stutes' Title VII claim is DISMISSED;

2    -    Cherry's Title VII claim and WLAD claims are DISMISSED;

3    -    DeLozier's Title VII claim is DISMISSED;

4    -    Lopez's Title VII claim and WLAD claims are DISMISSED;

5    -    Kolb's WLAD claim is DISMISSED;

6    -    Frady's Title VII and WLAD claims are DISMISSED;

7    -    Allen's Title VII and WLAD claims are DISMISSED;

8    -    DeBoer's Title VII and WLAD claims are DISMISSED

9         Shirley's Title VII and WLAD claims, Hones' Title VII and WLAD claims, Stutes'

10   (WLAD claim, DeLozier's WLAD claim, Kolb's Title VII claim, and Julia Anderson's Title VII

11   and WLAD claims remain live for trial

12        Dated this 7th day of May, 2025.

13

14

15                                          David G. Estudillo
                                            United States District Judge

16

17

18

19

20

21

22

23

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 69, 75) - 31